IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE PROCTER & GAMBLE COMPANY and THE GILLETTE COMPANY, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. NO.: _____ |
| SUSAN HARRISON; WILLIAM G. HARRISON III, individually and as a Trustee for the Harrison Family Trust and The Emily Waldrip Trust; CINDY NOSSER; KATHY ALLEN; PAT ALLEN; TINA HARRISON; W.G. HARRISON IV; LARRY LUXENBERG; and JOHN SHELTON, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT
AND BREACH OF STOCK PURCHASE AGREEMENT**

**INTRODUCTION**

1.     This action is brought by Plaintiffs, The Procter & Gamble Company

("Procter & Gamble") and The Gillette Company ("Gillette"), to seek a judgment declaring that:

(1) Gillette, a wholly-owned subsidiary and affiliate of Procter & Gamble, has not breached the

terms of the June 4, 2004 Stock Purchase Agreement among The Gillette Company, Zooth, Inc.,

and the Seller and Option Holder Parties Hereto ("Stock Purchase Agreement" or "Agreement")

(attached as Exhibit A to this Complaint); (2) Procter & Gamble has not tortiously interfered

with Gillette's performance under the terms of the Stock Purchase Agreement; and (3)

Defendants Susan Harrison, William G. Harrison III, individually and as a Trustee for the

Harrison Family Trust and The Emily Waldrip Trust, Cindy Nosser, Kathy Allen, Pat Allen, Tina

Harrison, W.G. Harrison IV, Larry Luxenberg, and John Shelton have breached the Stock

Purchase Agreement by filing a lawsuit on July 2, 2006 against Procter & Gamble in a state court

in Texas, styled <u>Harrison et al. v The Procter & Gamble Company</u>, Cause No. 164, 474-C, 89th

District Court for Wichita County, Texas ("the Texas Lawsuit"; attached as Exhibit B to this

Complaint). On information and belief, Defendants are residents of various counties within the

State of Texas.

<b><u>PARTIES, JURISDICTION, AND VENUE</u></b>

2.     Plaintiff Procter & Gamble is an Ohio corporation with its principal place

of business in Cincinnati, Ohio. Procter & Gamble is a recognized leader in the development,

marketing, and global distribution of consumer products. Procter & Gamble is an Affiliate and a

permitted assign under the terms of the Stock Purchase Agreement.

3.     Plaintiff Gillette is a Delaware corporation with its principal place of

business in Boston, Massachusetts. Gillette is a developer, marketer, and global distributor of

consumer products. On October 1, 2005, Procter & Gamble merged with Gillette, and Gillette is

an Affiliate and wholly-owned subsidiary of Procter & Gamble.

4.     Defendants Susan Harrison, William G. Harrison III, individually and in

his capacity as Trustee for the Harrison Family Trust and The Emily Waldrip Trust, Cindy

Nosser, Kathy Allen, Pat Allen, Tina Harrison, W.G. Harrison IV, Larry Luxenberg, and John

Shelton (collectively, the "Defendants") are former shareholders of Zooth, Inc. ("Zooth"). Upon

information and belief, all Defendants are residents of the State of Texas.

5.     Pursuant to § 12.12.1 of the Stock Purchase Agreement, the Defendants

agreed to and thereby are subject to personal jurisdiction in the federal and state courts in the

State of Delaware. Specifically, in accordance with the terms of the Stock Purchase Agreement,

2

the Defendants waived any defense that the District of Delaware lacks personal jurisdiction over them, and instead expressly agreed to submit to the personal jurisdiction of the federal and state courts in the State of Delaware. Moreover, Defendants are subject to personal jurisdiction in the District of Delaware because they purposefully availed themselves of the laws of the State of Delaware to transact business and executed a written Agreement with Gillette that contains an exclusive, irrevocable Delaware forum selection clause (and choice of law clause) whereby they agreed to submit to the exclusive jurisdiction of this Court to resolve all claims, actions, and causes of action or suits between the parties to the Stock Purchase Agreement that arose in whole or in part under or in connection with the Agreement. Stock Purchase Agreement, § 12.12.1.

6.     This Court has subject matter jurisdiction over this action because the parties agreed in the Stock Purchase Agreement, at page 1, that this Court would have irrevocable, exclusive jurisdiction over any Action, which includes, among others, "any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation (whether at law or in equity, whether civil or criminal)." Additionally, this Court has jurisdiction under 28 U.S.C. § 1332 by reason of diversity of citizenship between Procter & Gamble, Gillette, and Defendants, and because the amount in controversy is in excess of $75,000, exclusive of interest and costs.

7.     Venue is proper in this District under 28 U.S.C. § 1391(a) because Defendants are subject to the personal jurisdiction of this Court and have agreed to venue in this Court in the Stock Purchase Agreement. The Stock Purchase Agreement, at § 12.12.2, provides that "[e]ach party agrees that for any Action between the parties arising in whole or in part under or in connection with this Agreement, such party bring Actions only in the State of Delaware."

3

Defendants also agreed in § 12.12.2 to waive "any claim and will not assert that venue should properly lie in any other location within the related jurisdiction."

## BACKGROUND TO THE CONTROVERSY

### Procter & Gamble, Gillette, and Zooth

8.      Procter & Gamble manufactures and markets a broad range of consumer products, including toothbrushes and toothpaste.

9.      Prior to its merger with Procter & Gamble in 2005, Gillette was an independent Delaware corporation. Gillette manufactures and sells a wide variety of consumer products, including toothbrushes and toothpaste.

10.     The merger between Procter & Gamble and Gillette was subject to review and preclearance by the U.S. Federal Trade Commission and other regulatory bodies throughout the world.

11.     Until its acquisition by Gillette in 2004, Zooth was an independent Texas corporation. Zooth designs and distributes children's manual and battery-powered toothbrushes and toothpaste.

12.     Zooth was founded in 1992 in Wichita Falls, Texas by Susan Harrison. During most of Zooth's pre-acquisition existence, Ms. Harrison served as Zooth's President and Chief Executive Officer. Ms. Harrison and The Harrison Family Trust were the majority shareholders of Zooth.

### Gillette's Purchase of Zooth

13.     In the late-1990s and early-2000s, Defendants sought to sell their interest in Zooth to a buyer that could provide additional capital investment and a global distribution

4

network to Zooth. Defendants, through their investment banker, contacted Gillette regarding a possible acquisition of Zooth. As a result of that contact, Gillette and Defendants entered into the negotiation and execution of the Agreement to purchase the Defendants' interest in Zooth.

14.     During the negotiations and purchase, both parties were represented by investment bankers and counsel. Defendants were advised and represented by investment bankers from Brown, Gibbons, Lang & Company, L.P. and lawyers from the firm of Taft, Stettinius & Hollister LLP. Gillette was advised and represented by lawyers from Ropes & Gray LLP and Gillette in-house counsel. After extensive negotiations, the parties entered into a 59-page Stock Purchase Agreement on June 4, 2006, that detailed the entirety of the parties' agreement. Stock Purchase Agreement, § 12.5.

### Stock Purchase Agreement Between Gillette, Zooth, and Defendants

15.     Under the terms of the Stock Purchase Agreement, Gillette purchased the Defendants' interest (all of the issued and outstanding shares of Common Stock of Zooth) for $27,815,000 in cash at the time of the closing. Stock Purchase Agreement, § 2.2.1. In addition, Gillette agreed to pay Defendants certain deferred consideration or deferred compensation as detailed below.

16.     Gillette agreed to pay deferred consideration to the Defendants for a three-year period that was equal to "4% per annum of Net Sales of Zooth Brand Products" and "4% per annum of Net Sales of Design Portfolio Products." Stock Purchase Agreement, § 2.2.1(b). The deferred consideration provisions of the Stock Purchase Agreement provided for both a minimum and maximum payout, recognizing that future events might affect the ultimate payout to Defendants.

5

17.   The term "Zooth Brand Products" in the Agreement is defined to include: (1) all products at the time of the Agreement that were "branded with one or more Zooth marks"; (2) any product sold by Gillette that was "virtually the same (except for variations in packaging, color, minor dimensional changes, and branding) as a product branded with a Zooth mark that is sold by" Gillette; and (3) "any children's oral care product sold by [Gillette] pursuant to a character license with a third-party other than those licenses listed in Schedule 1.5" of the Agreement.  Stock Purchase Agreement, p. 11 (Definition of "Zooth Brand Products").

18.   The term "Design Portfolio Products" in the Agreement is defined to include "oral care products sold by [Gillette] that are based on one or more designs included in the Design Portfolio."  Stock Purchase Agreement, p. 4 (Definition of "Design Portfolio Products").

19.   The products in the Design Portfolio include "those designs for not yet commercialized oral care products described in Schedule 1.3 that:  (a) existed prior to April 10, 2004, (b) are not related to toothbrush head design, battery and rechargeable mechanical design, or refill design, (c) could lead to the development of an oral care product that could not otherwise be developed from designs owned or licensed by [Gillette] as of the Closing Date, and (d) are assigned to [Zooth] on or before the Closing Date such that [Zooth] owns all right, title and interest in and to such designs as of the Closing Date."  Id. at 3-4 (Definition of "Design Portfolio").

20.   The Stock Purchase Agreement between Gillette, Zooth, and Defendants recognized that Gillette might some day consolidate or merge into another company.  The term "Acquisition Transaction" (Stock Purchase Agreement, p. 1) is defined to include "any transaction whereby [Gillette] (a) consolidate[s] or merge[s] with or into any Person (other than

6

an individual)." Stock Purchase Agreement, p. 1 (Definition of "Acquisition Transaction"). The definitions for both "Design Portfolio Products" and "Zooth Brand Products" state that the meanings of the terms "do[] not include products or product lines that are acquired by, or made available to, [Gillette] in connection with an Acquisition Transaction that closes after the Closing Date." Stock Purchase Agreement, pp. 4 and 11. The Stock Purchase Agreement thus explicitly recognized that Gillette could merge into another company with competing products, and that sales of such products would not generate deferred compensation for the Defendants.

21.    Other than payment of the minimum deferred compensation, the Stock Purchase Agreement imposes no restrictions on the conduct of the Zooth business by Gillette or its Affiliates that would affect deferred compensation.

22.    The Stock Purchase Agreement, § 12.5, contains a merger clause stating that it, "together with the other Ancillary Agreements and any documents, instruments and certificates explicitly referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto."

23.    The parties also agreed to waive any jury trial in § 12.14 of the Stock Purchase Agreement:

**"TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE."**

7

RLF1-3039505-1

### The Procter & Gamble and Gillette Merger

24.     On October 1, 2005, Procter & Gamble merged with Gillette, and Gillette became an Affiliate and wholly-owned subsidiary of Procter & Gamble. While both Procter & Gamble and Gillette each had strong growth potential and prospects for the near and long-term future as stand-alone entities, both believed that a combination of the two companies would create a leading global consumer products company with greater product diversity, geographic breadth, organizational capabilities, and financial resources that would have the opportunity to grow in ways that would be unlikely to be achieved by Procter & Gamble or Gillette alone.

25.     Procter & Gamble is a permitted assign and Affiliate under the terms of the Stock Purchase Agreement. The Agreement provides that "[Gillette] may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, and (b) designate one or more of its Affiliates to perform its obligations hereunder, in each case, so long as [Gillette] is not relieved of any Liability hereunder." Stock Purchase Agreement, § 12.2.

### Defendants Breach Stock Purchase Agreement

26.     Procter & Gamble and Gillette performed their obligations as agreed to under the Stock Purchase Agreement both before and after the merger and paid to Defendants the required compensation under the Deferred Consideration provision of the Agreement.

27.     In accordance with the terms of the Stock Purchase Agreement, Procter & Gamble and Gillette have paid Defendants all amounts due under the Deferred Consideration provision of the Agreement.

28.     Defendants have breached the Stock Purchase Agreement by filing the Texas Lawsuit and demanding a jury trial. In that lawsuit, Defendants have also sued the

8

attorneys who negotiated the Stock Purchase Agreement on their behalf, Taft, Stettinius & Hollister LLP, alleging that the Taft firm failed to undertake appropriate measures to address and ensure that Defendants' interests would be adequately protected in the event of a change in control of Gillette. Defendants have not yet served the Texas Lawsuit on Procter & Gamble.

29.    The Texas Lawsuit against Procter & Gamble and Defendants' claim of tortious interference by Procter & Gamble arises in whole or in part under or in connection with the Stock Purchase Agreement.

### FIRST CLAIM FOR RELIEF
#### (Declaratory Judgment)

30.    Procter & Gamble and Gillette incorporate by reference the allegations in Paragraphs 1 through 29 as if fully set forth herein.

31.    This claim is filed pursuant to 28 U.S.C. §§ 2201 and 2202. An actual and bona fide controversy exists between Procter & Gamble and Gillette and Defendants concerning the parties' rights, responsibilities, and performance under the terms of the Stock Purchase Agreement, which is well in excess of $75,000.

32.    On October 1, 2005, Procter & Gamble merged with Gillette and Gillette became an Affiliate and wholly-owned subsidiary of Procter & Gamble. Under the Stock Purchase Agreement, p. 2, Procter & Gamble is an Affiliate of Gillette.

33.    Defendants have claimed, in out-of-court communications, that Procter & Gamble is not an Affiliate under the terms of the Stock Purchase Agreement, and that Procter & Gamble has interfered with the Stock Purchase Agreement. In addition, Defendants have claimed that they are entitled to additional compensation from Gillette under the Deferred

9

Consideration provision of the Stock Purchase Agreement. Procter & Gamble and Gillette maintain that they are Affiliates under the terms of the Stock Purchase Agreement, that Procter & Gamble, as an Affiliate, cannot interfere with the Stock Purchase Agreement, and that Defendants have been paid all the compensation they are entitled to receive under the terms of the Agreement.

34.    An actual, real, and substantial controversy exists between Procter & Gamble, Gillette, and Defendants regarding: (1) whether Procter & Gamble and Gillette are Affiliates of each other under the terms of the Stock Purchase Agreement; and (2) whether Defendants are entitled to additional compensation from Gillette under the Deferred Consideration provision of the Stock Purchase Agreement.

35.    This Court's declaration of the parties' rights, responsibilities, and performance under the terms of the Stock Purchase Agreement will fully resolve the dispute between the parties.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

36.    Procter & Gamble and Gillette incorporate by reference the allegations in Paragraphs 1 through 35 as if fully set forth herein.

37.    Gillette, a wholly-owned subsidiary and Affiliate of Procter & Gamble, entered into the Agreement with Defendants, and the parties agreed not to commence any claim, action, cause of action or suit against the other party in any court other than courts in the State of Delaware, including the state courts of the State of Delaware or the United States District Court for the District of Delaware.

10

38.    The parties agreed that if the Agreement was breached then the non-breaching party would be permitted to recover its attorneys' fees, costs, losses, and expenses associated with the breach.

39.    Gillette and Procter & Gamble have fulfilled all of their duties and obligations under the terms of the Stock Purchase Agreement.

40.    Defendants commenced an Action -- the Texas Lawsuit -- against Procter & Gamble in a state court in Texas.

41.    As a direct and proximate result of the filing of the Texas Lawsuit, Defendants have breached the Stock Purchase Agreement. Procter & Gamble and Gillette are incurring costs, expenses, and attorneys' fees as a result of the Texas Lawsuit.

42.    The Texas Lawsuit is a willful and intentional breach of Defendants' agreement to litigate all actions arising "in connection with" the Stock Purchase agreement in Delaware, and of Defendants' agreement to waive a jury trial in any such action.

43.    Procter & Gamble and Gillette have been damaged, as a direct and proximate result of Defendants' breach, in an amount to be determined at trial.

WHEREFORE, Procter & Gamble and Gillette demand judgment as follows:

a.    a judgment declaring that Procter & Gamble and Gillette have fully performed their obligations as agreed under the terms of the Stock Purchase Agreement with Defendants;

RLF1-3039505-1

b.  a judgment declaring that Procter & Gamble and Gillette are Affiliates and that Procter & Gamble has not tortiously interfered with Gillette's performance under the terms of the Stock Purchase Agreement with Defendants;

c.  a judgment declaring that Defendants have breached the terms of the Stock Purchase Agreement by filing an Action against Procter & Gamble in a state court in Texas and demanding a jury trial;

d.  award Procter & Gamble and Gillette compensatory damages for Defendants' breach of the Stock Purchase Agreement;

e.  award Procter & Gamble and Gillette punitive damages;

f   award Procter & Gamble and Gillette pre and post-judgment interest;

g.  award Procter & Gamble and Gillette their attorneys' fees and costs; and

h.  award Procter & Gamble and Gillette such further relief as this Court deems just and proper.

OF COUNSEL:

D. Jeffrey Ireland
djireland@ficlaw.com
Brian D. Wright
bwright@ficlaw.com
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH  45402
Telephone:  (937) 227-3710
Facsimile:  (937) 227-3717

Dated:  July 21, 2006

*Anne Shea Gaza*

Allen M. Terrell, Jr. (#709)
Terrell@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899-0551
Telephone:  (302) 651-7539
Facsimile:  (302) 498-7539

Attorneys for Plaintiffs The Procter &
Gamble Company and The Gillette Company

13

# EXHIBIT A
# PART 1

*Execution Version*

STOCK PURCHASE AGREEMENT

Dated as of June 4, 2004

Among

THE GILLETTE COMPANY

ZOOTH, INC.

and

THE SELLER AND OPTION HOLDER PARTIES HERETO

## TABLE OF CONTENTS

1. DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.................................................1
2. PURCHASE AND SALE OF SHARES.................................................................12
   2.1.   Purchase and Sale of Shares.................................................12
   2.2.   Purchase Price .................................................................12
   2.3.   The Closing .....................................................................14
   2.4.   Closing Deliveries.............................................................14
   2.5.   Working Capital Adjustment ...............................................14
   2.6.   Deferred Consideration Audits.............................................16
3. REPRESENTATIONS AND WARRANTIES REGARDING THE ACQUIRED
   COMPANIES.......................................................................17
   3.1.   Organization; Predecessors ................................................17
   3.2.   Power and Authorization....................................................17
   3.3.   Authorization of Governmental Authorities ...........................17
   3.4.   Noncontravention.............................................................18
   3.5.   Capitalization of the Acquired Companies ............................18
   3.6.   Financial Statements.........................................................19
   3.7.   Absence of Undisclosed Liabilities.......................................20
   3.8.   Absence of Certain Developments.......................................20
   3.9.   Debt; Guarantees ............................................................22
   3.10.   Assets .............................................................................22
   3.11.   Accounts Receivables .......................................................22
   3.12.   Real Property....................................................................22
   3.13.   Equipment .......................................................................23
   3.14.   Intellectual Property .........................................................23
   3.15.   Legal Compliance; Illegal Payments; Permits ........................26
   3.16.   Tax Matters .....................................................................27
   3.17.   Employee Benefit Plans .....................................................29
   3.18.   Environmental Matters.......................................................31
   3.19.   Contracts.........................................................................31
   3.20.   Affiliate Transactions ........................................................33
   3.21.   Relationships with Customers, Suppliers, Agents, and Brokers...........33
   3.22.   Employees .......................................................................35
   3.23.   Litigation; Governmental Orders ........................................35
   3.24.   Product Warranties; Defects; Liability.................................35
   3.25.   Insurance ........................................................................36
   3.26.   Banking Facilities.............................................................37
   3.27.   Powers of Attorney...........................................................37
   3.28.   No Brokers ......................................................................37
   3.29.   Disclosure........................................................................37
   3.30.   Inventory ........................................................................37
4. INDIVIDUAL REPRESENTATIONS AND WARRANTIES OF THE SELLERS ...............37
   4.1.   Organization....................................................................38
   4.2.   Power and Authorization....................................................38
   4.3.   Authorization of Governmental Authorities ...........................38

| | | |
|---|---|---|
| 4.4. | Noncontravention | 38 |
| 4.5. | Title | 38 |
| 4.6. | No Brokers | 39 |
| **5. REPRESENTATIONS AND WARRANTIES OF THE BUYER** | | **39** |
| 5.1. | Organization | 39 |
| 5.2. | Power and Authorization | 39 |
| 5.3. | Authorization of Governmental Authorities | 39 |
| 5.4. | Noncontravention | 39 |
| 5.5. | No Brokers | 40 |
| **6. COVENANTS** | | **40** |
| 6.1. | Cancellation of Existing Options; Termination of Existing Option Agreements | 40 |
| 6.2. | Releases | 40 |
| 6.3. | Confidentiality | 40 |
| 6.4. | Public Announcements | 41 |
| 6.5. | Noncompetition and Nonsolicitation | 41 |
| 6.6. | Further Assurances | 42 |
| **7. SELLERS' OBLIGATIONS** | | **42** |
| 7.1. | Stock Certificates | 42 |
| 7.2. | Amendments to Real Property Leases | 42 |
| 7.3. | Consents Under Licenses | 42 |
| 7.4. | Legal Opinion | 43 |
| 7.5. | Consents, etc. | 43 |
| 7.6. | FIRPTA Certificate | 43 |
| 7.7. | [Intentionally Omitted] | 43 |
| 7.8. | Employment Agreements | 43 |
| 7.9. | Ancillary Agreements | 44 |
| 7.10. | Repayment of Amounts Owed by Sellers to the Acquired Companies | 44 |
| 7.11. | Payment of Amounts Due for Accrued Vacation, Illness and Personal Leave | 44 |
| 7.12. | Payment of Debt | 44 |
| 7.13. | Company's 401(k) Contributions | 44 |
| 7.14. | Termination of Certain Existing Agreements | 44 |
| 7.15. | Resignations | 44 |
| 7.16. | Assignment of Interest in Zooth de Mexico | 45 |
| 7.17. | Assignment of Proprietary Rights to the Company | 45 |
| 7.18. | Termination of Internal Royalty Payments | 45 |
| 7.19. | Loan Agreement with Zooth de Mexico | 45 |
| 7.20. | Required Votes | 45 |
| 7.21. | Design Portfolio | 45 |
| 7.22. | Payment of Accrued Salary and Merit Salary Increases | 45 |
| 7.23. | Reporting of Pre-Closing Insurance Claims | 45 |
| 7.24. | Funding of Accounts | 46 |
| 7.25. | [INTENTIONALLY OMITTED] | 46 |
| **8. BUYER'S OBLIGATIONS** | | **46** |
| 8.1. | Payment | 46 |
| 8.2. | Legal Opinion | 46 |
| 8.3. | Ancillary Agreements | 46 |

| | | |
|---|---|---|
| 8.4. | Escrow Agent Fees | 46 |
| 9. | [Intentionally Omitted] | 46 |
| 10. | INDEMNIFICATION | 46 |
| 10.1. | Indemnification by the Sellers | 46 |
| 10.2. | Indemnification by the Buyer | 48 |
| 10.3. | Time for Claims | 49 |
| 10.4. | Third Party Claims | 49 |
| 10.5. | No Circular Recovery | 51 |
| 10.6. | Indemnity Escrow | 52 |
| 10.7. | Right of Set-off | 52 |
| 10.8. | Mitigation of Damages | 52 |
| 10.9. | Remedies Cumulative | 52 |
| 11. | TAX MATTERS | 52 |
| 11.1. | Tax Indemnification | 52 |
| 11.2. | Straddle Period | 53 |
| 11.3. | Tax Sharing Agreements | 53 |
| 11.4. | Certain Taxes and Fees | 53 |
| 11.5. | Cooperation on Tax Matters | 53 |
| 12. | MISCELLANEOUS | 54 |
| 12.1. | Notices | 54 |
| 12.2. | Succession and Assignment; No Third-Party Beneficiary | 55 |
| 12.3. | Amendments and Waivers | 55 |
| 12.4. | Provisions Concerning Sellers' Representative | 55 |
| 12.5. | Entire Agreement | 56 |
| 12.6. | Schedules; Listed Documents, etc. | 56 |
| 12.7. | Counterparts | 56 |
| 12.8. | Severability | 56 |
| 12.9. | Headings | 57 |
| 12.10. | Construction | 57 |
| 12.11. | Governing Law | 57 |
| 12.12. | Jurisdiction; Venue; Service of Process | 57 |
| 12.13. | Specific Performance | 58 |
| 12.14. | Waiver of Jury Trial | 58 |

EXHIBITS

| | |
|---|---|
| 1.1 | Form of Employment Agreement |
| 1.2 | Option Holder's Pro Rata Amount |
| 1.3 | Form of Escrow Agreement |
| 2.2.1(b) | Form of Deferred Consideration Report |
| 2.5.1 | Closing Balance Sheet Example |
| 3.6 | Acquired Companies' Financial Statements |
| 7.4 | Form of Legal Opinion to be Delivered by Sellers |
| 7.18 | Form of Royalty Release |

SCHEDULES

| | |
|---|---|
| 1.3 | Designs Potentially Included in Design Portfolio |
| 1.4 | Unconditional and Long-Term Allowances |
| 1.5 | Licenses Excluded from Zooth Branded Products |
| 2.4(h) | Additional Amounts to be Paid out of Proceeds at Closing |
| 3.1.1 | Organization |
| 3.1.2 | Predecessor Status, etc. |
| 3.3 | Authorization of Governmental Authorities |
| 3.4 | Effect of Contemplated Transactions |
| 3.5 | Capitalization of Acquired Companies |
| 3.6 | Financial Statements |
| 3.8 | Absence of Certain Developments |
| 3.9 | Debt |
| 3.10 | Assets |
| 3.12 | Real Property |
| 3.14 | Intellectual Property |
| 3.15.1 | Legal Compliance |
| 3.15.3 | Permits |
| 3.16 | Tax Matters |
| 3.17 | Employee Benefit Plans |
| 3.18 | Environmental Regulation |
| 3.19 | Contracts |
| 3.20 | Transactions with Sellers and Their Affiliates |
| 3.21 | Customers, Suppliers, Agents, and Brokers |
| 3.22 | Employees |
| 3.23 | Litigation |
| 3.24 | Product Warranties, Defects; Liability |
| 3.25 | Insurance |
| 3.26 | Banking Facilities |
| 3.30 | Inventory |
| 4.3 | Authorization of Governmental Authorities |
| 4.4 | Effect of Contemplated Transactions |
| 4.5 | Title |

| | |
|---|---|
| 4.6 | No Brokers |
| 5.3 | Authorization of Governmental Authorities |
| 5.4 | Effect of Contemplated Transactions |
| 6.5 | Seller Noncompetition Periods |
| 7.3 | Licensed Characters |
| 7.12 | Transaction Expenses |
| 7.14 | Agreements to be Terminated Prior to Closing |
| 7.22 | Merit Salary Increases |
| 7.24 | Closing Bank Account Balances |
| 10.1.3 | Sellers Subject to Limited Liability |

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement dated as of June 4, 2004 (as amended or otherwise modified, the "Agreement") is by and among The Gillette Company, a Delaware corporation (the "Buyer"), Zooth, Inc., a Texas corporation (the "Company"), each Person that has signed this Agreement as a "Seller" (collectively, the "Sellers"), each Person who has signed this Agreement as a holder of Convertible Securities issued by the Company, and the Person who will serve as the representative of the Sellers and the Option Holders.

### RECITALS

WHEREAS, the Sellers are the record and beneficial owners of all of the issued and outstanding shares of Common Stock of the Company (the "Shares");

WHEREAS, the Option Holders hold all of the Convertible Securities that have been issued by the Company and its Subsidiary;

WHEREAS, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, all of the Shares upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Option Holders have agreed to cancel their Convertible Securities upon the terms and subject to the conditions set forth in this Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Buyer, the Company, the Sellers, the Option Holders and the Sellers' Representative hereby agree as follows:

1.    DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.

As used herein, the following terms will have the following meanings:

"1933 Act" means the Securities Act of 1933.

"Accounting Principles" is defined in Section 2.5.1.

"Acquisition Transaction" means any transaction whereby Buyer or any of its Subsidiaries (a) consolidate or merge with or into any Person (other than an individual), (b) acquire assets constituting a product line or portion of a going concern business from a Person, or (c) acquire beneficial ownership of more than fifty percent (50%) of the issued and outstanding voting securities or other ownership interests of a Person (other than an individual).

"Action" means any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation (whether at law or in equity, whether civil or criminal), controversy,

assessment, arbitration, investigation, hearing, charge, complaint, demand, notice or proceeding to, from, by or before any Governmental Authority.

"Acquired Companies" means, collectively, the Company and its Subsidiary.

"Affiliate" means, with respect to any specified Person at any time, (a) each Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person at such time, (b) each Person who is at such time an officer or director of, or direct or indirect beneficial holder of at least 20% of any class of the Equity Interests of, such specified Person, (c) each Person that is managed by a common group of executive officers and/or directors as such specified Person, (d) the Members of the Immediate Family (i) of each officer, director or holder described in clause (b) and (ii) if such specified Person is an individual, of such specified Person and (e) each Person of which such specified Person or an Affiliate (as defined in clauses (a) through (d)) thereof will, directly or indirectly, beneficially own at least 20% of any class of Equity Interests at such time.

"Agreement" is defined in the Preamble.

"Ancillary Agreements" means the Employment Agreements and the Escrow Agreement.

"Assets" is defined in Section 3.10.1.

"Business" means the businesses currently conducted by the Acquired Companies, pertaining to the design, development, manufacture, distribution and sale of oral care and hair care products.

"Business Day" means Monday, Tuesday, Wednesday, Thursday, or Friday of any week other than such day that constitutes an official United States federal government holiday.

"Buyer" is defined in the Preamble.

"Buyer Indemnified Person" is defined in Section 10.1.

"Closing" is defined in Section 2.3.

"Closing Balance Sheet" is defined in Section 2.5.1.

"Closing Date" means June 4, 2004.

"Code" means the U.S. Internal Revenue Code of 1986.

"Common Stock" means the common stock, par value $1.00 per share, of the Company.

"Company" is defined in the Preamble.

"Company Plan" is defined in Section 3.17.2.

"Company Proprietary Rights" means any and all Technology and Works used in the Business and any and all Intellectual Property in any and all such Technology and Works. For

the avoidance of doubt, and without limiting any provision of this Agreement, Company Proprietary Rights include all rights to characters owned by third parties and used by any Acquired Company in connection with the Business pursuant to a license or otherwise.

"Compensation" means, with respect to any Person, all salaries, compensation, remuneration, bonuses or benefits of any kind or character whatever (including issuances or grants of Equity Interests), made directly or indirectly by an Acquired Company to such Person or Affiliates of such Person.

"Contemplated Transactions" means, collectively, the transactions contemplated by this Agreement, including (a) the sale and purchase of the Shares and (b) the execution, delivery and performance of the Ancillary Agreements.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, promise, undertaking, arrangement or understanding, whether written or oral and whether express or implied, or other document or instrument (including any document or instrument evidencing or otherwise relating to any Debt) to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Convertible Securities" means all issued and outstanding Equity Interests in the Company other than the Shares, including the stock options held by the Option Holders.

"Current Liability Policies" is defined in Section 3.25.

"Debt" means, with respect to any Person, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person (a) for borrowed money (including overdraft facilities), (b) evidenced by notes, bonds, debentures or similar Contractual Obligations, (c) for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course of Business), (d) under capital leases (in accordance with GAAP), (e) in respect of letters of credit and bankers' acceptances, (f) for Contractual Obligations relating to interest rate protection, swap agreements and collar agreements and (g) in the nature of Guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Deferred Amount" is defined in Section 2.2.1(b).

"Deferred Consideration" is defined in Section 2.2.1(b).

"Deferred Consideration Report" means a report, substantially in the form of Exhibit 2.2.1(b), describing the manner in which a Deferred Amount was determined for a particular payment period.

"Design Portfolio" means those designs for not yet commercialized oral care products described in Schedule 1.3 that: (a) existed prior to April 10, 2004, (b) are not related to toothbrush head design, battery and rechargeable mechanical design, or refill design, (c) could lead to the development of an oral care product that could not otherwise be developed from designs owned or licensed by Buyer or its Subsidiaries as of the Closing Date, and (d) are

assigned to the Company on or before the Closing Date such that Company owns all right, title and interest in and to such designs as of the Closing Date.

"Design Portfolio Products" means oral care products sold by Buyer or any of its Subsidiaries that are based on one or more designs included in the Design Portfolio. Among other things, the meaning of "Design Portfolio Product" does not include products or product lines that are acquired by, or made available to, Buyer or any of its Subsidiaries in connection with an Acquisition Transaction that closes after the Closing Date. For example, if Buyer or any of its Subsidiaries acquires a company after the Closing Date that holds product designs (either its own or licensed) as of the closing date of the acquisition, the products sold by such acquired company that are developed from such designs will not be considered Design Portfolio Products.

"Dispute Notice" is defined in Section 2.5.3.

"DPP Consideration Termination Date" is defined in Section 2.2.1(b).

"DPP Deferred Consideration" is defined in Section 2.2.1(b).

"Employee Plan" is defined in Section 3.17.1.

"Employment Agreement" means Buyer's standard form employment agreement substantially in the form annexed hereto as Exhibit 1.1.

"Encumbrance" means any charge, claim, community or other marital property interest, condition, equitable interest, lien, license, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement and any other restriction or covenant with respect to, or condition governing the use, construction, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

"Enforceable" means, with respect to any Contractual Obligation stated to be Enforceable by or against any Person, that such Contractual Obligation is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"Environmental Laws" means any Legal Requirement relating to (a) releases or threatened releases of Hazardous Substances, (b) pollution or protection of public health or the environment or worker safety or health or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

"Equipment" is defined in Section 3.13.

"Equity Interests" means (a) any capital stock, share, partnership or membership interest, unit of participation or other similar interest (however designated) in any Person and/or (b) any option, warrant, purchase right, conversion right, exchange right or other Contractual Obligation

which would entitle any Person to acquire any such interest in such Person or otherwise entitle any Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the federal Employee Retirement Income Security Act of 1974.

"Escrow Agent" means Citibank Agency & Trust Services as agent under the Escrow Agreement.

"Escrow Agent Fees" means all fees due pursuant to the Escrow Agreement.

"Escrow Agreement" means the escrow agreement, substantially in the form of Exhibit 1.3.

"Existing Options" means all options issued by the Company to the Option Holders as evidenced by the Existing Option Agreements.

"Existing Option Agreements" means (a) the Stock Option Agreement dated March 23, 1998 between the Company and John Shelton pursuant to which the Company granted John Shelton an option to purchase forty (40) shares of Common Stock, $1.00 par value per share, of the Company at an exercise price of $3,500 per share, (b) the Stock Option Agreement dated September 26, 2002 between the Company and Scott Spivey pursuant to which the Company granted Scott Spivey an option to purchase ten (10) shares of Common Stock, $1.00 par value per share, of the Company at an exercise price of $3,500 per share, (c) the Stock Option Agreement dated June 18, 2003 between the Company and Greg Thornhill pursuant to which the Company granted Greg Thornhill an option to purchase ten (10) shares of Common Stock, $1.00 par value per share, of the Company at an exercise price of $10,000 per share, and (d) the Stock Option Agreement dated January 7, 2004 between the Company and Greg Thornhill pursuant to which the Company granted Greg Thornhill an option to purchase five (5) shares of Common Stock, $1.00 par value per share, of the Company at an exercise price of $10,000 per share.

"Facilities" means any buildings, plants, improvements or structures located on the Real Property.

"FDA" means the United States Food and Drug Administration.

"FDCA" means the Federal Food, Drug, and Cosmetic Act.

"FFPLA" means the Federal Fair Packaging and Labeling Act.

"Financials" is defined in Section 3.6.1(b).

"FTC" means the Federal Trade Commission.

"Full Revenue Sales" means, with respect to any period:

(i)     gross sales for such period by Buyer or any of its Subsidiaries to independent third parties on an arms'-length basis, meaning the total invoice value of shipments representing sales to independent third parties

on an arms'-length basis during such period based on standard list price, less returns

less

    (ii)    Unconditional and Long-Term Allowances for such period.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Government Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered by or with any Governmental Authority.

"Governmental Authority" means any United States federal, state or local or any foreign government, or political subdivision thereof, or any multinational organization or authority or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person, (b) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor and/or (c) any liability as a general partner of a partnership or as a venturer in a joint venture in respect of Debt or other obligations of such partnership or venture.

"Hazardous Substance" is defined in Section 3.18.

"Indemnity Claim" means a claim for indemnity under Section 10.1 or 10.2, as the case may be.

"Indemnified Party" means, with respect to any Indemnity Claim, the party asserting such claim under Section 10.1 or 10.2, as the case may be.

"Indemnifying Party" means, with respect to any Indemnity Claim, the party against whom such claim is asserted under Section 10.1 or 10.2, as the case may be.

"Initial DPP Ship Date" is defined in Section 2.2.1(b).

"Intellectual Property" means the entire right, title and interest in and to all proprietary rights of every kind and nature, including all rights and interests pertaining to or deriving from:

(a)    patents, copyrights, mask work rights, technology, know-how, processes, trade secrets, algorithms, inventions, works, proprietary data, databases, formulae, research and development data and computer software or firmware;

(b)    Trademarks;

(c)    domain names, rights of privacy and publicity, moral rights, and proprietary rights of any kind or nature, however denominated, throughout the world in all media now known or hereafter created;

(d)    any and all registrations, applications, recordings, licenses, common-law rights and Contractual Obligations relating to any of the foregoing; and

(e)    all Actions and rights to sue at law or in equity for any past or future infringement or other impairment of any of the foregoing, including the right to receive all proceeds and damages therefrom, and all rights to obtain renewals, continuations, divisions or other extensions of legal protections pertaining thereto.

"Interest" means the five (5) year U.S. treasury bill rate in effect at the time interest begins to accrue pursuant to this Agreement.

"Legal Requirement" means any United States federal, state or local or foreign law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Government Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"Liability" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential, whether due or to become due and whether or not required under GAAP to be accrued on the financial statements of such Person.

"Liability Policies" is defined in Section 3.25.

"Licenses" is defined in Section 3.14.5.

"Losses" is defined in Section 10.1.

"Material Adverse Effect" means any change in, or effect on, the Business, operations, Assets, or condition (financial or otherwise) of an Acquired Company which, when considered either individually or in the aggregate together with all other adverse changes or effects with respect to which such phrase is used in this Agreement leads to (a) a write-down or write-off of Assets of at least $62,000 made by Buyer or any of its Subsidiaries in accordance with GAAP,

(b) a Loss or Liability of at least $62,000 which is included in the financial statements of Buyer or any of its Subsidiaries in accordance with GAAP or (c) a loss of revenues of at least $62,000.

"Members of the Immediate Family" means, with respect to any Person who is an individual, (a) such Person, himself or herself, and such Person's spouse, (b) each parent, brother, sister or child of such Person or such Person's spouse, (c) the spouse of any Person described in clause (b) above, (d) each child of any Person described in clauses (a), (b) or (c) above, (e) each trust created solely for the benefit of one or more of the Persons described in clauses (a) through (d) above and (f) each custodian or guardian of any property of one or more of the Persons described in clauses (a) through (e) above in his capacity as such custodian or guardian.

"Minimum Earnout Balance" means the amount, if any, by which $3 million exceeds the aggregate total of all Deferred Consideration paid by Buyer pursuant to this Agreement.

"Monthly Financials" is defined in Section 3.6.1(b).

"Most Recent Balance Sheet" is defined in Section 3.6.1(a).

"Most Recent Balance Sheet Date" is defined in Section 3.6.1(a).

"Net Sales" means 90% of Full Revenue Sales.

"Option Holders" means John Shelton, Greg Thornhill, and Scott Spivey.

"Option Holder's Pro Rata Amount" means with respect to each Option Holder, the percentage set forth next to such Option Holder's name on Exhibit 1.2.

"Ordinary Course of Business" means an action taken by any Person in the ordinary course of such Person's business which is consistent with the past customs and practices of such Person which is taken in the ordinary course of the normal day-to-day operations of such Person.

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended and supplemented.

"Permits" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Permitted Encumbrance" means (a) statutory Liens for current Taxes, special assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP, (b) mechanics', materialmen's, carriers', workers',

-8-

repairers' and similar statutory liens arising or incurred in the Ordinary Course of Business which liens have not had and are not reasonably likely to have a Material Adverse Effect, (c) deposits or pledges made in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable Legal Requirements or other social security, and (d) restrictions on the transfer of securities arising under federal and state securities laws.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Pre-Closing Tax Period" is defined in Section 11.1.

"Predecessor" is defined in Section 3.1.2.

"Products" is defined in Section 3.24.1.

"Purchase Price" is defined in Section 2.2.1.

"Real Property" is defined in Section 3.12.1.

"Real Property Leases" is defined in Section 3.12.1.

"Regulated Product" means any product that is manufactured, tested, distributed, held and/or marketed by an Acquired Company (including any product being manufactured, tested, distributed, held and/or marketed by an Acquired Company on the Closing Date) that is subject to the jurisdiction of: (a) the FDA pursuant to the FDCA or the FFPLA; (b) the FTC in connection with the FTC's authority to regulate the marketing of nonprescription drugs, medical devices, and cosmetics; or (c) any local, state, federal, or foreign governmental entity pursuant to any Legal Requirement relating to the regulation of food, drugs, cosmetics, or medical devices.

"Representative" means, with respect to any Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Royalty Release" means a release in the form outlined in Exhibit 7.18.

"Seller" and "Sellers" are defined in the Preamble.

"Sellers' Knowledge" means the actual knowledge of Susan Harrison, Steve Nosser, Greg Thornhill, John Shelton, Joe Mattiko, Scott Spivey, Dennis Harris, Tom Shanks, and Chris Zuck.

"Seller's Pro Rata Amount" means with respect to each Seller, the percentage set forth next to such Seller's name on Schedule 3.5, representing the number of Shares to be held by such Seller on the Closing Date immediately prior to the consummation of the Contemplated Transactions divided by the total number of Shares to be outstanding on the Closing Date immediately prior to the consummation of the Contemplated Transactions.

"Sellers' Representative" means Susan Harrison, as representative for the Sellers and Option Holders.

"Seller Indemnified Person" is defined in Section 10.2.1.

"Shares" is defined in the recitals to this Agreement.

"Straddle Period" is defined in Section 11.2.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person will, at the time, directly or indirectly through one or more Subsidiaries, (a) own at least 50% of the issued and outstanding capital stock (or other shares of beneficial interest) entitled to vote generally, (b) hold at least 50% of the partnership, limited liability company, joint venture or similar interests or (c) be a general partner, managing member or joint venturer.

"Tax" or "Taxes" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and (b) any liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology and Works" means all inventions, works (including all literary, musical, dramatic, pictorial, graphic, sculptural, audiovisual, and recorded works), discoveries, innovations, know-how, information (including ideas, research and development, know-how, formulas, compositions, processes and techniques, data, designs, drawings, specifications, customer lists, supplier lists, licensor lists, pricing and cost information, business and marketing plans and proposals, documentation and manuals), computer software, firmware, computer hardware, integrated circuits and integrated circuit masks, electronic, electrical and mechanical equipment and all other forms of technology, including improvements, modifications, works in process, derivatives or changes, whether tangible or intangible, embodied in any form, whether or not protectible or protected by patent, copyright, mask work right, trade secret law or otherwise, and all documents and other materials recording any of the foregoing.

"Third Party Claim" is defined in Section 10.4.1.

"Trademarks" means trademarks, trade names, service marks, service names, brands, trade dress and logos, and all goodwill associated therewith.

"Transaction Expenses" means the costs and expenses (including legal, accounting, consulting, advisory and brokerage costs and expenses) incurred in connection with the Contemplated Transactions.

"Treasury Regulations" means the regulations promulgated under the Code.

"Unaudited Financials" is defined in Section 3.6.1(a).

"Unconditional and Long-Term Allowances" means all discounts, rebates, and allowances that are unconditional, based on total year performance or required by the terms of any Contractual Obligation with a term of six months or more, regardless of the method of payment and whether or not reflected on an invoice, including those discounts, rebates and allowances described on Schedule 1.4.

"Working Capital" means Current Assets minus Current Liabilities, determined in accordance with the Accounting Principles. Current Assets are defined as accounts receivable, inventories, prepaid expenses, and other current assets (excluding cash). Current Liabilities are defined as accounts payable, accrued U.S. federal and state and foreign income taxes payable, deferred taxes, and accrued expenses (excluding current notes payable but including accruals for Transaction Expenses incurred by the Company and not yet paid). Working Capital does not include any tax consequences resulting from payments to Option Holders.

"Working Capital Referee" is defined in Section 2.5.4.

"Working Capital Statement" is defined in Section 2.5.1.

"ZBP Deferred Consideration" is defined in Section 2.2.1(b).

"Zooth Branded Products" means only the following: (i) any product branded with one or more Zooth Marks, (ii) any product sold by Buyer or its Subsidiaries using a brand other than a Zooth Mark which product is virtually the same (except for variations in packaging, color, minor dimensional changes, and branding) as a product branded with a Zooth Mark that is sold by Buyer or its Subsidiaries (a "Virtually Similar Product"); provided, however, that any Virtually Similar Product will not be considered a Zooth Branded Product if it was initially shipped to a customer anywhere in the world under a brand other than a Zooth Mark (this proviso does not apply to products otherwise covered by clauses (i) or (iii) of this definition), and/or (iii) any children's oral care product sold by Buyer or its Subsidiaries pursuant to a character license with a third-party other than those licenses listed in Schedule 1.5. For the purposes of this definition, a product will be considered a children's product if it is designed and marketed primarily for use by individuals of less than eighteen (18) years of age. Among other things, the meaning of "Zooth Branded Products" does not include products, product lines, or licensed rights that are acquired by, or made available to, Buyer or any of its Subsidiaries in connection with an Acquisition Transaction that closes after the Closing Date. For example, if Buyer or any of its Subsidiaries acquires a company after the Closing Date that holds third-party character licenses as of the closing date of the acquisition, the products sold by such acquired company under such third-party licenses will not be considered Zooth Branded Products.

"Zooth Marks" means the "Zooth," "Zoothbrush," and "Zoothpaste" marks along with all other Trademarks owned by the Company as of the Closing Date.

Except as otherwise explicitly specified to the contrary, (a) references to a Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to this Agreement, unless another agreement is specified, (b) the word "including" will be construed as "including without limitation," (c) references to a particular statute or regulation include all rules and regulations thereunder and any predecessor or successor statute, rules or regulation, in each case as amended or otherwise modified from time to time, (d) words in the singular or plural form include the plural and singular form, respectively and (e) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement.

## 2.   PURCHASE AND SALE OF SHARES.

2.1.   _Purchase and Sale of Shares._  At the Closing, subject to the terms and conditions of this Agreement, the Sellers will sell, transfer and deliver to the Buyer, and the Buyer will purchase from the Sellers, the Shares, representing at such time all of the Equity Interests in the Company.

2.2.   _Purchase Price._

2.2.1   _Purchase Price._  The aggregate consideration for the Shares will be the sum of $27,815,000 plus the Deferred Consideration paid to the Sellers (collectively, the "Purchase Price"), payable as described below.  The Purchase Price will be subject to adjustment as provided in Sections 2.5 and Section 10.

(a)   _Closing Date Consideration._  On the Closing Date, Buyer will pay $27,815,000 to be distributed according to Section 2.4.

(b)   _Deferred Consideration._  Buyer will pay deferred cash consideration equal to 4% per annum of Net Sales of Zooth Branded Products ("ZBP Deferred Consideration") plus 4% per annum of Net Sales of Design Portfolio Products (the "DPP Deferred Consideration" and, together with the ZBP Deferred Consideration, the "Deferred Consideration").  Buyer will pay (i) ZBP Deferred Consideration during the three-year period beginning on January 1, 2005 and ending on December 31, 2007 and (ii) DPP Deferred Consideration during the period beginning on the later of (x) January 1, 2005 and (y) the date on which the first Design Portfolio Products are shipped by Buyer or any of its Subsidiaries to a customer (the "Initial DPP Ship Date") and ending on the third anniversary of such later date (such ending date, the "DPP Consideration Termination Date"); _provided, however,_ that neither Buyer nor any of its Subsidiaries (nor any of their respective successors or assigns) will have any obligation whatsoever to pay any DPP Deferred Consideration pursuant to this Agreement or otherwise, and this Section 2.2.1(b) will terminate and be of no further force or effect, if the Initial DPP Ship Date does not occur on or before June 4, 2009.

Buyer will pay Deferred Consideration under this Section 2.2.1(b) semi-annually, in arrears, with respect to Net Sales of Zooth Branded Products and/or Net

Sales of Design Portfolio Products, as the case may be, for the preceding semi-annual period (the total amount of each such semi-annual payment made pursuant to this Section 2.2.1(b) is hereinafter referred to as a "Deferred Amount"). No later than forty-five (45) days after the last Business Day of each such semi-annual period, Buyer will (i) pay each Seller his, her or its Seller's Pro Rata Amount of 94.93% of the Deferred Amount for the relevant semi-annual period, (ii) pay each Option Holder his Option Holder's Pro Rata Amount of 5.07% of the Deferred Amount for the relevant semi-annual period, and (iii) deliver to each Seller and Option Holder a Deferred Consideration Report for the relevant semi-annual period, which will describe how the Deferred Amount for the applicable period was determined, including all credits and debits (including deductions pursuant to Sections 2.5.4(b), 2.6, 7.3 and 8.4).

Notwithstanding any provision of this Agreement to the contrary, in no event will Buyer or any of its Subsidiaries (or any of their respective successors or assigns) be required to pay Deferred Consideration under this Agreement or otherwise in an amount that is greater than $12 million in the aggregate. At such time, if any, that Buyer and/or its Subsidiaries has paid Deferred Consideration under this Agreement totaling $12 million in the aggregate, neither Buyer nor any of its Subsidiaries (nor any of their respective successor or assigns) will have any further obligation to pay any Deferred Consideration and this Section 2.2.1(b) will terminate immediately and be of no further force or effect.

If the DPP Consideration Termination Date has occurred before, or is scheduled to occur after, June 4, 2009, then on or before the 60th day following the DPP Consideration Termination Date, Buyer will pay each Seller his, her or its Seller's Pro Rata Amount of 94.93% of the Minimum Earnout Balance, if any, and will pay each Option Holder his Option Holder's Pro Rata Amount of 5.07% of the Minimum Earnout Balance, if any.

If the Initial DPP Ship Date has not occurred on or before June 4, 2009, then on the first Business Day in July of 2009, Buyer will pay each Seller his, her or its Seller's Pro Rata Amount of 94.93% of the Minimum Earnout Balance, if any, and will pay each Option Holder his Option Holder's Pro Rata Amount of 5.07% of the Minimum Earnout Balance, if any.

(c)     Tax Related Withholdings. The Buyer will be entitled to deduct and withhold, or cause the Escrow Agent to deduct and withhold, from any payment made by Buyer hereunder any withholding Taxes or other amounts required under the Code or any applicable Legal Requirement to be deducted and withheld. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

(d)     Late Payments. All late payments under this Section 2.2.1 will accrue Interest until paid by the Buyer, provided that no Interest will be due in connection with any payment properly withheld or delayed pursuant to the terms of this

Agreement unless the parties later agree or Sellers obtain a final judgment indicating that such withheld or delayed payments are owed by Buyer to Sellers.

2.3.    The Closing. The consummation of the Contemplated Transactions (the "Closing") will take place in Cincinnati, Ohio on June 4, 2004 or at such other place and on such other date as the Buyer and the Sellers' Representative may agree in writing, in each case, subject to the satisfaction of the conditions set forth in Sections 7 and 8 which must be satisfied prior to Closing.

2.4.    Closing Deliveries. At the Closing, the Buyer will deliver by wire transfer of immediately available federal funds to the accounts designated in writing not fewer than two Business Days prior to the scheduled Closing Date:

(a)    an aggregate amount of $22,500,393.91 to the Sellers, distributed in accordance with the Seller's Pro Rata Amount designated for each Seller, against delivery to the Buyer of certificates evidencing each Seller's Shares duly endorsed (or accompanied by duly executed stock transfer powers), with signature guaranteed by a commercial bank;

(b)    an aggregate amount of $1,202,179.44 to the Option Holders, distributed in accordance with the Option Holder's Pro Rata Amount designated for each Option Holder; and

(c)    an amount of $3,000,000 to the Escrow Agent for deposit pursuant to the Escrow Agreement.

(d)    an amount of $250,890.21 to Brown Gibbons Lang & Company in payment for services provided to the Sellers prior to Closing.

(e)    an amount of $361,287.01 to Taft, Stettinius & Hollister LLP in payment for services provided to the Sellers, the Option Holders and the Acquired Companies prior to Closing.

(f)    an amount of $500,249.43 to State National Bank of Texas in satisfaction of all amounts owed by the Acquired Companies to State National Bank of Texas.

2.5.    Working Capital Adjustment.

2.5.1    Closing Balance Sheet. As promptly as possible and in any event within forty-five (45) days after the Closing Date, the Company will prepare or cause to be prepared, and will provide to the Buyer, a consolidated balance sheet of the Company as of the Closing Date (the "Closing Balance Sheet"), together with a written statement setting forth in reasonable detail its determination of the Working Capital on the Closing Date as reflected on the Closing Balance Sheet (the "Working Capital Statement"). Prior to the preparation of the Closing Balance Sheet and the Working Capital Statement, the accounting books and records of the Acquired Companies will accurately reflect, in accordance with GAAP, all amounts (including accrued amounts) owed by the Acquired Companies to all Persons as at the Closing Date, including amounts owed to benefits providers; insurance companies and agencies; employees; landlords; utilities; taxing

authorities and other Governmental Authorities; service providers and other vendors; agents and brokers; and banks and other creditors.

2.5.2     The Closing Balance Sheet and the Working Capital Statement will be prepared in accordance with GAAP as in effect on the date of the Most Recent Balance Sheet and in accordance with the example set forth on Exhibit 2.5.1 (the "Accounting Principles"). The Buyer will have reasonable access to the work papers used by the Company in the preparation of the Closing Balance Sheet and the Working Capital Statement. The reserve for income taxes, as such reserve is adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Companies in filing their Tax Returns, and that will be taken into account in the Closing Balance Sheet used for the purposes of the Working Capital adjustment, will not include any reduction in or increase to the reserve for income taxes, which reduction or increase is a direct result of any tax consequences resulting from the payments to Option Holders.

2.5.3     Dispute Notice.  The Closing Balance Sheet and the Working Capital Statement will become final, conclusive and binding on the parties unless the Buyer provides a written notice (a "Dispute Notice") to the Sellers' Representative no later than twenty (20) Business Days after delivery of the Working Capital Statement setting forth in reasonable detail (a) any item on the Closing Balance Sheet and/or the Working Capital Statement which the Buyer believes has not been prepared in accordance with the Accounting Principles and (b) what the Buyer reasonable believes to be the correct amount of such item in accordance with the Accounting Principles. Any item or amount to which no dispute is raised in the Dispute Notice will be final, conclusive and binding on the parties.

2.5.4     Resolution of Disputes.  The Buyer and the Sellers' Representative will attempt to resolve the matters raised in a Dispute Notice in good faith. Ten Business Days after delivery of the Dispute Notice, either the Buyer or the Sellers' Representative may provide written notice to the other that it elects to submit the disputed items to a nationally recognized independent accounting firm chosen jointly by the Buyer and Sellers' Representative, or PriceWaterhouse Coopers LLP, if the parties cannot agree on another firm within twenty (20) Business Days of the delivery of the Dispute Notice (the "Working Capital Referee"). The Working Capital Referee will promptly, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, review only those items and amounts specifically set forth and objected to in the Dispute Notice and resolve the dispute with respect to each such specific item and amount in accordance with the Accounting Principles. The fees and expenses of the Working Capital Referee will be shared equally by the Sellers and the Option Holders on the one hand, and the Buyer, on the other hand, and the decision of the Working Capital Referee with respect to the items of the Closing Balance Sheet and the Working Capital Statement submitted to it will be final, conclusive and binding on the parties. Each of the parties to this Agreement agrees to use its commercially reasonable efforts to cooperate with the Working Capital Referee and to cause the Working Capital Referee to resolve any dispute no later than thirty Business Days after selection of the Working Capital Referee.

2.5.5    Purchase Price Adjustment. Promptly, and in any event no later than the fifth Business Day, after final determination of the Working Capital in accordance with this Section 2.5,

(a)    if the Working Capital amount determined pursuant to this Section 2.5 exceeds $6,781,131.72, then the Buyer will pay (i) to each Seller his, her or its Seller's Pro Rata Amount of 94.93% of such excess by wire transfer of immediately available funds and (ii) to each Option Holder his Option Holder's Pro Rata Amount of 5.07% of such excess by wire transfer of immediately available funds; and

(b)    if the Working Capital amount determined pursuant to this Section 2.5 is less than $6,781,131.72, then (i) all amounts of such shortfall up to $1 million will be paid to the Buyer in accordance with the terms of the Escrow Agreement (with the amount by which $1 million exceeds any shortfall to be distributed to Sellers and Option Holders in accordance with the terms of the Escrow Agreement), and (ii) all amounts of such shortfall in excess of $1 million will, at the Buyer's sole discretion, (1) be paid to the Buyer by each Seller and Option Holder in accordance with each Seller's and Option Holder's pro rata share of such shortfall, by wire transfer in immediately available funds; or (2) be deducted by Buyer from the amounts due to Sellers and Option Holders pursuant to Section 2.2.1(b) in accordance with each Seller's and each Option Holder's pro rata share of such shortfall.

2.6.    Deferred Consideration Audits. Buyer will, and will cause each of its Subsidiaries as may be relevant to, permit its books and records to be examined by an independent accounting firm reasonably acceptable to the Buyer on behalf of the Sellers and Option Holders during regular business hours and upon reasonable advance notice, but not later than one year following the later of (a) the DPP Consideration Termination Date and (b) June 4, 2009, and no more often than once per calendar year. Such examination will be permitted only to the extent necessary to verify the sufficiency of Deferred Consideration payments made to the Sellers and Option Holders. Prior to any such examination, the independent accounting firm will enter into an agreement with Buyer and its Subsidiaries agreeing to keep confidential any information learned or obtained during the examination except that the independent accounting firm will have the right to report to the Sellers and Option Holders the Deferred Amount payable, including a reasonable explanation thereof, for the period under audit. Any such examination will be conducted at the expense of the Sellers and Option Holders, provided that if the examination shows an underpayment of more than five percent (5%) of the amount otherwise due, Buyer will reimburse the Sellers and Option Holders for the reasonable costs of the examination. Buyer will promptly remit any underpayment to the Sellers and Option Holders plus Interest for the relevant period of underpayment. If the examination shows an overpayment, the Sellers and Option Holders will promptly pay such overpayment amount, plus Interest for the relevant period of overpayment, to Buyer upon request, or, at Buyer's election, Buyer may offset such amount against the next payment of Deferred Amounts due hereunder.

3.    REPRESENTATIONS AND WARRANTIES REGARDING THE ACQUIRED COMPANIES.

In order to induce the Buyer to enter into and perform this Agreement and to consummate the Contemplated Transactions, the Company and each Seller, as of the Closing Date, hereby represents and warrants to the Buyer as follows:

3.1.    Organization; Predecessors.

3.1.1    Organization.  Schedule 3.1.1 sets forth for each Acquired Company its name and jurisdiction of organization.  Each Acquired Company is (a) duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (b) is duly qualified to do business and in good standing in each jurisdiction in which it owns or leases Real Property and in each other jurisdiction in which the failure to so qualify has not had, and is not reasonably likely to have, a Material Adverse Effect.  The Sellers have delivered to the Buyer true, accurate and complete copies of (x) the Organizational Documents of each Acquired Company and (y) the minute books of each Acquired Company which contain all of the records of all meetings held, and other corporate actions taken, by its stockholders, Board of Directors and any committees appointed by its Board of Directors.

3.1.2    Predecessors.  Schedule 3.1.2 sets forth a list of (a) any Person that has ever merged with or into an Acquired Company, (b) any Person a majority of whose capital stock (or similar outstanding ownership interests) or Equity Interests has ever been acquired by an Acquired Company, (c) any Person all or substantially all of whose assets has ever been acquired by an Acquired Company and (d) any prior names of an Acquired Company or any Person described in clauses (a) through (c) (each such Person, a "Predecessor").

3.2.    Power and Authorization.

3.2.1    Contemplated Transaction.  The execution, delivery and performance by each Acquired Company of this Agreement and each Ancillary Agreement to which it is (or will be) a party and the consummation of the Contemplated Transactions are within the power and authority of each Acquired Company and have been duly authorized by all necessary action on the part of each Acquired Company.  This Agreement and each Ancillary Agreement to which each Acquired Company is (or will be) a party (a) has been (or, in the case of Ancillary Agreements to be entered into at or prior to the Closing, will be) duly executed and delivered by each Acquired Company and (b) is (or, in the case of Ancillary Agreements to be entered into at or prior to the Closing, will be) a legal, valid and binding obligation of such Acquired Company, enforceable against each such Acquired Company in accordance with its terms.

3.2.2    Conduct of Business.  Each Acquired Company has the full power and authority necessary to own and use its Assets and carry on the Business.

3.3.    Authorization of Governmental Authorities.  Except as disclosed on Schedule 3.3, no action by (including any authorization, consent or approval), or in respect of, or filing

with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by any Acquired Company of this Agreement and each Ancillary Agreement to which it is (or will be) a party or (b) the consummation of the Contemplated Transactions by each Acquired Company. To Sellers' Knowledge, no provision of any applicable Legal Requirement and no Government Order will prohibit the consummation of the Contemplated Transactions.

3.4.     Noncontravention. Except as disclosed on Schedule 3.4, neither the execution, delivery and performance by each Acquired Company or any Seller of this Agreement or any Ancillary Agreement to which it is (or will be) a party nor the consummation of the Contemplated Transactions will:

(a)     assuming the taking of any action by (including any authorization, consent or approval), or in respect of, or any filing with, any Governmental Authority, in each case, as disclosed on Schedule 3.3, violate any Legal Requirement applicable to an Acquired Company;

(b)     result in a breach or violation of, or default under, any Contractual Obligation of any Acquired Company that causes such Acquired Company to experience a loss of $10,000 or more;

(c)     require any action by (including any authorization, consent, or approval), or in respect of (including notice to), any Person under any Contractual Obligation of any Acquired Company or otherwise;

(d)     result in the creation or imposition of an Encumbrance upon, or the forfeiture of, any Asset; or

(e)     result in a breach or violation of, or default under, the Organizational Documents of any Acquired Company.

3.5.     Capitalization of the Acquired Companies.

3.5.1     Outstanding Capital Stock. As of the date of this Agreement, the entire authorized capital stock of each Acquired Company is as set forth on Schedule 3.5. All of the issued and outstanding shares of capital stock of each Acquired Company have been duly authorized, validly issued, and are fully paid and non-assessable. None of the Acquired Companies has violated the 1933 Act, any state "blue sky" or securities laws, any other similar Legal Requirement or any preemptive or other similar rights of any Person in connection with the issuance or redemption of any of its Equity Interests.

3.5.2     Ownership. The Company holds no shares of its capital stock in its treasury. All of the issued and outstanding Equity Interests of the Company are held of record and beneficially owned by the Persons and in the respective amounts set forth in Schedule 3.5. There are no issued and outstanding Equity Interests in any Acquired Company other than those set forth in Schedule 3.5. The Sellers have delivered to the Buyer true, accurate and complete copies of the stock ledger of each Acquired Company which reflects all issuances, transfers, repurchases and cancellations of shares of its

capital stock. The Seller's Pro Rata Amount for each Seller reflects the percentage that such Seller's Shares represent of the total number of Shares issued and outstanding immediately prior to consummation of the Contemplated Transactions after the exercise or cancellation (as the case may be) of all other outstanding Equity Interests in the Company.

3.5.3     Subsidiaries. All of the issued and outstanding Equity Interests in each of the Company's Subsidiaries are set forth on Schedule 3.5 and are validly issued, fully paid and non-assessable. Except as set forth on Schedule 3.5, the Company is the record and beneficial owner of all of the Equity Interests in the Company's Subsidiaries and holds such Equity Interests free and clear of all Encumbrances.

3.5.4     Encumbrances, etc. Except as disclosed on Schedule 3.5: (a) there are no preemptive rights or other similar rights in respect of any Equity Interests in any Acquired Company, (b) there are no Encumbrances on, or other Contractual Obligations relating to, the ownership, transfer or voting of any Equity Interests in any Acquired Company, or otherwise affecting the rights of any holder of the Equity Interests in any Acquired Company, (c) except for the Contemplated Transactions, there is no Contractual Obligation, or provision in the Organizational Documents of any Acquired Company which obligates it to purchase, redeem or otherwise acquire, or make any payment (including any dividend or distribution) in respect of, any Equity Interests in any Acquired Company and (d) there are no existing rights with respect to registration under the 1933 Act of any Equity Interests in any Acquired Company.

3.6.     Financial Statements.

3.6.1     Financial Statements. Attached as Exhibit 3.6 are copies of each of the following:

(a)     the unaudited consolidated balance sheet of the Acquired Companies as of December 31, 2003 (respectively, the "Most Recent Balance Sheet," and the "Most Recent Balance Sheet Date"), and the related unaudited consolidated statement of income, cash flow, and changes in stockholders' equity of the Acquired Companies for the two most recently ended fiscal years (collectively, the "Unaudited Financials"); and

(b)     monthly unaudited financial statements of the Acquired Companies in the form customarily prepared by management for internal use for each complete month from the Most Recent Balance Sheet Date through the Closing Date (the "Monthly Financials," and together with the Unaudited Financials, collectively the "Financials").

3.6.2     Compliance with GAAP, etc. Except as disclosed on Schedule 3.6, the Financials (including any notes thereto) (a) are complete and correct in all material respects and were prepared in accordance with the books and records of the Acquired Companies, (b) have been prepared in accordance with GAAP, consistently applied, and (c) fairly present in all material respects the consolidated financial position of the

Acquired Companies as at the respective dates thereof and the consolidated results of the operations of the Acquired Companies and changes in financial position for the respective periods covered thereby. For the purposes of this Section 3.6.2, "material respects" means that total assets, total liabilities, net revenues and net income are not overstated or understated by more than $75,000.

3.7.    Absence of Undisclosed Liabilities.  No Acquired Company has any Liabilities except for (a) Liabilities set forth on the face of the Most Recent Balance Sheet and (b) Liabilities incurred in the Ordinary Course of Business since the Most Recent Balance Sheet Date (none of which results from, arises out of, or relates to any breach or violation of, or default under, a Contractual Obligation or Legal Requirement).

3.8.    Absence of Certain Developments.  Since the Most Recent Balance Sheet Date, the Business has been conducted in the Ordinary Course of Business and, except for the matters disclosed in Schedule 3.8 (which matters have not had, and are not reasonably likely to have, a Material Adverse Effect):

(a)    no Acquired Company has (i) amended its Organizational Documents, (ii) amended any term of its issued and outstanding Equity Interests or other securities or (iii) issued, sold, granted, or otherwise disposed of, its Equity Interests or other securities;

(b)    no Acquired Company has become liable in respect of any Guarantee or has incurred, assumed or otherwise become liable in respect of any Debt, except for borrowings in the Ordinary Course of Business under credit facilities in existence on the Most Recent Balance Sheet Date;

(c)    no Acquired Company has permitted any of its Assets to become subject to an Encumbrance other than a Permitted Encumbrance;

(d)    no Acquired Company has (i) made any declaration, setting aside or payment of any dividend or other distribution with respect to, or any repurchase, redemption or other acquisition of, any of its capital stock or other Equity Interests or (ii) entered into, or performed, any transaction with, or for the benefit of, any Seller or any Affiliate of any Seller (other than payments made to officers, directors and employees in the Ordinary Course of Business);

(e)    there has been no physical loss, destruction, damage or eminent domain taking (in each case, whether or not insured) affecting the Business or any Asset that would have a Material Adverse Effect;

(f)    no Acquired Company has entered into any Contractual Obligation or any other transaction with any of its Affiliates or any third parties other than in the Ordinary Course of Business;

(g)    no Acquired Company has altered or amended the terms of any License or other Contractual Obligation with any third party in a manner that would have a Material Adverse Effect;

(h)    no Acquired Company has increased the Compensation payable or paid, whether conditionally or otherwise, or made any payment outside the Ordinary Course of Business to (i) any employee, consultant or agent, (ii) any director or officer or (iii) any Seller or any Affiliate of any Seller;

(i)    no Acquired Company has entered into any Contractual Obligation providing for the employment or consultancy of any Person on a full-time, part-time, consulting or other basis or otherwise providing Compensation or other benefits to any officer, director, employee or consultant;

(j)    no Acquired Company has made any change in its methods of accounting or accounting practices (including with respect to reserves) or its respective pricing policies, payment, or credit practices or failed to pay any creditor any amount owed to such creditor when due or granted any extension of credit other than in the Ordinary Course of Business;

(k)    no Acquired Company has made, changed or revoked any Tax election in such a manner as would have a Material Adverse Effect, or elected or changed any method of accounting for Tax purposes, settled any Action in respect of Taxes or entered into any Contractual Obligation in respect of Taxes with any Governmental Authority;

(l)    no Acquired Company has terminated or closed any Facility, business or operation;

(m)    no Acquired Company has adopted any Employee Plan or, except in accordance with terms thereof as in effect on the Most Recent Balance Sheet Date, increased any benefits under any Employee Plan;

(n)    no Acquired Company has written up or written down any of its Assets or revalued its inventory in a manner that would have a Material Adverse Effect;

(o)    no Acquired Company has made any change in the conduct of its manufacturing, sales, shipping, distribution, or promotional activities, except in the Ordinary Course of Business;

(p)    no Acquired Company has made any change in its production or inventory levels, except as consistent with past practice or in the Ordinary Course of Business;

(q)    no Acquired Company has offered discounts, allowances, or promotions in amounts and types that are inconsistent with those offered at similar times in the preceding year, except in the Ordinary Course of Business;

(r)    no Acquired Company has entered into any Contractual Obligation to do any of the things referred to elsewhere in this Section 3.8; and

(s)    no event or circumstance has occurred which has had, or is reasonably likely to have, a Material Adverse Effect.

3.9.    Debt; Guarantees. The Acquired Companies have no Liabilities in respect of Debt except as set forth on Schedule 3.9. For each item of Debt, Schedule 3.9 correctly sets forth the debtor, the principal amount of the Debt as the date of this Agreement, the creditor, the maturity date, the collateral, if any, securing the Debt. No Acquired Company has any Liability in respect of a guarantee of any Liability of any other Person (other than another Acquired Company).

3.10.    Assets.

3.10.1    Ownership of Assets. Each Acquired Company has sole and exclusive, good and marketable title to, or, in the case of property held under a lease or other Contractual Obligation, a sole and exclusive, Enforceable leasehold interest in, or right to use in the Business, all of its properties, rights, and assets, whether real or personal and whether tangible or intangible, including all Assets reflected in the Most Recent Balance Sheet or acquired after the Most Recent Balance Sheet Date (except for such Assets which have been sold or otherwise disposed of since the Most Recent Balance Sheet Date in the Ordinary Course of Business) (collectively, the "Assets"). Except as disclosed on Schedule 3.10, none of the Assets is subject to any Encumbrance other than Permitted Encumbrances.

3.10.2    Sufficiency of Assets. Except as listed on Schedule 3.10, the Assets comprise all of the assets, properties and rights of every type and description, whether real or personal, tangible or intangible, used or necessary to the conduct of the Business and are adequate to conduct the Business.

3.10.3    Investments. No Acquired Company controls, directly or indirectly, or owns any direct or indirect Equity Interest in any Person which is not a Subsidiary of the Company.

3.11.    Accounts Receivables. All accounts and notes receivable reflected on the Most Recent Balance Sheet and all accounts and notes receivable arising subsequent to the Most Recent Balance Sheet Date and on or prior to the Closing Date, have arisen or will arise in the Ordinary Course of Business, represent or will represent legal, valid, binding and enforceable obligations to an Acquired Company and, subject only to consistently recorded reserves for bad debts established as of a date prior to the Closing Date in a manner consistent with past practice, have been, or will be, collected or are, or will be, collectible in the aggregate recorded amounts thereof in accordance with their terms and, to the Sellers' knowledge, will not be subject to any contests, claims, counterclaims or setoffs.

3.12.    Real Property.

3.12.1    No Acquired Company owns or has ever owned any real property. Schedule 3.12 describes each leasehold interest in real property leased, subleased by, licensed or with respect to which a right to use or occupy has been granted to or by any of the Acquired Companies (such leased Real Property, the "Real Property"), and specifies the lessor(s) of such leased property, the Acquired Company occupying such leased property, and identifies each lease or any other Contractual Obligation under which such

property is leased (the "Real Property Leases"). Except as described on Schedule 3.12, there are no written or oral subleases, licenses, concessions, occupancy agreements or other Contractual Obligations granting to any other Person the right of use or occupancy of the Real Property and there is no Person (other than an Acquired Company and any lessor(s) of leased Real Property) in possession of the leased Real Property. With respect to each Real Property Lease that is a sublease, to the Sellers' Knowledge, the representations and warranties set forth in Sections 3.19.2 and 3.19.3 are true and correct with respect to the underlying lease.

3.12.2    The Real Property Leases do not impose any restrictions on any portion of the Business that would have a Material Adverse Effect. No Acquired Company is obligated to pay any leasing or brokerage commission as a result of the Contemplated Transaction. There is no pending or, to Sellers' Knowledge, threatened eminent domain taking affecting any of the Real Property. The Sellers have delivered to the Buyer true, correct and complete copies of the Real Property Leases including all amendments, modifications, notices or memoranda of lease thereto and all estoppel certificates or subordinations, non-disturbance and attornment agreements related thereto.

3.12.3    None of the Facilities currently existing on the Real Property encroaches upon, and any Facilities under construction on the Real Property will not encroach upon, the real property of any other Person. No facility of any other Person encroaches upon the Real Property. Each Facility is supplied with utilities and other services (including gas, electricity, water, drainage, sanitary sewer, storm sewer, fire protection and telephone) necessary for the operation of such Facility as the same is currently operated or currently proposed to be operated. Each parcel of Real Property abuts on, and has direct vehicular access to, a public road, or has access to a public road via a permanent, irrevocable appurtenant easement benefiting the parcel of Real Property, in each case, to the extent necessary for the conduct of the Business.

3.12.4    To Sellers' Knowledge, all Permits necessary in connection with the present use and operation of, the Real Property and the lawful occupancy thereof have been issued by the appropriate Governmental Authorities, except as would not result in a Material Adverse Effect. The current use of the Real Property is in accordance with the certificates of occupancy relating thereto and the terms of any such Permits except as would not result in a Material Adverse Effect.

3.13.    Equipment. All of the fixtures and other improvements to the Real Property included in the Assets (including any Facilities) and all of the tangible personal property other than inventory included in the Assets (the "Equipment") (a) are suitable for their present use, (b) are in good working order, operating condition and state of repair, and (c) have been maintained in accordance with normal industry practice.

3.14.    Intellectual Property.

3.14.1    Except as set forth in Schedule 3.14, the Acquired Companies are the sole owners of or have the sole right to use all Company Proprietary Rights, and none of the

Company Proprietary Rights are in the possession, custody, or control of any Person other than the Acquired Companies.

3.14.2    None of the Acquired Companies nor any Predecessor (a) has, to Sellers' Knowledge, after conducting the procedures described in Schedule 3.14, interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of third parties or (b) has received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that a Person must license or refrain from using any Intellectual Property rights of any third party in connection with the conduct of the Business or the use of the Company Proprietary Rights). No third party has, to Sellers' Knowledge, interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Company Proprietary Rights.

3.14.3    Schedule 3.14 identifies (a) all registered Intellectual Property which has been issued to an Acquired Company, (b) each pending application for registration which an Acquired Company has made with respect to any Company Proprietary Rights, (c) each Contractual Obligation in which an Acquired Company or any Seller has granted rights to any third party with respect to any of (a) or (b) above and (d) each Contractual Obligation in which an Acquired Company or any Seller has granted rights to any third party with respect to Company Proprietary Rights that is not included in (a) or (b) above. True, accurate and complete copies of all such registrations, applications and Contractual Obligations, in each case, as amended, or otherwise modified and in effect, have been provided to the Buyer, as well as true, accurate and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item. Each such registration is valid and subsisting. Schedule 3.14 also identifies each material trade name, trade dress and unregistered trademark or service mark owned by any Acquired Company or in connection with the Business or the Company Proprietary Rights.

3.14.4    With respect to each item of the Company Proprietary Rights:

(a)    an Acquired Company possesses all right, title, and interest in and to such item, free and clear of any Encumbrance;

(b)    such item is not subject to any outstanding Government Order, and no Action is pending or threatened, which challenges the legality, validity, enforceability, use, or ownership of such item; and

(c)    except as disclosed on Schedule 3.14, an Acquired Company has not agreed and does not have a Contractual Obligation to indemnify any Person for or against any interference, infringement, misappropriation or other conflict with respect to such item.

3.14.5    Schedule 3.14 identifies each item of the Company Proprietary Rights that any Person besides an Acquired Company owns and that is used by an Acquired Company or in connection with the Business pursuant to any license, sublicense or other

Contractual Obligation (the "Licenses"). Except as disclosed on Schedule 3.14, there are no royalties for the use of any such Company Proprietary Rights. The Company has provided to the Buyer true, accurate and complete copies of all of the Licenses, in each case, as amended or otherwise modified and in effect. With respect to each such item identified on Schedule 3.14: (a) such item is not subject to any outstanding Government Order, and no Action is pending or threatened which challenges the legality, validity or enforceability of such item and (b) none of the Sellers or the Acquired Companies has granted any sublicense or similar right with respect to any License covering such item.

3.14.6    The Acquired Companies have taken all commercially reasonable steps necessary to protect their respective right, title, and interest in and to the Company Proprietary Rights. The Acquired Companies have established a commercially reasonable program of practices and procedures to (a) ensure compliance with all terms and conditions contained in the Licenses, including compliance with royalty payment, royalty reporting, product specifications, distribution restrictions, and geographic restrictions applicable to sales of Products embodying the Company Proprietary Rights, and (b) identify and renewing Licenses of continuing value to the Business prior to their expiration. All royalties, costs, and expenses relating to and due under the Licenses have been paid and no Acquired Company is in breach of default under any License.

3.14.7    The Acquired Companies have used commercially reasonable efforts to ensure that: (a) all Products made, used, or licensed under any registered patents that are part of the Company Proprietary Rights are properly marked with patent notices, including all patent notices required by Contractual Obligations owed by an Acquired Company to any third party, (b) all Products and other materials that use any trademark or service mark that is part of the Company Proprietary Rights or otherwise used in the Business bear proper trademark notices, including all trademark notices required by Contractual Obligations owed by an Acquired Company to any third party, and (c) all works that are part of the Company Proprietary Rights and provided or published to third parties are marked with proper copyright notices, including all copyright notices required by Contractual Obligations owed by an Acquired Company to any third party.

3.14.8    All current and former directors, officers, employees, and contractors of an Acquired Company who contributed to the Company Proprietary Rights in any way have executed Enforceable Contractual Obligations that assign to the Acquired Company all the respective rights, including Intellectual Property, to any inventions, improvements, discoveries or information relating to the Business. Neither the execution nor delivery of this Agreement, nor the conduct of the Business, nor the carrying on of the Business by the directors, officers, or employees of any Acquired Company, will conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such directors, officers, or employees is now obligated.

3.14.9    The Acquired Companies are the sole owners of or have the sole right to use all designs described in Schedule 1.3, and none of the designs described in Schedule 1.3 are in the possession, custody, or control of any Person other than the Acquired Companies.

# EXHIBIT A

# PART 2

3.15.   Legal Compliance; Illegal Payments; Permits.

3.15.1   Compliance. No Acquired Company is in breach or violation of, or default under, and has not since December 31, 1997 been in breach or violation of, or default under:

(a)   its Organizational Documents nor, to the Sellers' Knowledge, is there a basis which could constitute such a breach, violation or default;

(b)   any Legal Requirement nor, to Sellers' Knowledge, is there a basis which could constitute such a breach, violation or default, except for breaches, violation or defaults (i) disclosed on Schedule 3.15.1 or (ii) which have not had, and are not reasonably likely to have, a Material Adverse Effect.

3.15.2   Illegal Payments, etc. In the conduct of the Business, no Acquired Company nor any of its directors, officers, employees or agents, has (a) directly or indirectly, given, or agreed to give, any illegal gift, contribution, payment or similar benefit to any supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder an Acquired Company (or assist in connection with any actual or proposed transaction) or made, or agreed to make, any illegal contribution, or reimbursed any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office or (b) established or maintained any unrecorded fund or asset or intentionally made any false entries on any books or records for any purpose.

3.15.3   Permits. Each Acquired Company has been duly granted all Permits under all Legal Requirements necessary for the conduct of the Business. Schedule 3.15.3 describes each Permit affecting, or relating to, the Assets or the Business together with the Governmental Authority or other Person responsible for issuing such Permit. Except as disclosed on Schedule 3.15.3, (a) the Permits are valid and in full force and effect, (b) no Acquired Company is in breach or violation of, or default under, any such Permit, and, to the Sellers' Knowledge, no basis exists which, with notice or lapse of time or both, would constitute any such breach, violation nor default and (c) the Permits will continue to be valid and in full force and effect, on identical terms following the consummation of the Contemplated Transactions.

3.15.4   FDA and Related Compliance. Except for instances of non-compliance that would not have a Material Adverse Effect, each Regulated Product has been and is, as of the Closing Date, being manufactured, tested, distributed, held, and marketed in compliance with all applicable requirements under the FDCA, the FFPLA, and all other applicable Legal Requirements relating to the regulation of food, drugs, cosmetics, or medical devices including those relating to investigational use, premarket clearance, good manufacturing practices, labeling, advertising, promotional activities, record keeping, filing of reports, and security. Sellers have caused the Company to make available to the Buyer copies of all documents in the possession of the Acquired Companies relating to compliance by the Acquired Companies with the FDCA and its implementing regulations, the FFPLA and its implementing regulations, and all similar or related Legal

Requirements, including copies of (a) all warning letters, notices of adverse findings, and similar correspondence received in the last three years; (b) any document concerning any significant oral or written communication received from the FDA or any similar federal, state, local, or foreign governmental entity in the last three years; (c) all FDA correspondence and minutes from meetings with the FDA during the last two years; and (d) any document concerning any significant oral or written communication received from the FTC or any similar federal, state, local, or foreign governmental entity in the last three years.

3.16.    Tax Matters.

3.16.1    Each Acquired Company has: (a) timely filed, or has caused to be timely filed on its behalf, all Tax Returns required to be filed by it in accordance with all Legal Requirements; and (b) filed all income tax returns, and paid all related taxes, for periods that have closed prior to the Closing Date, whether or not such returns are due or required to be filed prior to the Closing Date. Except for errors that would not have a Material Adverse Effect, all Tax Returns referenced in (a) and (b) were true, correct and complete. All Taxes owed by each Acquired Company (whether or not shown on any Tax Return) have been timely paid in full. No claim has ever been made by an authority in a jurisdiction where an Acquired Company does not file Tax Returns that such Acquired Company is or may be subject to taxation by that jurisdiction, and, to the Sellers' Knowledge, there is no basis for any such claim to be made. There are no Encumbrances with respect to Taxes upon any Asset other than Permitted Encumbrances for current Taxes not yet due and payable.

3.16.2    Each Acquired Company has deducted, withheld, and timely paid to the appropriate Governmental Authority all Taxes required to be deducted, withheld, or paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party, and each Acquired Company has complied with all reporting and recordkeeping requirements.

3.16.3    There is no dispute, audit, investigation, proceeding or claim concerning any Tax Liability of any Acquired Company pending, being conducted, claimed, or raised by a Governmental Authority. The Company has provided to the Buyer true, correct and complete copies of all Tax Returns, examination reports, and statements of deficiencies filed, assessed against, or agreed to by an Acquired Company since January 1, 2001.

3.16.4    No Acquired Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. No Acquired Company has executed any power of attorney with respect to any Tax, other than powers of attorney that are no longer in force. No closing agreements, private letter rulings, technical advice memoranda or similar agreements or rulings relating to Taxes have been entered into or issued by any Governmental Authority with or in respect of any Acquired Company.

3.16.5    The unpaid Taxes of the Acquired Companies (a) did not as of the Most Recent Balance Sheet Date exceed the reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Most Recent Balance Sheet (rather than in any notes thereto) and (b) will not exceed that reserve as adjusted for the passage of time through the Closing Date and taken into account in the Closing Balance Sheet used for purposes of the Working Capital adjustment under Section 2.5 in accordance with the past custom and practice of the Acquired Companies in filing their Tax Returns. For the purposes of this Section 3.16.5, the computation of the amount of unpaid Taxes or the reserve for taxes will not include any reduction or increase to the reserve for taxes, which reduction or increase is a direct result of any tax consequences resulting from the payments to Option Holders).

3.16.6    No Acquired Company has made any payments, or has been or is a party to any agreement, contract, arrangement or plan that could result in it making payments, that have resulted or would result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G or in the imposition of an excise Tax under Code Section 4999 (or any corresponding provisions of state, local or foreign Tax law) or that were or would not be deductible under Code Sections 162 or 404.

3.16.7    No Acquired Company has ever been a member of an "affiliated group" within the meaning of Code Section 1504(a) filing a consolidated federal income Tax Return (other than the "affiliated group" the common parent of which is the Company). No Acquired Company is a party to any Contractual Obligation relating to Tax sharing or Tax allocation. No Acquired Company has any Liability for the Taxes of any Person (other than an Acquired Company) under Treasury Regulation 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise.

3.16.8    No Acquired Company has filed a consent under former Code Section 341(f).

3.16.9    No Acquired Company is or has been required to make any adjustment pursuant to Code Section 481(a) (or any predecessor provision) or any similar provision of state, local or foreign tax law by reason of any change in any accounting methods, or will be required to make such an adjustment as a result of the Contemplated Transactions, and there is no application pending with any Governmental Authority requesting permission for any changes in any of its accounting methods for Tax purposes. To the Sellers' Knowledge, no Governmental Authority has proposed any such adjustment or change in accounting method.

3.16.10    No Acquired Company will be required to include any amount in taxable income or exclude any item of deduction or loss from taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of (a) any "closing agreement" as described in Code Section 7121 (or any corresponding or similar provision of state, local or foreign Income Tax law) executed on or prior to the Closing Date,

(b) any deferred intercompany gain or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision or administrative rule of federal, state, local or foreign Income Tax law), (c) installment sale or open transaction disposition made on or prior to the Closing Date, (d) any prepaid amount received on or prior to the Closing Date or (e) any change in Legal Requirements.

3.16.11   No Acquired Company owns any property of a character, the indirect transfer of which, pursuant to this Agreement, would give rise to any documentary, stamp, or other transfer Tax.

3.16.12   Schedule 3.16 sets forth the following information with respect to each Acquired Company as of the most recent practicable date (as well as on an estimated pro forma basis as of the Closing giving effect to the consummation of the Contemplated Transactions): (a) the basis of each Acquired Company in each of its assets, (b) the basis of the stockholder(s) of each Acquired Company in its stock (or the amount of any excess loss account), (c) the amount of any net operating loss, net capital loss, unused investment or other credit, unused foreign tax, or excess charitable contribution allocated to any Acquired Company, (d) the amount of any deferred gain or loss allocable to any Acquired Company arising out of any intercompany transaction and (e) all material federal Income Tax elections. Except as set forth on Schedule 3.16, no Acquired Company has a net operating loss or other Tax attribute that is presently, or that will become as a result of the Contemplated Transactions, subject to limitation under Code Sections 382, 383 or 384.

3.17.   Employee Benefit Plans.

3.17.1   For purposes of this Agreement, "Employee Plan" means any plan, program, agreement, policy or arrangement, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (a) a welfare plan within the meaning of Section 3(1) of ERISA, (b) a pension plan within the meaning of Section 3(2) of ERISA, (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity-based plan, program, agreement, policy or arrangement, or (d) any other deferred-compensation, retirement, welfare-benefit, reimbursement account, cafeteria plan, dependent care, bonus, incentive, severance, separation pay, change in control, fringe-benefit or other employee benefit plan, program, agreement, policy or arrangement.

3.17.2   Schedule 3.17 lists each Employee Plan that is sponsored or maintained by one or more of the Acquired Companies, or as to which one or more of the Acquired Companies contributes or is obligated to contribute, or under which one or more of the Acquired Companies has or may have any Liability, or that benefits any current or former employee or director of, or consultant or independent contractor with respect to, one or more of the Acquired Companies or the beneficiaries or dependents of any such Person (each, a "Company Plan"). With respect to each Company Plan, the Sellers have delivered or caused to be delivered to the Buyer true, accurate and complete copies of each of the following: (a) if the Company Plan has been reduced to writing, the plan document currently in effect, including all amendments thereto, (b) if the Company Plan

has not been reduced to writing, a written summary of all material plan terms, (c) copies of all trust agreements, custodial agreements, insurance policies, including stop-loss policies, administrative agreements, investment management agreements, investment advisory agreements, and similar agreements currently in effect, including all amendments, together with, in the case of any funding arrangement intended to qualify as VEBA under Code Section 501(c)(9), a copy of the most recently received IRS letter determining that is so qualifies, plus all amendments thereto, (d) copies of all summary plan descriptions, employee handbooks or similar employee communications, together with all amendments thereto, (e) in the case of any Company Plan that is intended to be qualified under Code Section 401(a), a copy of the most recent determination or opinion letter from the IRS, and a copy of any pending request for such determination, and (f) in the case of any Company Plan for which Forms 5500 are required to be filed, a copy of the two most recently filed Forms 5500, with schedules attached. All Contractual Obligations relating to the agreements and policies listed in Section 3.17.2(c) above are terminable by the Acquired Companies with no more than 30 days notice and without cause or penalty.

3.17.3    No Acquired Company and no other Person that would be considered a single employer with an Acquired Company under the Code or ERISA has within the last seven (7) years maintained a plan subject to Title IV of ERISA or Code Section 412, including any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

3.17.4    Each Company Plan that is intended to be qualified under Code Section 401(a) is so qualified. Except for instances of non-compliance with Legal Requirements that would not have a Material Adverse Effect, each Company Plan, including any associated trust or fund, has been administered in accordance with its terms and with applicable Legal Requirements, including the Code, and nothing has occurred with respect to any Company Plan that has subjected or could subject an Acquired Company to a Liability under Title I or Title IV of ERISA or to an excise tax under Chapter 43 of the Code, or that has subjected or could subject any participant in, or beneficiary of, a Company Plan to an excise tax under Chapter 43 of the Code.

3.17.5    All required contributions to, and premium payments on account of, each Company Plan have been made on a timely basis.

3.17.6    There is no pending or, to the Sellers' Knowledge, threatened Action relating to any Company Plan, other than routine claims for benefits. No Company Plan is or, within the last six years, has been (i) the subject of an examination or audit by a Governmental Authority or (ii) the subject of an application or filing under, or a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program.

3.17.7    Except to the extent required under Section 601 *et seq.* of ERISA, no Company Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment. The consummation of the Contemplated Transactions will not, by itself or together with any other event,

increase the amount of or accelerate the vesting or payment of any benefit under any Company Plan.

3.18. <u>Environmental Matters</u>. Except as set forth in <u>Schedule 3.18</u>, (a) the Acquired Companies and their Predecessors are, and have been, in compliance with all Environmental Laws, (b) there has been no release or threatened release by an Acquired Company or a Predecessor of any pollutant, petroleum or any fraction thereof, contaminant or toxic or hazardous material (including toxic mold), substance or waste (each a "<u>Hazardous Substance</u>") on, upon, into or from any site currently or heretofore owned, leased or otherwise used by an Acquired Company or a Predecessor, (c) none of the operations of the Acquired Companies or the Predecessors at the Facilities involves, or has involved, the generation, transportation, use, treatment, storage or disposal of a Hazardous Substance in a manner that would have a Material Adverse Effect, (d) there have been no Hazardous Substances generated by an Acquired Company or a Predecessor that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any Governmental Authority in the United States, (e) to Seller's Knowledge, there are no underground storage tanks located on, no PCBs (polychlorinated biphenyls) or PCB-containing Equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act stored on, any site owned or operated by an Acquired Company or a Predecessor, except for the storage of hazardous waste in compliance with Environmental Laws and (f) the Sellers have provided to the Buyer true, accurate and complete copies of the following documents in their possession pertaining to the Real Property and/or the Facilities: all material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies, and environmental studies or assessments, in each case as amended and in effect.

3.19. <u>Contracts</u>.

3.19.1 <u>Contracts</u>. Except as disclosed on <u>Schedule 3.19</u>, no Acquired Company is bound by or a party to:

(a) any Contractual Obligation (or group of related Contractual Obligations) for the purchase or sale of inventory, raw materials, commodities, supplies, goods, products, equipment or other personal property, or for the furnishing or receipt of services, in each case, the performance of which will extend over a period of more than one year or which provides for annual payments to or by an Acquired Company in excess of $10,000;

(b) (i) any capital lease or (ii) any other lease or other Contractual Obligation relating to the Equipment providing for annual rental payments in excess of $10,000, under which any Equipment is held or used by an Acquired Company;

(c) any Contractual Obligation, other than Real Property Leases or leases relating to the Equipment, relating to the lease or license of any Asset, including Technology and Intellectual Property (and including all customer license and maintenance agreements) that is not included on Schedule 3.14;

9460416.doc                                    -31-

(d)     any Contractual Obligation relating to the acquisition or disposition of (i) any business of an Acquired Company (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise) or (ii) any asset other than in the Ordinary Course of Business;

(e)     any Contractual Obligation under which an Acquired Company is, or may become, obligated to pay any amount in respect of indemnification obligations, purchase price adjustment or otherwise in connection with any (i) acquisition or disposition of assets or securities (other than the sale of inventory in the Ordinary Course of Business), (ii) merger, consolidation or other business combination or (iii) series or group of related transactions or events of the type specified in clauses (i) and (ii) above.

(f)     any Contractual Obligation concerning or consisting of a partnership, limited liability company or joint venture agreement;

(g)     any Contractual Obligation (or group of related Contractual Obligations) (i) under which an Acquired Company has created, incurred, assumed or guaranteed any Debt in excess of $10,000 or (ii) under which an Acquired Company has permitted any Asset to become Encumbered;

(h)     any Contractual Obligation under which any other Person has guaranteed any Debt of an Acquired Company;

(i)     any Contractual Obligation relating to confidentiality or non-competition (whether the Acquired Company is subject to or the beneficiary of such obligations);

(j)     any Contractual Obligation under which an Acquired Company is, or may become, obligated to incur any severance pay or special Compensation obligations which would become payable by reason of, this Agreement or the Contemplated Transactions;

(k)     any Contractual Obligation under which an Acquired Company is, or may, have any Liability to any investment bank, broker, financial advisor, finder's agreement or other similar Person (including an obligation to pay any legal, accounting, brokerage, finder's, or similar fees or expenses in connection with this Agreement or the Contemplated Transactions);

(l)     any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other plan or arrangement for the benefit of an Acquired Company's current or former directors, officers, and employees;

(m)     any Contractual Obligation providing for the employment or consultancy with an individual on a full-time, part-time, consulting or other basis or otherwise providing Compensation or other benefits to any officer, director, employee or consultant (other than an Employee Plan);

(n)    any agency, dealer, distributor, sales representative, marketing or other similar agreement;

(o)    any Contractual Obligation under which an Acquired Company has advanced or loaned an amount to any of its Affiliates or employees other than in the Ordinary Course of Business;

(p)    any Contractual Obligation under which an Acquired Company has the right to exploit characters, including Intellectual Property underlying such characters, owned by any third party;

(q)    any other Contractual Obligation (or group of related Contractual Obligations) the performance of which involves consideration in excess of $10,000 over the life of such Contractual Obligation

The Sellers have delivered to the Buyer true, accurate and complete copies of each written Contractual Obligation listed on Schedule 3.19, in each case, as amended or otherwise modified and in effect. The Sellers have delivered to the Buyer a written summary setting forth the terms and conditions of each oral Contractual Obligation listed on Schedule 3.19.

3.19.2    Enforceability, etc. To the Sellers' knowledge, each Contractual Obligation required to be disclosed on Schedule 3.9 (Debt), 3.12(Real Property Leases), 3.14 (Intellectual Property), 3.17 (Employee Plans), 3.19 (Contracts), 3.21 (Customers and Suppliers) or 3.25 (Insurance) (each, a "Disclosed Contract") is Enforceable against each party to such Contractual Obligation, and is in full force and effect, and, subject to obtaining any necessary consents disclosed in Schedule 3.3, will continue to be so Enforceable and in full force and effect on identical terms following the consummation of the Contemplated Transactions.

3.19.3    Breach, etc. No Acquired Company or, to Sellers' Knowledge, any other party to any Disclosed Contract is in material breach or violation of, or default under, or has repudiated any provision of, any Disclosed Contract. For the purposes of this Section 3.19.3, a breach, violation of, default under, or repudiation of any provision of any Disclosed Contract will be considered material if it causes an Acquired Company to experience a loss of $10,000 or more.

3.20.    Affiliate Transactions. Except for the matters disclosed on Schedule 3.20, no Seller or any Affiliate of any Seller is an officer, director, employee, consultant, competitor, creditor, debtor, customer, distributor, supplier or vendor of, or is a party to any Contractual Obligation with, an Acquired Company. Except as disclosed on Schedule 3.20, no Seller or any Affiliate of any Seller owns any Asset used in, or necessary to, the Business.

3.21.    Relationships with Customers, Suppliers, Agents, and Brokers.

3.21.1    Customers and Suppliers. Schedule 3.21 sets forth a complete and accurate list of (a) each customer of the Acquired Companies as of the Closing Date with aggregate payments to the Acquired Companies in excess of $10,000 during the prior 12

months, indicating the existing Contractual Obligations with each such Customer by product or service provided and (b) each supplier of materials, products, or services to the Acquired Companies as of the Closing Date with aggregate payments by the Acquired Companies in excess of $10,000 during the prior 12 months, indicating the Contractual Obligations for continued supply from each such supplier. The relationships of the Acquired Companies with the customers and the suppliers required to be listed on Schedule 3.21 are good commercial working relationships and none of such customers or suppliers has canceled, terminated or, otherwise materially altered (including any material reduction in the rate or amount of sales or purchases or material increase in the prices charged or paid, as the case may be) or notified an Acquired Company of any intention to do any of the foregoing or otherwise threatened in writing to cancel, terminate or materially alter (including any material reduction in the rate or amount of sales or purchases, as the case may be) its relationship with an Acquired Company. As of the Closing Date, to the Sellers' Knowledge, there is no reason to believe that there will be any material change in the relationships of the Acquired Companies with the customers or the suppliers required to be listed on Schedule 3.21 as a result of the Contemplated Transactions. A change in the relationship of the Acquired Companies with any customer required to be listed on Schedule 3.21 will be considered material if it results in a decrease in sales by the Acquired Companies to such customer equal to the greater of (i) $10,000 per year and (ii) ten percent (10%) of sales to such customer recorded by the Acquired Companies during the trailing twelve (12) month period immediately preceding the Closing Date. A change in the relationship of the Acquired Companies with a supplier required to be listed on Schedule 3.21 will be considered material if it causes the Acquired Companies to experience an increase in payments to such supplier equal to the greater of (x) $10,000 per year and (y) the additional amount the Acquired Companies would pay per year to such supplier if per-unit costs were to increase by ten percent (10%) over Closing Date per-unit costs.

3.21.2    Agents and Brokers.  Schedule 3.21 sets forth a complete and accurate list of (a) all U.S. and international agents of the Acquired Companies as of the Closing Date, indicating the existing Contractual Obligations with each such agent, and (b) all U.S. and international brokers engaged by the Acquired Companies (including brokers engaged for the purposes of facilitating the manufacture or distribution of Products) as of the Closing Date, indicating the existing Contractual Obligations with each such broker. The relationships of the Acquired Companies with the agents and the brokers required to be listed on Schedule 3.21 are good commercial working relationships and none of such agents or brokers has canceled, terminated, or otherwise materially altered or notified an Acquired Company of any intention to do any of the foregoing or otherwise threatened in writing to cancel, terminate, or materially alter its relationship with an Acquired Company. As of the date hereof, to the Sellers' Knowledge, there is no reason to believe that there will be any material change in the relationships of the Acquired Companies with the agents or the brokers required to be listed on Schedule 3.21 as a result of the Contemplated Transactions. A change in the relationships of the Acquired Companies with any agents or broker required to be listed on Schedule 3.21 will be considered material if it results in a decrease in sales by the Acquired Companies equal to the greater of (i) $10,000 per year and (ii) ten percent (10%) of sales procured by such agent or

broker during the trailing twelve (12) month period immediately preceding the Closing Date.

3.22.    Employees. Except as disclosed on Schedule 3.22, there are no labor troubles (including any work slowdown, lockout, stoppage, picketing or strike) pending, or to the Sellers' Knowledge, threatened between an Acquired Company, on the one hand, and its employees, on the other hand, and there have been no such troubles since December 31, 1997. Except as disclosed on Schedule 3.22, (a) no employee of an Acquired Company is represented by a labor union, (b) no Acquired Company is a party to, or otherwise subject to, any collective bargaining agreement or other labor union contract, (c) no petition has been filed or proceedings instituted by an employee or group of employees of an Acquired Company with any labor relations board seeking recognition of a bargaining representative and (d) there is no organizational effort currently being made or threatened by, or on behalf of, any labor union to organize employees of an Acquired Company and no demand for recognition of employees of an Acquired Company has been made by, or on behalf of, any labor union. Except as set forth on Schedule 3.22, no executive officer's or other key employee's employment with the Acquired Companies has been terminated for any reason nor has any such officer or employee notified the Company of his or her intention to resign or retire since December 31, 1997.

3.23.    Litigation; Governmental Orders.

3.23.1    Litigation. Except as disclosed on Schedule 3.23 (which matters have not had, and are not reasonably likely to have, a Material Adverse Effect), there is no Action to which an Acquired Company is a party (either as plaintiff or defendant) or to which its Assets are subject pending, or to the Sellers' Knowledge, threatened, which may affect an Acquired Company or its ownership of, or interest in, any Asset or the use or exercise by the Acquired Companies of any Asset. There is no Action to which an Acquired Company is a party (either as plaintiff or defendant) or to which its Assets are subject pending, or to the Sellers' Knowledge, threatened, which (a) in any manner challenges or seeks the rescission of, or seeks to prevent, enjoin, alter or delay the consummation of, or otherwise relates to, this Agreement and the Contemplated Transactions, or (b) may result in any change in the current equity ownership of any Acquired Company, nor, to the Sellers' Knowledge, is there any basis for any of the foregoing. Except as disclosed on Schedule 3.23, there is no Action which an Acquired Company presently intends to initiate. To Sellers' Knowledge, no Acquired Company may presently initiate an Action that could result in a recovery in excess of $62,000.

3.23.2    Governmental Orders. Except as disclosed on Schedule 3.23, no Governmental Order has been issued which is applicable to, or otherwise affects, an Acquired Company or its Assets or the Business.

3.24.    Product Warranties; Defects; Liability.

3.24.1    Except as disclosed in Schedule 3.24 (and except for other Liabilities for which there is a reserve which meets the standards described in the following sentence), each product manufactured, sold, leased, licensed, delivered or installed by an Acquired

Company (collectively, the "Products") is, and at all times has been, (a) in compliance with all applicable Legal Requirements except for failures that would not have a Material Adverse Effect, (b) fit for the ordinary purposes for which it is intended to be used and (c) except as would not have a Material Adverse Effect, in conformity with any and all Contractual Obligations, express and implied warranties, promises and affirmations of fact made by any Acquired Company. No Acquired Company has, to Sellers' Knowledge, any Liability for replacement or repair of any Products or other damages in connection with any Products that would exceed the reserve for product warranty claims set forth on the face of the Most Recent Balance Sheet, as adjusted for the passage of time in accordance with GAAP, applied on a basis consistent with the principles applied in the preparation of the Most Recent Balance Sheet. Each Product contains warnings, the content and display of which conform with applicable Legal Requirements (except for failures to conform that would not have a Material Adverse Effect) and current industry practice. There is no design defect with respect to any Product including any design defect that, to Sellers' Knowledge, might present a risk to the safety of users of such Product.

3.24.2   Except as disclosed in Schedule 3.24, no Product is subject to any guaranty, warranty, or other indemnity beyond the applicable standard terms and conditions of sale, lease or license. Schedule 3.24 includes a summary of the standard terms and conditions of sale, lease or license for the Acquired Companies (including applicable guaranty, warranty, and indemnity provisions).

3.24.3   Except as disclosed on Schedule 3.24, there is no Action to which an Acquired Company is a party pending, or, to Sellers' Knowledge, threatened relating to, or otherwise involving, alleged defects in the Products or services provided by an Acquired Company, or the failure of any such Products or services to meet certain specifications, and, to Sellers' Knowledge, there is no basis for any of the foregoing. Schedule 3.24 sets forth all concluded Actions (including the disposition thereof) against an Acquired Company since December 31, 1997 relating to, or otherwise involving, alleged defects in the Products or services provided by an Acquired Company, or the alleged failure of any such services or Products to meet certain specifications. No Acquired Company has, to Sellers' Knowledge, any Liability arising out of any injury to any Person or property as a result of any services provided by an Acquired Company, or the ownership, possession, or use of the Products.

3.25.   Insurance.  Schedule 3.25 sets forth a list of insurance policies, including policies by which the Acquired Companies, or any of their Assets, employees, officers or directors or the Business has been insured since December 31, 1997 (the "Liability Policies") and, with respect to such Liability Policies under which the Acquired Companies, or any of their Assets, employees, officers or directors or the Business is currently insured (the "Current Liability Policies"), their respective expiration dates. The list includes for each Liability Policy the type of policy, form of coverage, policy number and name of insurer. The Sellers have provided to the Buyer true, accurate and complete copies of all Liability Policies, in each case, as amended or otherwise modified and in effect. Schedule 3.25 describes any self-insurance arrangements affecting the Acquired Companies. The Acquired Companies have since December 31, 1997 maintained in full force and effect with financially sound and

reputable insurers insurance with respect to their Assets and the Business, in such amounts and against such losses and risks as is customarily carried by Persons engaged in the same or similar business and as is required under the terms of any applicable Real Property Leases or other Contractual Obligations. Except as disclosed on Schedule 3.25, no insurer (a) has questioned, denied or disputed (or otherwise reserved its rights with respect to) the coverage of any claim pending under any Liability Policy or (b) has, to Sellers' Knowledge, threatened to cancel any Liability Policy. Except as disclosed on Schedule 3.25, to the Sellers' Knowledge, no insurer plans to raise the premiums for, or materially alter the coverage under, any Current Liability Policy in such a way that would have a Material Adverse Effect. Except as disclosed on Schedule 3.25, the Acquired Companies will after the Closing continue to have coverage under all of the Liability Policies with respect to events occurring prior to the Closing.

3.26.  Banking Facilities. Schedule 3.26 sets forth a true, correct and complete list of: (a) each bank, savings and loan or similar financial institution with which an Acquired Company has an account or safety deposit box or other arrangement, and any numbers or other identifying codes of such accounts, safety deposit boxes or such other arrangements maintained by an Acquired Company thereat; (b) the names of all Persons authorized to draw on any such account or to have access to any such safety deposit box facility or such other arrangement; and (c) any outstanding powers of attorney executed by or on behalf of an Acquired Company.

3.27.  Powers of Attorney. No Acquired Company has general or special powers of attorney outstanding (whether as grantor or grantee thereof).

3.28.  No Brokers. No Acquired Company has any Liability of any kind to, or is subject to any claim of, any broker, finder or agent in connection with the Contemplated Transactions other than those which will be borne by the Sellers.

3.29.  Disclosure. The representations and warranties contained in this Section 3 and in the documents, instruments and certificates and all diligence material and information, furnished by the Company, the Sellers' Representative and the Sellers to the Buyer and its Representatives pursuant to this Agreement and the Ancillary Agreements do not contain and will not contain any untrue statement of fact or omit to state any material fact necessary in order to make the statements and information contained therein not misleading.

3.30.  Inventory. All Product and other inventory maintained by the Acquired Companies is merchantable and fit for sale in the Ordinary Course of Business. Except as set forth on Schedule 3.30, none of the Products or other inventory maintained by the Acquired Companies is slow-moving, obsolete, below standard quality, damaged, or defective.

4.    INDIVIDUAL REPRESENTATIONS AND WARRANTIES OF THE SELLERS.

Each Seller severally, and not jointly, hereby represents and warrants as of the Closing Date to the Buyer, solely as to such Seller, that:

4.1.    <u>Organization.</u> In the case of each Seller which is not an individual, such Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

4.2.    <u>Power and Authorization.</u> The execution, delivery and performance by such Seller of this Agreement and each Ancillary Agreement to which it is (or will be) a party and the consummation of the Contemplated Transactions are within the power and authority of such Seller and, if applicable, have been duly authorized by all necessary action on the part of such Seller. This Agreement and each Ancillary Agreement to which such Seller is (or will be) a party (a) has been (or, in the case of Ancillary Agreements to be entered into at or prior to the Closing, will be) duly executed and delivered by such Seller and (b) is (or in the case of Ancillary Agreements to be entered into at or prior to the Closing, will be) a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.

4.3.    <u>Authorization of Governmental Authorities.</u> Except as disclosed on <u>Schedule 4.3</u>, no action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by such Seller of this Agreement and each Ancillary Agreement to which it is (or will be) a party or (b) the consummation of the Contemplated Transactions by such Seller.

4.4.    <u>Noncontravention.</u> Except as disclosed on <u>Schedule 4.4</u>, neither the execution, delivery and performance by such Seller of this Agreement or any Ancillary Agreement to which such Seller is (or will be) a party nor the consummation of the Contemplated Transactions will:

(a)    assuming the taking of any action by (including any authorization, consent or approval) or in respect of, or any filing with, any Governmental Authority, in each case, as disclosed on <u>Schedule 4.3</u>, violate any provision of any Legal Requirement applicable to such Seller;

(b)    result in a breach or violation of, or default under, any Contractual Obligation of such Seller;

(c)    require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation; or

(d)    in the case of each Seller which is not an individual, result in a breach or violation of, or default under, such Seller's Organizational Documents.

4.5.    <u>Title.</u> Such Seller is the record and beneficial owner of the outstanding Shares set forth opposite such Seller's name on <u>Schedule 4.5</u>, and has good and marketable title to such Shares, free and clear of all Encumbrances. Such Seller has full right, power and authority to transfer and deliver to the Buyer valid title to the Shares held by such Seller, free and clear of all Encumbrances. Immediately following the Closing, the Buyer will be the record and beneficial owner of such Shares, and have good and marketable title to such Shares, free and clear of all Encumbrances except as are created by the Buyer. Except pursuant to this

Agreement, there is no Contractual Obligation pursuant to which such Seller has, directly or indirectly, granted any option, warrant or other right to any Person to acquire any Shares or other Equity Interests in an Acquired Company.

4.6.    No Brokers. Except as disclosed in Schedule 4.6, such Seller has no Liability of any kind to any broker, finder or agent with respect to the Contemplated Transactions, and such Seller agrees to satisfy in full any Liability required to be disclosed on Schedule 4.6.

5.    REPRESENTATIONS AND WARRANTIES OF THE BUYER.

The Buyer represents and warrants as of the Closing Date to the Sellers that:

5.1.    Organization. The Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

5.2.    Power and Authorization. The execution, delivery and performance by the Buyer of this Agreement and each Ancillary Agreement to which it is (or will be) a party and the consummation of the Contemplated Transactions are within the power and authority of the Buyer and have been duly authorized by all necessary action on the part of the Buyer. This Agreement and each Ancillary Agreement to which the Buyer is (or will be) a party (a) has been (or, in the case of Ancillary Agreements to be entered into at or prior to the Closing, will be) duly executed and delivered by the Buyer and (b) is (or in the case of Ancillary Agreements to be entered into at or prior to the Closing, will be) a legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms.

5.3.    Authorization of Governmental Authorities. Except as disclosed on Schedule 5.3, no action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by the Buyer of this Agreement and each Ancillary Agreement to which it is (or will be) a party or (b) the consummation of the Contemplated Transactions by the Buyer.

5.4.    Noncontravention. Except as disclosed on Schedule 5.4, neither the execution, delivery and performance by the Buyer of this Agreement or any Ancillary Agreement to which it is (or will be) a party nor the consummation of the Contemplated Transactions will:

(a)    assuming the taking of any action by (including any authorization, consent or approval) or in respect of, or any filing with, any Governmental Authority, in each case, as disclosed on Schedule 5.3, violate any provision of any Legal Requirement applicable to the Buyer;

(b)    result in a breach or violation of, or default under, any Contractual Obligation of the Buyer;

(c)    require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation; or

-39-

(d)    result in a breach or violation of, or default under, the Buyer's Organizational Documents.

5.5.    No Brokers.  The Buyer has no Liability of any kind to any broker, finder or agent with respect to the Contemplated Transactions for which the Sellers could be Liable.

6.    COVENANTS.

6.1.    Cancellation of Existing Options; Termination of Existing Option Agreements. Each Option Holder and the Company acknowledge and agree that, effective as of the Closing, (a) the Existing Option Agreements are hereby terminated, void and no longer of any legal force or effect and (b) the Existing Options, as evidenced by the Existing Option Agreements, are hereby deemed to be delivered by the Option Holders to the Company and Cancelled by the Company.

6.2.    Releases.  Effective as of the Closing, each Seller and Option Holder hereby releases, remises and forever discharges any and all rights and claims that it has had, now has or might now have against the Acquired Companies except for (a) rights and claims arising from or in connection with this Agreement, (b) rights and claims arising from or in connection with the Ancillary Agreements, (c) rights and claims arising from or in connection with claims asserted against such Seller by third parties for which the Buyer Indemnitees are not entitled to indemnification by such Seller pursuant to Section 11.2 and (d) counterclaims arising from the same facts and circumstances as give rise to any claim brought by any Acquired Company against a Seller or Option Holder.

6.3.    Confidentiality.

6.3.1    Confidentiality of the Sellers.  Each Seller and Option Holder acknowledges that the success of the Acquired Companies after the Closing depends upon the continued preservation of the confidentiality of certain information possessed by such Seller or Option Holder, that the preservation of the confidentiality of such information by such Seller or Option Holder is an essential premise of the bargain between the Sellers and the Option Holders on one hand, and the Buyer on the other hand, and that the Buyer would be unwilling to enter into this Agreement in the absence of this Section 6.3.1. Accordingly, each Seller and Option Holder hereby agrees with the Buyer that such Seller and Option Holder and their respective Representatives will not, and that such Seller and Option Holder will cause its Affiliates not to, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use, any confidential or proprietary information involving or relating to the Business or an Acquired Company; provided, however, that the information subject to the foregoing provisions of this sentence will not include any information generally available to, or known by, the public (other than as a result of disclosure in violation hereof); and provided, further, that the provisions of this Section 6.3.1 will not prohibit any retention of copies or records or disclosure (a) required by any applicable Legal Requirement so long as reasonable prior notice is given of such retention and/or disclosure and a reasonable opportunity is afforded to contest the same or (b) made in connection with the enforcement of any right or remedy relating to this Agreement or the Contemplated

Transactions. The Sellers and the Option Holders agree that they will be responsible for any breach or violation of the provisions of this Section 6.3.1 by any of their Representatives.

6.4.   Public Announcements.  Buyer will be solely responsible for the issuance and content of all press releases, public announcements, and publicity of any kind whatsoever relating to this Agreement and the Contemplated Transactions, and neither the Sellers, the Option Holders nor any Acquired Company will make any such disclosure without the prior written consent of Buyer, provided that Buyer will use its reasonable efforts to confer with the Sellers' Representative with respect to the content of any such press release, announcement, or other publicity prior to its dissemination.

6.5.   Noncompetition and Nonsolicitation. Each Seller and each Option Holder, for the period from and after the Closing Date indicated in Schedule 6.5 with respect to such Seller or Option Holder, agrees that he, she or it, as the case may be, (a) will not perform any services, with or without compensation, anywhere in the world, either as a consultant, employee, owner, investor or otherwise, with or for any Person, regardless of where such Person is located, that competes or is planning to compete with all or any portion of the Business, (b)  will not (and will not assist others to) solicit or divert any present or prospective business opportunities of Buyer or of any of its Subsidiaries related to the Business and (c) will not solicit or hire, or in any way assist others to solicit or hire, any employee of Buyer or of any of its Subsidiaries whose job responsibilities relate to the Business.

Notwithstanding the foregoing, a Seller or Option Holder will not be deemed in breach of this Section 6.5 solely because such Seller or Option Holder: (a) is the owner of less than 5% of the issued and outstanding stock of any publicly-traded corporation that competes with all or any portion of the Business, or (b) performs services with or on behalf of any Person relating to the design, development, manufacture, distribution or sale of hair care products in any country other than Mexico.

If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 6.5 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified.

Each Seller and/or Option Holder who, as of or subsequent to the Closing Date, accepts employment with Buyer or any of Buyer's Subsidiaries agrees and acknowledges that (a) he or she will be subject to non-competition and non-solicitation obligations set forth in his or her Employment Agreement, (b) notwithstanding anything to the contrary set forth in this Agreement or in the Employment Agreement, the non-competition and non-solicitation provisions set forth herein and therein are separate and distinct obligations of such Seller or Option Holder, (c) this Section 6.5 is not superseded by any provision contained in a Seller's or an Option Holder's Employment Agreement and vice versa, and (d) Buyer has the right, in

its sole and absolute discretion, to enforce its rights under this Section 6.5 and/or the Employment Agreement either independently or together.

6.6.    Further Assurances.  From and after the Closing Date, upon the request of either the Sellers' Representative or the Buyer, each of the parties hereto will do, execute, acknowledge, and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances, and other instruments and papers as may be reasonably required or appropriate to carry out the Contemplated Transactions.  No Seller or Option Holder will take any action that is designed or intended to have the effect of discouraging any lessor, licensor, supplier, distributor or customer of an Acquired Company or other Person with whom an Acquired Company has a relationship from maintaining the same relationship with the Acquired Company after the Closing as it maintained prior to the Closing.  Each Seller and Option Holder will refer all customer inquiries relating to the Business to the Buyer, or an Acquired Company, as appropriate, from and after the Closing.

7.    SELLERS' OBLIGATIONS.

On or before the Closing Date, or after the Closing Date as applicable, Sellers will take, or will cause the Acquired Companies or the applicable Person to take, the following actions:

7.1.    Stock Certificates.  The Sellers will have delivered to the Buyer certificates, duly endorsed (or accompanied by duly executed stock transfer powers) evidencing all of the Shares.

7.2.    Amendments to Real Property Leases.  Sellers will have caused the Company to enter into written agreements amending each of the Company's existing Real Property Leases with the Harrison Family Trust such that the leases remain in force in accordance with their original terms through January 31, 2005 and revert to a month-to-month term thereafter.

7.3.    Consents Under Licenses.  The Acquired Companies will obtain and deliver all consents, waivers, and approvals (including consents to change of control of the Acquired Companies in connection with the Contemplated Transactions) required to ensure that all Licenses are effective and enforceable by the Acquired Companies after the Closing Date under the same terms that existed immediately prior to Closing.  For the avoidance of doubt, and without limiting any provision of this Agreement, the Acquired Companies' obligations pursuant to this Section 7.3 will include securing and delivering all consents, waivers, and approvals required to ensure that the Acquired Companies' licensed rights to the characters listed in Schedule 7.3 are effective and enforceable by the Acquired Companies after the Closing Date under the same terms that existed immediately prior to Closing.

The parties hereby agree that the Sellers and the Option Holders are fully responsible for the payment of all transfer and other fees associated with those consents, waivers, and approvals that are obtained by the Acquired Companies from licensors prior to the Closing Date (other than the payment to Mattel, Inc. referenced below which is being made by the Buyer from funds that otherwise would have been delivered to the Sellers and the Option Holders on the Closing Date).  In this regard, the Sellers and Option Holders hereby represent that the only

transfer and other fees associated with consents, waivers, and approvals obtained from licensors prior to the Closing Date are $175,000 owed to Mattel, Inc. Buyer agrees to pay that amount to Mattel, Inc. within five (5) Business Days of the Closing Date. In the event, however, that, in addition to the consent from Mattel, Inc., there are other consents, waivers, and approvals obtained by the Acquired Companies from licensors prior to the Closing Date that are subject to the payment of a transfer or other fee, Buyer may pay such fee and deduct the full amount of such transfer or other fee from the amounts due to Sellers and Option Holders pursuant to Section 2.2.1(b) in accordance with each Seller's and each Option Holder's pro rata share of such transfer or other fee.

In the event that any consents, waivers or approvals required by this Section 7.3 are obtained after the Closing Date, the Buyer, on the one hand, and the Sellers and the Option Holders, on the other, shall each be responsible for one-half of any transfer and/or other fees required to obtain such consent, waiver or approval; provided, however, that the Sellers' and the Option Holders' shall not pay more than $150,000 in the aggregate to obtain such consents, waivers or approvals. If Buyer pays the entire amount of any such transfer and/or other fees, Buyer may, subject to the $150,000 limit described in the previous sentence, deduct 50% of the cost of such transfer and/or other fee from the amounts due to Sellers and Option Holders pursuant to Section 2.2.1(b) in accordance with each Seller's and each Option Holder's pro rata share of such transfer or other fee.

7.4.     Legal Opinion. The Buyer will have received from Taft, Stettinius & Hollister LLP, counsel to the Company and the Sellers (or other counsel reasonably acceptable to the Buyer), its opinion with respect to the Contemplated Transactions, which opinion will be in the form attached hereto as Exhibit 7.4.

7.5.     Consents, etc. All actions by (including any authorization, consent or approval) or in respect of (including notice to), or filings with, any Governmental Authority or other Person that are required to consummate the Contemplated Transactions, as disclosed in Schedule 3.3, Schedule 3.4, Schedule 4.3, and Schedule 4.4 or as otherwise reasonably requested by the Buyer, will have been obtained or made, in a manner reasonably satisfactory in form and substance to the Buyer, and no such authorization, consent or approval will have been revoked.

7.6.     FIRPTA Certificate. The Company will have delivered to the Buyer a certification (in such form as may be reasonably requested by counsel to the Buyer) conforming to the requirements of Treasury Regulations 1.1445-2(c)(3) and 1.897-2(h).

7.7.     [Intentionally Omitted].

7.8.     Employment Agreements. Susan Harrison, Steve Nosser, John Shelton, Greg Thornhill, Scott Spivey and Joe Mattiko will have executed Employment Agreements and delivered such agreements to the Buyer. The Acquired Companies will have terminated all other existing employment agreements with their employees. Each Seller's and Option Holder's noncompetition and nonsolicitation obligations pursuant to Section 6.5 of this Agreement will be binding for their full terms regardless of any shorter periods described in their Employment Agreement.

7.9.   Ancillary Agreements. Each of the other Ancillary Agreements will have been executed and delivered to the Buyer by each of the other parties thereto.

7.10.   Repayment of Amounts Owed by Sellers to the Acquired Companies. Sellers will have repaid all amounts they owe to the Acquired Companies as of the Closing Date.

7.11.   Payment of Amounts Due for Accrued Vacation, Illness and Personal Leave. The Sellers will have paid, or caused the Acquired Companies to pay, all Acquired Company employees in full for: (a) all vacation time accrued through December 31, 2003 and (b) all illness and personal time accrued through the Closing Date.

7.12.   Payment of Debt. As of the Closing Date, the Sellers will have repaid or caused the Acquired Companies to repay all Debt listed on Item 1 of Schedule 3.9 and the Sellers will have obtained and delivered or caused the Acquired Companies to obtain and deliver to Buyer documentation satisfactory to Buyer evidencing repayment of such Debt.

7.13.   Company's 401(k) Contributions. As of the Closing Date, the Sellers will have caused the Company to deposit at least $100,000 in a designated 401(k) bank account for the purpose of contributing to the trust associated with the Company's 401(k) plan (regardless whether such contributions would ordinarily be required to be made by such date and without regard to any requirement under the plan that a participant be employed as of the last day of the plan year to share in any such contribution) (a) all elective deferrals withheld from payroll prior to the Closing, plus (b) a nonelective employer contribution at the rate (expressed as a percentage of compensation) described in the plan determined by reference to all eligible payroll for the period beginning with the commencement of the 2004 plan year and ending on the Closing Date, plus (c) an amount equal to the rate (expressed as a percentage of compensation) at which any discretionary employer contributions were made to the plan for the 2003 plan year multiplied by the same eligible payroll amount as is used for purposes of clause (b). Prior to the Closing, the Company's Board of Directors will have authorized (i) the complete vesting for all participants of all amounts in the Company's 401(k) plan as of the Closing Date, (ii) delivery of the discretionary employer contributions to the Company's 401(k) plan as required by clause (c) above, and (iii) merger of the Company's 401(k) plan into Buyer's 401(k) plan.

7.14.   Termination of Certain Existing Agreements. The Company will have terminated or caused to be terminated the agreements listed in Schedule 7.14.

7.15.   Resignations.

7.15.1   Zooth, Inc. Buyer will have received the resignations, effective as of the Closing, of all current directors and officers of the Company. Sellers will cause the Company to deliver certified resolutions by the Company's Board of Directors accepting such resignations and appointing directors and officers designated by Buyer to replace them effective immediately as of the Closing.

7.15.2   Zooth de Mexico. Buyer will have received the resignations, effective as of the Closing, of all managing board members and officers of the Company's Subsidiary. Sellers will cause the Company to deliver a certified partnership action and a certified

managing board action accepting such resignations and appointing managing members and officers designated by Buyer to replace them effective immediately as of the Closing.

7.16.  Assignment of Interest in Zooth de Mexico.  Susan Harrison will have assigned her entire right, title, and interest in and to Zooth de Mexico to Gillette Worldwide Holding LLC.

7.17.  Assignment of Proprietary Rights to the Company.  Sellers will cause the Company to deliver to Buyer written assignments from all Company employees assigning to the Company all right, title and interest in and to all Company Proprietary Rights created by each employee in the course of his or her employment by the Company. Except as set forth in Schedule 3.14, Sellers will cause the Company to deliver to Buyer written assignments from all contractors, agents, and other Persons that have assisted in the design or development of products currently distributed by the Company or Company Proprietary Rights currently used by the Company, assigning to the Company all right, title and interest in and to Company Proprietary Rights created by such contractors, agents and other Persons.

7.18.  Termination of Internal Royalty Payments.  The Company will have delivered to Buyer Royalty Releases executed by Susan Harrison and William G. Harrison III.

7.19.  Loan Agreement with Zooth de Mexico.  The Company will have entered into a written loan agreement with its Subsidiary, Zooth de Mexico, documenting its outstanding loan to Zooth de Mexico. Such loan agreement will be in a form reasonably acceptable to Buyer.

7.20.  Required Votes.  The Company will have submitted to shareholders of the Company for their determination all payments that could be viewed as parachute payments, within the meaning of Section 280G and the regulations thereunder, made to all individuals that could be "disqualified individuals" within the meaning of Code Section 280G(c). The shareholder vote will meet the requirements of Code Section 280G(b)(5)(B) and the regulations thereunder, and will be in a form reasonably satisfactory to Buyer.

7.21.  Design Portfolio.  Sellers will deliver or cause the Acquired Companies to deliver to Buyer (a) written assignments from all Persons that have participated in the development of the designs described in Schedule 1.3 assigning all right, title and interest in and to the designs described in Schedule 1.3 to the Company and (b) all designs, drawings, specifications, artwork, know how, technical data, and other materials describing or related to the designs described in Schedule 1.3.

7.22.  Payment of Accrued Salary and Merit Salary Increases.  Sellers will have caused the Acquired Companies to (i) pay all salaries and benefits of all employees of the Acquired Companies accrued through the Closing Date and (ii) award all deferred merit salary increases described in Schedule 7.22 and pay any and all back pay due to Company employees in connection with such merit salary increases accrued through the Closing Date.

7.23.  Reporting of Pre-Closing Insurance Claims.  Sellers will have caused the Acquired Companies to file any and all insurance claims that, to Sellers' Knowledge, accrued prior to the Closing.

7.24.    Funding of Accounts.  As of the Closing Date, Sellers will cause the Company to maintain sufficient cash in its bank accounts to pay all checks that have been issued by the Acquired Companies prior to the Closing Date but have not cleared as of the Closing Date. Sellers shall, within three (3) Business Days of the Closing Date, provide the Buyer with Schedule 7.24, which shall describe all such bank accounts and specify the associated cash balances as of the Closing Date.

7.25.    [INTENTIONALLY OMITTED]

8.    BUYER'S OBLIGATIONS.

On or before the Closing Date, or after the Closing Date as applicable, Buyer will take, or will cause the applicable Person to take, the following actions:

8.1.    Payment.  Buyer will make the payments described in Section 2.4.

8.2.    Legal Opinion.  The Sellers' Representative will have received from Carol S. Fischman, Esq., Deputy General Counsel of the Buyer, an opinion with respect to the Contemplated Transactions, which opinion will be in form and substance reasonably satisfactory to the Sellers' Representative and cover such matters with respect to the Contemplated Transactions as the Sellers' Representative or its counsel may reasonably request.

8.3.    Ancillary Agreements.  Each of the Ancillary Agreements to which Buyer is a party will have been executed and delivered to the Sellers' Representative by each of the other parties thereto.

8.4.    Escrow Agent Fees.  Pursuant to the Escrow Agreement, all invoices for Escrow Agent Fees will be submitted to the Buyer. Sellers and Option Holders have, as of the Closing Date, each paid 50% of all Escrow Agent Fees identified in the Escrow Agent's first invoice to Buyer. Buyer will pay all subsequent invoices issued by the Escrow Agent and will deduct 50% of the amount of such invoices from the amounts due to Sellers and Option Holders pursuant to Section 2.2.1(b) in accordance with each Seller's and each Option Holder's pro rata share.

9.    [Intentionally Omitted].

10.    INDEMNIFICATION.

10.1.    Indemnification by the Sellers.

10.1.1    Indemnification.  Subject to the limitations set forth in this Section 10, each Seller will jointly and severally (or in the case of clauses (c) and (d) below, severally, solely as to itself) indemnify and hold harmless the Buyer and each of its Affiliates (including, following the Closing, each Acquired Company), and the Representatives and Affiliates of each of the foregoing Persons (each, a "Buyer Indemnified Person"), from, against and in respect of any and all Actions, Liabilities, Governmental Orders, Encumbrances, losses, damages, bonds, dues, assessments, fines, penalties, Taxes, fees,

costs (including costs of investigation, defense and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorneys' and experts' fees and expenses), whether or not involving a Third Party Claim (collectively, "Losses"), incurred or suffered by the Buyer Indemnified Persons or any of them as a result of, arising out of or relating to:

(a)    any fraud of any of the Sellers or the Company or any breach of, or inaccuracy in, any representation or warranty made by the Company or the Sellers or any of them in this Agreement (other than in Sections 3.16, 3.17, 3.18 and 4), any Ancillary Agreement or in any document, Schedule, instrument or certificate delivered pursuant to this Agreement;

(b)    any breach or violation of any covenant or agreement of the Company (including under Sections 6 or 7 or this Section 10) to the extent required to be performed or complied with by the Company pursuant to this Agreement or any Ancillary Agreement;

(c)    any breach of, or inaccuracy in, any representation or warranty made by such Seller in Section 4, any Ancillary Agreement, or in any document, Schedule, instrument or certificate delivered pursuant to this Agreement;

(d)    any breach or violation of any covenant or agreement of such Sellers or any of them (including under Sections 6 or 7 or this Section 10) in or pursuant to this Agreement or any Ancillary Agreement;

(e)    any breach of, or inaccuracy in, any representation or warranty made by such Seller in Sections 3.16, 3.17, or 3.18; or

(f)    any action or inaction taken by an Acquired Company or Jet Fair Industrial prior to Closing with regard to the existing $275,000 letter of credit with State National Bank of Texas.

(g)    any inability or difficulty experienced, or incremental cost incurred, by the Buyer or any of its Subsidiaries in terminating all or any part of the business relationship with Universal Distribution, S.A. DE C.V. and/or any of its Affiliates ("Universal") arising from any written agreement that exists or that is claimed to exist between Universal and an Acquired Company. (The parties hereby agree that inability, difficulty or incremental cost includes payments made pursuant to any such written agreement while Buyer or any of its Subsidiaries is attempting to terminate such agreement.)

10.1.2    Monetary Limitations.

(a)    The Sellers will have no obligation to indemnify the Buyer Indemnified Persons pursuant to Sections 10.1.1(a) and 10.1.1(c) in respect of Losses arising from the breach of, or inaccuracy in, any representation or warranty described therein unless the aggregate amount of all such Losses incurred or suffered by the Buyer Indemnified Persons exceeds $250,000 (at which point the Sellers will indemnify the

Buyer Indemnified Persons for all Losses that exceed $250,000 in the aggregate), and the Sellers' aggregate liability in respect of claims for indemnification pursuant to Sections 10.1.1(a) and 10.1.1(c) will not exceed $7 million; provided, however, that foregoing limitations will not apply to (a) claims for indemnification pursuant to Sections 10.1.1(a) and 10.1.1(c) in respect of breaches of, or inaccuracies in, representations and warranties set forth in Sections 3.1.1 (Organization), 3.2 (Power and Authorization), 3.4(e) (Breach of Organizational Documents), 3.5 (Capitalization), 3.14.9 (relating to ownership of Design Portfolio), 3.15.2 (Illegal Payments), 3.28 (No Brokers), 4.1 (Organization), 4.2 (Power and Authorization), 4.4(d) (No Breach of Organizational Documents of Seller), 4.5 (Title) or 4.6 (No Brokers) or (b) claims based upon fraud or intentional misrepresentation.

(b)    The Sellers will have no obligation to indemnify the Buyer Indemnified Persons in respect of Losses arising from (i) the breach of, or inaccuracy in, any representation or warranty in Sections 3.16, 3.17, or 3.18 and/or (ii) under Section 11.1, unless the aggregate amount of all such Losses incurred or suffered by the Buyer Indemnified Persons under Sections 3.16, 3.17, 3.18 and/or 11.1 exceeds $100,000 (at which point the Sellers will indemnify the Buyer Indemnified Persons for all Losses that exceed $100,000 in the aggregate).

(c)    Claims for indemnification pursuant to any other provision of Section 10.1.1 are not subject to the monetary limitations set forth in this Section 10.1.2.

10.1.3    Additional Limitations Relating to Certain Sellers.  Notwithstanding any provision of Section 10.1 to the contrary, the liability of each Seller listed in Schedule 10.1.3 will not exceed such Seller's Pro Rata Amount of any amount due to a Buyer Indemnified Person.

10.2.    Indemnification by the Buyer.

10.2.1    Indemnification.  Subject to the limitations set forth in this Section 10, the Buyer will indemnify and hold harmless each Seller and each Seller's respective Affiliates, and the Representatives and Affiliates of each of the foregoing Persons (each, a "Seller Indemnified Person"), from, against and in respect of any and all Losses incurred or suffered by the Seller Indemnified Persons or any of them as a result of, arising out of or relating to, directly or indirectly:

(a)    any breach of, or inaccuracy in, any representation or warranty made by the Buyer in this Agreement any Ancillary Agreement or in any document, Schedule, instrument or certificate delivered pursuant to this Agreement; or

(b)    any breach or violation of any covenant or agreement of the Buyer (including under Section 8 or this Section 10) or any covenant or agreement of the Company, to the extent required to be performed or complied with by the Company after the Closing, in either case in or pursuant to this Agreement or any Ancillary Agreement.

10.2.2   Monetary Limitations.  The Buyer will have no obligation to indemnify the Seller Indemnified Persons pursuant to Section 10.2.1(a) in respect of Losses arising from the breach of, or inaccuracy in, any representation or warranty described therein unless and until the aggregate amount of all such Losses incurred or suffered by the Seller Indemnified Persons exceeds $250,000 (at which point the Buyer will indemnify the Seller Indemnified Persons for all Losses that exceed $250,000 in the aggregate), and the Buyer's aggregate liability in respect of claims for indemnification pursuant to Section 10.2.1(a) will not exceed $7 million; provided, however, that foregoing limitations will not apply to (a) claims for indemnification pursuant to Section 10.2.1(a) in respect of breaches of, or inaccuracies in, representations and warranties set forth in Sections 5.1 (Organization), 5.2 (Power and Authorization), 5.4(d) (Breach of Organizational Documents) or 5.5 (No Brokers) or (b) claims based upon fraud or intentional misrepresentation.  Claims for indemnification pursuant to any other provision of Section 10.2.1 are not subject to the limitations set forth in this Section 10.2.2.

10.3.   Time for Claims.  No claim may be made or suit instituted seeking indemnification pursuant to Section 10.1.1(a), 10.1.1(c), 10.1.1(e) or 10.2.1(a) for any breach of, or inaccuracy in, any representation or warranty unless a written notice describing such breach or inaccuracy in reasonable detail in light of the circumstances then known to the Indemnified Party, is provided to the Indemnifying Party:

(a)   at any time, in the case of any breach of, or inaccuracy in, the representations and warranties set forth in Sections 3.1.1 (Organization), 3.2 (Power and Authorization), 3.4(e) (Breach of Organizational Documents), 3.5 (Capitalization), 3.14.9 (relating to ownership of Design Portfolio), 3.28 (No Brokers), 4.1 (Organization), 4.2 (Power and Authorization), 4.4(d) (No Breach of Organizational Documents of Seller), 4.5 (Title), 4.6 (No Brokers), 5.1 (Organization), 5.2 (Power and Authorization), 5.4(d) (Breach of Organizational Documents) or 5.5 (No Brokers);

(b)   at any time, in the case of any claim or suit based upon criminal violations of law, fraud, intentional misrepresentation or other intentional misconduct;

(c)   at any time prior to the thirtieth day after the expiration of the applicable statute of limitations (taking into account any tolling periods and other extensions) in the case of any breach of, or inaccuracy in, the representations and warranties set forth in Sections 3.16 (Tax Matters), 3.15.2 (No Illegal Payments, Etc.), 3.17 (Employee Benefit Plans) or 3.18 (Environmental Regulation); and

(d)   at any time prior to eighteen (18) months following the Closing Date, in the case of any breach of, or inaccuracy in, any other representation and warranty in this Agreement.

Claims for indemnification pursuant to any other provision of Sections 10.1.1 and 10.2.1 are not subject to the limitations set forth in this Section 10.3.

10.4.   Third Party Claims.

10.4.1   <u>Notice of Claim</u>. If any third party notifies an Indemnified Party with respect to any matter (a "<u>Third Party Claim</u>") which may give rise to an Indemnified Claim against an Indemnifying Party under this Section 10, then the Indemnified Party will promptly give written notice to the Indemnifying Party; <u>provided, however,</u> that no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation under this Section 10, except to the extent such delay actually and materially prejudices the Indemnifying Party.

10.4.2   <u>Assumption of Defense, etc.</u> The Indemnifying Party will be entitled to participate in the defense of any Third Party Claim that is the subject of a notice given by the Indemnified Party pursuant to Section 10.4.1. In addition, the Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (a) the Indemnifying Party gives written notice to the Indemnified Party within fifteen (15) Business Days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any and all Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (b) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have adequate financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (c) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief against the Indemnified Party, (d) the Indemnified Party has not been advised by counsel that an actual or potential conflict exists between the Indemnified Party and the Indemnifying Party in connection with the defense of the Third Party Claim, (e) the Third Party Claim does not relate to or otherwise arise in connection with Taxes or any criminal or regulatory enforcement Action, (f) settlement of, an adverse judgment with respect to, or the Indemnifying Party's conduct of the defense of the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to be adverse to the Indemnified Party's reputation or continuing business interests (including its relationships with current or potential customers, suppliers or other parties material to the conduct of its business) and (g) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently. The Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; <u>provided, however,</u> that the Indemnifying Party will pay the fees and expenses of separate co-counsel retained by the Indemnified Party that are incurred prior to Indemnifying Party's assumption of control of the defense of the Third Party Claim.

10.4.3   <u>Limitations on Indemnifying Party</u>. The Indemnifying Party will not consent to the entry of any judgment or enter into any compromise or settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless such judgment, compromise or settlement (a) provides for the payment by the Indemnifying Party of money as sole relief for the claimant, (b) results in the full and general release of the Buyer Indemnified Persons or Seller Indemnified Persons, as applicable, from all liabilities arising or relating to, or in connection with, the Third Party Claim and (c) involves no finding or admission of any violation of Legal Requirements or

the rights of any Person and no effect on any other claims that may be made against the Indemnified Party.

10.4.4    Indemnified Party's Control. If the Indemnifying Party does not deliver the notice contemplated by clause (a), or the evidence contemplated by clause (b), of Section 10.4.2 within fifteen (15) Business Days after the Indemnified Party has given notice of the Third Party Claim, or otherwise at any time fails to conduct the defense of the Third Party Claim actively and diligently, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith). If such notice and evidence is given on a timely basis and the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently but any of the other conditions in Section 10.4.2 is or becomes unsatisfied, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim; provided, however, that the Indemnifying Party will not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent will not be unreasonably withheld or delayed). In the event that the Indemnified Party conducts the defense of the Third Party Claim pursuant to this Section 10.4.4, the Indemnifying Party will (a) advance the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) and (b) remain responsible for any and all other Losses that the Indemnified Party may incur or suffer resulting from, arising out of, relating to, in the nature of or caused by the Third Party Claim to the fullest extent provided in this Section 10.

10.4.5    Consent to Jurisdiction Regarding Third Party Claim. The Buyer and each of the Sellers, each in its capacity as an Indemnifying Party, hereby consents to the non-exclusive jurisdiction of any court in which any Third Party Claim may brought against any Indemnified Party for purposes of any claim which such Indemnified Party may have against such Indemnifying Party pursuant to this Agreement in connection with such Third Party Claim, and in furtherance thereof, the provisions of Section 12.12 are incorporated herein by reference, mutatis mutandis.

10.5.    No Circular Recovery. Each Seller hereby agrees that it will not make any claim for indemnification against the Buyer or any Acquired Company by reason of the fact that such Seller was a controlling person, director, employee or Representative of an Acquired Company or was serving as such for another Person at the request of the Buyer or an Acquired Company (whether such claim is for Losses of any kind or otherwise and whether such claim is pursuant to any statute, Organizational Document, Contractual Obligation or otherwise) with respect to any claim brought by a Buyer Indemnified Person against any Seller relating to this Agreement or any of the Contemplated Transactions. With respect to any claim brought by a Buyer Indemnified Person against any Seller relating to this Agreement and any of the Contemplated Transactions, each Seller expressly waives any right of subrogation, contribution, advancement, indemnification or other claim against any

Acquired Company with respect to any amounts owed by such Seller pursuant to this Section 10.

10.6. _Indemnity Escrow._ For as long as there are funds in the account maintained under the Escrow Agreement for the purpose of satisfying portions of Sellers' indemnification obligations pursuant to this Agreement, any and all amounts payable by the Sellers as Indemnifying Parties to a Buyer Indemnified Person will be paid in cash first out of such account established pursuant to the Escrow Agreement, and thereafter by the Sellers in accordance with payment instructions provided by the Buyer. The existence of the escrowed funds under the Escrow Agreement will not be deemed to limit the amount of any allowable claims by any Buyer Indemnified Person pursuant to this Agreement for Losses in excess of the amount of such escrowed funds.

10.7. _Right of Set-off._ Each of the parties will be entitled to set-off, recoup, or deduct any amounts owed to it pursuant to this Agreement or the Escrow Agreement, against any amounts which such party would otherwise be required to pay pursuant to this Agreement or the Escrow Agreement, including any Deferred Consideration. If a party retains any amount pursuant to this Section 10.7 that is later proven to have been improperly retained, such party will promptly return such amount, plus Interest from the date the amount was retained, to the party to whom such amount was originally owed.

10.8. _Mitigation of Damages._ If any event occurs that entitles a party to assert a claim for indemnification pursuant to this Section 10, no Losses will be deemed to have been sustained by such Indemnified Party to the extent of (a) any Tax savings actually recognized by such party in the year the Loss is incurred (calculated on a with and without basis) or (b) any cash proceeds received by such Indemnified Party or its Affiliates from a third party pursuant to an insurance policy with respect to such Losses.

10.9. _Remedies Cumulative._ The rights of each Buyer Indemnified Person and Seller Indemnified Person under this Section 10 are cumulative, and each Buyer Indemnified Person and Seller Indemnified Person, as the case may be, will have the right in any particular circumstance, in its sole discretion, to enforce any provision of this Section 10 without regard to the availability of a remedy under any other provision of this Section 10. Notwithstanding the foregoing, the remedies described in this Section 10 will be each party's exclusive remedy with respect to monetary claims arising from breaches of representations and warranties made in this Agreement. Each party will retain the right to pursue all claims and causes of action (whether or not specified in this Section 10) for specific performance, equitable relief, and other non-monetary remedies relating to breaches of representations and warranties made in this Agreement.

11. **TAX MATTERS.**

11.1. _Tax Indemnification._ Each Seller will jointly and severally indemnify, exonerate and hold free and harmless each Buyer Indemnified Person from and against any Losses attributable to (a) all Taxes (or the non-payment thereof) of the Acquired Companies for all Taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date

("Pre-Closing Tax Period"), (b) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Acquired Company is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 or any analogous or similar state, local, or foreign law or regulation and (c) any and all Taxes of any person imposed on an Acquired Company as a transferee or successor, by contract, or otherwise; provided, however, that Sellers will be liable for Taxes pursuant to clauses (a), (b) and (c) above only to the extent that such Taxes exceed the amount, if any, included in accrued liability for U.S. federal and state and foreign income taxes on the face of the Closing Balance Sheet used for purposes of the Working Capital Adjustment. The right of a Buyer Indemnified Person to recover Losses under this Section 11.1 is expressly subject to the deductible described in Section 10.1.2(b). The Sellers listed in Schedule 10.1.3 will be held liable only for their pro rata share of any indemnification obligations that arise pursuant to this Section 11.1.

11.2.  Straddle Period. In the case of any Taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes of the Acquired Companies based upon or measured by net income or gain for the Pre-Closing Tax Period will be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which any Acquired Company holds a beneficial interest will be deemed to terminate at such time). The amount of Taxes other than Taxes of the Acquired Companies based upon or measured by net income or gain for a Straddle Period which relate to the Pre-Closing Tax Period will be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction, the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

11.3.  Tax Sharing Agreements. All Tax sharing agreements or similar agreements and all powers of attorney with respect to or involving any Acquired Company will be terminated prior to the Closing and, after the Closing, the Acquired Companies will not be bound thereby or have any Liability thereunder.

11.4.  Certain Taxes and Fees. All transfer, documentary, sales, use stamp, registration and other such Taxes, and any conveyance fees or recording charges incurred in connection with the Contemplated Transactions, will be paid by Sellers when due. Sellers will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges and, if required by applicable law, Buyer will (and will cause its Affiliates to) join in the execution of any such Tax Returns and other documentation.

11.5.  Cooperation on Tax Matters. Buyer, the Acquired Companies, and Sellers will cooperate fully, as and to the extent reasonably requested by the other party, in connection with any Tax matters relating to the Acquired Companies (including by the provision of reasonably relevant records or information). The party requesting such cooperation will pay the reasonable out-of-pocket expenses of the other party.

## 12.   MISCELLANEOUS.

12.1.   Notices.  All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered, given or otherwise provided:

(a)    by hand (in which case, it will be effective upon delivery);

(b)    by facsimile (in which case, it will be effective upon receipt of confirmation of good transmission); or

(c)    by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the Business Day after being deposited with such courier service);

in each case, to the address (or facsimile number) listed below:

If to the Buyer or the Company, to it at:

> The Gillette Company
> Prudential Tower Building
> Boston, Massachusetts, 02199
> Telephone number:  (617) 421-7000
> Facsimile number:  (617) 463-8600
> Attention General Counsel's Office

with a copy to:

> Ropes & Gray LLP
> One International Place
> Boston, Massachusetts 02110
> Telephone number: (617) 951-7000
> Facsimile number: (617) 951-7050
> Attention: Mary Weber, Esq.

If to the Sellers or the Option Holders, to the Sellers' Representative care of:

> Taft, Stettinius & Hollister LLP
> 425 Walnut Street, Suite 1800
> Cincinnati, Ohio 45202-3957
> Telephone number:  (513) 357-9381
> Facsimile number:  (513) 381-0205
> Attention:  George D. Molinsky

Each of the parties to this Agreement may specify different address or facsimile number by giving notice in accordance with this Section 12.1 to each of the other parties hereto.

12.2.  Succession and Assignment; No Third-Party Beneficiary.  Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a party hereto for all purposes hereof.  No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties; provided, however, that the Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, and (b) designate one or more of its Affiliates to perform its obligations hereunder, in each case, so long as Buyer is not relieved of any Liability hereunder.  Except as expressly provided herein, this Agreement is for the sole benefit of the parties and their permitted successors and assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties and such successors and assignees, any legal or equitable rights hereunder.

12.3.  Amendments and Waivers.  No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by Buyer and the Sellers' Representative, or in the case of a waiver, by the party (in the case of the Sellers, by the Sellers' Representative) against whom the waiver is to be effective.  No waiver by any party of any breach or violation or, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

12.4.  Provisions Concerning Sellers' Representative.

12.4.1  Appointment.  Each Seller and Option Holder hereby appoints Susan Harrison as the agent, proxy and attorney-in-fact for such Seller and Option Holder for all purposes under this Agreement (including full power and authority to act on the Sellers' and the Option Holder's behalf) and the Escrow Agreement.  Without limiting the generality of the foregoing, the Sellers' Representative will be authorized to:

(a)  in connection with the Closing, execute and receive all documents, instruments, certificates, statements and agreements on behalf of and in the name of the Sellers and Option Holders necessary to effectuate the Closing and consummate the Contemplated Transactions;

(b)  take all actions on behalf of the Sellers and the Option Holders with respect to the matters set forth in Section 2.5;

(c)  take all actions on behalf of the Sellers in connection with any claims made under Section 10 to defend or settle such claims, and to make payments in respect of such claims;

9460416.doc

    (d)    take all actions on behalf of the Sellers and the Option Holders in connection with the escrow account established pursuant to the Escrow Agreement (including giving any instructions to the Escrow Agent, on behalf of the Sellers and Option Holders, to pay from such escrow account any amounts owed by the Sellers and Option Holders pursuant to this Agreement);

    (e)    execute and deliver, should it elect to do so in its sole discretion, on behalf of the Sellers and the Option Holders, any amendment to this Agreement so long as such amendment will apply equally to all Sellers and Option Holders; and

    (f)    take all other actions to be taken by or on behalf of the Sellers and the Option Holders and exercise any and all rights which the Sellers and the Option Holders are permitted or required to do or exercise under this Agreement.

    12.4.2   Liability. The Sellers' Representative will not be liable to any Seller or Option Holder for any action taken by her in good faith pursuant to this Agreement, and the Sellers and Option Holders will jointly and severally indemnify the Sellers' Representative from any Losses arising out of her serving as the Sellers' Representative hereunder. The Sellers' Representative is serving in that capacity solely for purposes of administrative convenience, and is not personally liable in such capacity for any of the obligations of the Sellers or the Option Holders hereunder, and the Buyer agrees that it will not look to the personal assets of the Sellers' Representative, acting in such capacity, for the satisfaction of any obligations to be performed by the Sellers or the Option Holders hereunder.

    12.5.   Entire Agreement. This Agreement, together with the other Ancillary Agreements and any documents, instruments and certificates explicitly referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof and supersede any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

    12.6.   Schedules; Listed Documents, etc. Neither the listing nor description of any item, matter or document in any Schedule hereto nor the furnishing or availability for review of any document will be construed to modify, qualify or disclose an exception to any representation or warranty of any party made herein or in connection herewith, except to the extent that such representation or warranty specifically refers to such Schedule and such modification, qualification or exception is described in such Schedule or provides a cross-reference to another Schedule.

    12.7.   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument. This Agreement will become effective when duly executed by each party hereto.

    12.8.   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending

term or provision in any other situation or in any other jurisdiction. In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

12.9.    Headings. The headings contained in this Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

12.10.    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The parties intend that each representation, warranty and covenant contained herein will have independent significance. If any party has breached or violated, or if there is an inaccuracy in, any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the party has breached or violated, or there is an inaccuracy in, the first representation, warranty or covenant.

12.11.    Governing Law. This Agreement, the rights of the parties and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed in accordance with the domestic substantive laws of The State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

12.12.    Jurisdiction; Venue; Service of Process.

12.12.1    Jurisdiction. Subject to the provisions of Sections 2.5.4 and 10.4.5, each party to this Agreement, by its execution hereof, (a) hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of Delaware or the United States District Court located in the State of Delaware for the purpose of any Action between the parties arising in whole or in part under or in connection with this Agreement, (b) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court and (c) hereby agrees not to commence any such Action other than before one of the above-named courts. Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts

solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

12.12.2  Venue. Each party agrees that for any Action between the parties arising in whole or in part under or in connection with this Agreement, such party bring Actions only in the State of Delaware. Each party further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

12.12.3  Service of Process. Each party hereby (a) consents to service of process in any Action between the parties arising in whole or in part under or in connection with this Agreement in any manner permitted by Delaware law, (b) agrees that service of process made in accordance with clause (a) or made by registered or certified mail, return receipt requested, at its address specified pursuant to Section 12.1, will constitute good and valid service of process in any such Action and (c) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clause (a) or (b) does not constitute good and valid service of process.

12.13.  Specific Performance. Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity.  Each party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert that the defense that a remedy at law would be adequate.

12.14.  Waiver of Jury Trial. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

*[Signature Page Follows]*

-59-

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.


THE BUYER:                          THE GILLETTE COMPANY


                                    By:_____
                                        Name:
                                        Title:


THE COMPANY:                        ZOOTH, INC.


                                    By:_____
                                        Name:
                                        Title:


THE SELLERS:                        _____
                                    Susan Harrison

                                    HARRISON FAMILY TRUST

                                    By:_____
                                        Name:
                                        Title:

                                    _____
                                    Steve Nosser

                                    _____
                                    Cindy Nosser

                                    _____

                                    Kathy and Pat Allen

                                    _____
                                    Tina Harrison

                                    _____
                                    W.G. Harrison IV

_____
Larry Luxenburg

_____
Mabel Luxenburg

_____
John Shelton

_____
Steve Kitchen

EMILY WALDRIP TRUST

By:_____
   Name:
   Title:

_____
John and Andrea Wellsfry

SELLERS' REPRESENTATIVE:

_____
Name: Susan Harrison
Title: Sellers' Representative

THE OPTION HOLDERS:

_____
John Shelton

_____
Greg Thornhill

_____
Scott Spivey

## EXHIBIT 1.2

### Option Holder's Pro Rata Amount

| Name | Number of Shares | |
|------|------------------|--|
| John Shelton | 40 | 65.76% |
| Scott Spivey | 10 | 16.44% |
| Greg Thornhill | 15 | 17.80% |

# EXHIBIT B

CAUSE NO. *164,474-C*

| | | |
|---|---|---|
| SUSAN HARRISON; WILLIAM G. | § | IN THE DISTRICT COURT |
| HARRISON, III INDIVIDUALLY AND | § | |
| IN HIS CAPACITY AS TRUSTEE FOR | § | 89TH DISTRICT COURT |
| THE HARRISON FAMILY TRUST; | § | |
| CINDY NOSSER; KATHY ALLEN; | § | |
| PAT ALLEN; TINA HARRISON; W.G. | § | FILED FOR RECORD |
| HARRISON, IV; LARRY | § | AT 2.25 O'Clock ___M |
| LUXENBERG; JOHN SHELTON; and | § | |
| WILLIAM G. HARRISON, III IN HIS | § | JUN 2 2006 |
| CAPACITY AS TRUSTEE FOR THE | § | |
| EMILY WALDRUP TRUST; | § | DORSEY R TRAPP, Clerk Dist |
| | § | Courts & County Courts at Law |
| **Plaintiffs,** | § | Wichita County, Texas |
| | § | By_____Deputy |
| **v.** | § | |
| | § | WICHITA COUNTY, TEXAS |
| THE PROCTOR & GAMBLE | § | |
| COMPANY; TAFT, STETTINIUS | § | |
| & HOLLISTER LLP; and | § | |
| THOMAS E. GROSSMAN. | § | |
| | § | |
| **Defendants.** | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE:

SUSAN HARRISON, WILLIAM G. HARRISON, III INDIVIDUALLY AND IN HIS

CAPACITY AS TRUSTEE FOR THE HARRISON FAMILY TRUST; CINDY NOSSER,

KATHY ALLEN, PAT ALLEN, TINA HARRISON; W.G. HARRISON, IV; LARRY

LUXENBERG, JOHN SHELTON, and WILLIAM G. HARRISON, III IN HIS CAPACITY

AS TRUSTEE FOR THE EMILY WALDRUP TRUST ("Plaintiffs") file this Original Petition

complaining of **The Proctor & Gamble Company** ("P&G"); Taft, Stettinius & Hollister LLP

("**Taft Law Firm**") and Thomas E. Grossman ("**Grossman**") (collectively referred to as

"Defendants") and for causes of action respectfully shows as follows:

---

## I.
## DISCOVERY CONTROL PLAN

1.1     Plaintiffs intend for the discovery in this lawsuit to be conducted under Level 3 as set forth in Rule 190 of the Texas Rules of Civil Procedure.

## II.
## PARTIES

2.1     Plaintiffs are former stockholders in Zooth, Inc. – a Texas Corporation (hereinafter "Zooth"). Zooth maintained its principal place of business in Wichita Falls, Wichita County, Texas. At the time the acts complained of herein occurred, the Plaintiffs were residents of various counties within the State of Texas including Wichita County.

2.2     Defendant The Proctor & Gamble Company (hereinafter "P&G") is a corporation organized under the laws of the State of Ohio. P&G does business worldwide, as well as here in Wichita County, Texas. The Proctor & Gamble Company may be served with process by serving CT Corp System, 350 St. Paul Street, Dallas, Texas 75201 or Steven W. Jemison, Attn: Corporate Secretary, One Proctor & Gamble Plaza, Cincinnati, Ohio 45202.

2.3     Defendant Thomas E. Grossman ("Grossman") is an individual who resides in the State of Ohio. Although Grossman does business within the state of Texas, he does not maintain a regular place of business or a registered agent in Texas. Consequently, he may be served under the Long Arm Statute through the Texas Secretary of State 1019 Brazos Street, Austin, Texas 78701 who shall forward a copy to his mailing address: **Thomas E. Grossman, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202**.

2.4     Defendant Taft, Stettinius & Hollister LLP is a Limited Liability Partnership

Plaintiffs' Original Petition
G:\OPEN CASE FILES - LITIGATION\HARRISON - P & G\PLEADINGS\LAWSUIT AGAINST TAFT AND P&G\ORIGINAL PETITION DRAFT.DOC

Page 2

organized under the laws of Ohio. Although, Taft, Stettinius & Hollister LLP engages in business in Texas, it does not maintain a registered agent within the State of Texas. Consequently, it may be served may be served with process under the Long Arm Statute through the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who shall forward a copy to Taft, Stettinius & Hollister LLP, Attn: Managing Partner, at its mailing address: **425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202.**

## III.
## JURISDICTION AND VENUE

3.1     This Court has jurisdiction over this matter in that the Plaintiffs are citizens of the State of Texas and the Defendants, as set forth more specifically below, have maintained systematic and continuous contacts with the State of Texas or have committed torts against the Plaintiffs herein in the State of Texas and have otherwise made specific contacts with the State of Texas in connection with the claims made herein such that they have purposely availed themselves to the jurisdiction of the courts of this state and there are sufficient contacts by these Defendants for both specific and general jurisdiction so as to satisfy the requirements of the Due Process Clause of the United States Constitution.

3.2     Wichita County is the county of proper venue in that all or a substantial portion of the events giving rise to this suit occurred in Wichita County, Texas.

## IV.
## CONDITIONS PRECEDENT

4.1     All conditions precedent to the filing of this suit have occurred, will be performed, have been waived or otherwise would be futile such that this suit is properly before this court.

**Plaintiffs' Original Petition**
G:\OPEN CASE FILES - LITIGATION\HARRISON - P & G\PLEADINGS\LAWSUIT AGAINST TAFT AND P&G\ORIGINAL PETITION DRAFT.DOC

Page 3

## V.
## BACKGROUND FACTS

5.1     The Plaintiffs are all former stockholders in Zooth which was founded by Plaintiff Susan Harrison in the early 1990's in Wichita Falls, Texas. Zooth started as a small, family run operation with a focus on designing and producing tooth brushes and related dental products for children. Over time, Zooth created strong alliances and licensing arrangements with a host of popular and recognizable children's' characters. By the year 2000, Zooth had built itself up to a position of being a leader in the children's' oral/dentistry market and had become highly regarded for its efficiencies, creativity and increasing market share.

5.2     In the past, various representatives of Gillette, Inc. ("Gillette) a leading multi-national consumer products company had made overtures about their interest and desire to "do something" with Zooth. In the latter part of 2003, the stockholders of Zooth decided to test the market, and conversations with Gillette representatives were commenced. Ultimately, these conversations resulted in Gillette offering to purchase all of the outstanding shares of Zooth for the purpose of continuing to operate Zooth as an ongoing business enterprise.

5.3     The Plaintiff stockholders retained Thomas E. Grossman and his firm – the Taft Law Firm – to represent their interests. Mr. Grossman and other lawyers of the Taft Law Firm visited Texas on a number of occasions in the course of representing Plaintiffs. They communicated constantly with stockholders located in Wichita Falls and performed legal services within and throughout the State of Texas in connection with the Zooth/Gillette transaction.

5.4     Among other responsibilities, Mr. Grossman and the Taft Law Firm had the duty to make sure that all of the Plaintiffs' interests were being addressed and to ensure that all reasonable and prudent measures were undertaken for such a transaction. The final agreement that was

negotiated by Grossman and the Taft Law Firm provided that, in exchange for their shares in Zooth, the Plaintiffs would receive approximately $28 million dollars up front and, depending on the future performance of Zooth, Plaintiffs could earn up to an additional $12 million subsequent to the closing of the transaction.

5.5    The transaction closed on or about June 4, 2004 and a Stock Purchase Agreement (the "Contract") was executed on that date. On or about November 1, 2004, just five months after this sale closed, Gillette announced that it was going to be acquired by P&G. From that point on, the nature of the future performance capabilities of Gillette was altered and diminished and it became impossible for Gillette to fully perform its duties under the contract. Upon taking control of Gillette, P&G, not a party to the Contract, engaged in numerous acts designed to frustrate and otherwise impede Gillette from fully reaching its performance goals under the Contract. P&G closed its merger with Gillette on or about October 1, 2005.

5.6    Plaintiffs bring this suit against P&G on account of its unjustified and unlawful actions in interfering with and preventing Gillette and Plaintiffs from performing under the Contract and otherwise interfering with Plaintiffs' existing contract and/or business relationship with Gillette. Plaintiffs also bring this suit against Grossman and the Taft Law Firm on account of the lawyers' failure to act as reasonably prudent lawyers in failing to undertake appropriate measures to address and ensure that Plaintiffs' interests would be adequately protected in the event of a change in control of Gillette or in the event that Gillette acted to prevent Plaintiffs from earning the additional compensation due them pursuant to the terms of the Contract. The Defendants should be held jointly and severally liable to the Plaintiffs for the damages which have been sustained by the Plaintiffs.

## VI.
## CAUSES OF ACTION

*A.*    *Tortious Interference with Contract and Existing Business Relationship by P&G.*

6.1    A contract had been executed by and between the Plaintiffs and Gillette. In addition, as a result of the contract, the Plaintiffs and Gillette had an existing and continuing business relationship.

6.2    Among other things, the Contract provided that the Plaintiffs would receive additional, significant sums which were predicated on the continuing and future performance of Gillette with regard to marketing and selling Zooth products and design portfolio products as defined in the Contract. Gillette was contractually obligated to act in all commercially reasonable ways to facilitate and achieve these performance based incentives.

6.3    Upon announcing its takeover of Gillette and its assumption of Gillette operations, P&G unlawfully and without justification undertook to interfere with and otherwise prevent Gillette and/or Zooth from fully performing under the Contract and thereby damaging the Plaintiffs. Among other things, P&G interfered with the marketing of Zooth products, Gillette's efforts to expand and continue to develop Zooth's products and markets, its stability in the marketplace and its employment of key employees.

6.4    The aforesaid acts and omissions, when viewed objectively, involved an extreme likelihood of economic injury to Plaintiffs which P&G subjectively knew or should have known would occur. Nevertheless, P&G proceeded to act willfully and intentionally with regard to the rights of Plaintiffs such that the Plaintiffs are entitled to an award of exemplary damages against P&G.

***B.    Negligence against Grossman and the Taft Law Firm.***

6.5    Grossman and various Taft Law Firm members and lawyers personally delivered or purported to deliver legal representation, services and counsel to Plaintiffs in their individual capacity and as members of the Taft Law Firm. The Taft Law Firm is liable for its own actions in this case and by the theory of respondeat superior on account of the negligent acts of Mr. Grossman and its other employees who acted in this transaction. These Defendants accordingly owed a duty to Plaintiff to properly and competently provide legal representation, services and counsel to Plaintiffs.

6.6.    During the relevant time period, these Defendants committed one or more of the following acts or omissions, which amounted to an act and/or omission which a reasonably prudent law firm would not have done in the same or similar circumstances, proximately causing the occurrences, injuries, and damages complained of herein including but not limited to failing to conduct a thorough due diligence effort, failing to negotiate and draft a proper contract, failing to disclose potential conflicts of interest and failing to otherwise protect the interests of the Plaintiffs.

6.7.    Plaintiffs are entitled to recover from Defendants all actual damages occasioned by their negligence both jointly and severally.

## VII.

## DAMAGES

7.1.    As a direct and proximate cause or result of the tortious conduct described herein, the Plaintiffs have incurred the following damages which they seek to recover jointly and severally from the Defendants, including but not limited to:

A.    All actual economic damages sustained by them as a result of the Defendants' tortious interference and/or negligence;

B.    Exemplary Damages due to P&G's willful and intentional misconduct;

C.    A disgorgement of all fees that they have been paid to the Taft Law Firm as well as all actual damages occasioned by their conduct.

## VIII.

## JURY TRIAL

8.1.    Trial by jury is demanded.

## IX.

## PRAYER

**WHEREFORE PREMISES CONSIDERED,** based on the foregoing causes of action, Plaintiffs request that Defendants be cited to appear and answer, and at final trial, that they be found jointly and severally liable and that judgment be entered in the Plaintiffs' favor awarding the following:

(a)    Judgment against Defendants, jointly and severally for Plaintiffs' actual damages in an amount within the minimal jurisdictional limits of this Court;

(b)    Judgment against Defendant P&G for exemplary or punitive damages without limitation, in a sum to be determined by the trier of fact;

(c)    Pre-judgment interest at the highest legal rate allowed by law;

(d)    Post-judgment interest at the highest legal rate allowed by law; and

(e)    Such other and further relief at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

**Plaintiffs' Original Petition**
G:\OPEN CASE FILES - LITIGATION\HARRISON - P & G\PLEADINGS\LAWSUIT AGAINST TAFT AND P&G\ORIGINAL PETITION DRAFT.DOC

Page 8

Respectfully submitted,

_Robert K. Frawley_   with permission

Robert L. Chaiken
State Bar No. 04057830
Kenneth B. Chaiken
State Bar No. 04057800
Greg S. Gober
State Bar No. 00785916

**CHAIKEN & CHAIKEN, P.C.**
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
Telephone: (214)265-0250
Telecopy: (214)265-1537

**ATTORNEYS FOR PLAINTIFFS**

JS 44 (Rev 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| The Procter & Gamble Company and The Gillette Company | (see attachment) |

| **(b)** County of Residence of First Listed Plaintiff   Hamilton County, Ohio | County of Residence of First Listed Defendant   Wichita County, Texas |
|---|---|
| (EXCEPT IN U S  PLAINTIFF CASES) | (IN U S  PLAINTIFF CASES ONLY) NOTE  IN LAND CONDEMNATION CASES  USE THE LOCATION OF THE LAND INVOLVED |

| **(C)** Attorney's (Firm Name, Address  and Telephone Number) (see attachment) | Attorneys (If Known) |
|---|---|

## II  BASIS OF JURISDICTION (Place  an  "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  US Government Defendant

☐ 3 Federal Question (US. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 Incorporated or Principal Place of Business In This State | | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 Incorporated and Principal Place of Business In Another State | | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 Foreign Nation | | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med  Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault  Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R R  & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl  Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt  Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt  Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl  Ret  Inc Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U S  Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer  w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer  w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V  ORIGIN (Place  an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Sec. 1332 (Diversity of Citizenship)

Brief description of cause:
Declaratory Judgment and Breach of Contract

## VII  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint

JURY DEMAND:   ☐ Yes   ☒ No

## VIII  RELATED CASE(S) IF ANY

(See instructions): JUDGE _____   DOCKET NUMBER _____

DATE   July 21, 2006

SIGNATURE OF ATTORNEY OF RECORD   *Anne Shea Gaza*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

## CIVIL COVER SHEET (CONT'D)

1. (a)   Defendants:

HARRISON, SUSAN
2606 Harrison Street
Wichita Falls, TX 76308-1344

HARRISON III, WILLIAM G., individually and as a Trustee for the
Harrison Family Trust and The Emily Waldrip Trust
3305 Seymour Road
Wichita Falls, TX 76309-2003

HARRISON, TINA
3305 Seymour Road
Wichita Falls, TX 76309-2003

HARRISON IV, W. G.
3305 Seymour Road
Wichita Falls, TX 76309-2003

ALLEN, KATHY
15405 FM 1730 #1730
Lubbock, TX 79424-6638

ALLEN, PAT
7801 University Avenue
Lubbock, TX 79423-2129

LUXENBERG, LARRY
10365 Sofferto Avenue
Las Vegas, NV 89135-3244

NOSSER, CINDY
2113 Barnett Road
Wichita Falls, TX 76310-5227

and

SHELTON, JOHN
4163 Airport Drive
Wichita Falls, TX 76305-5708

1

1. (c) Attorney's (Firm Name, Address, and Telephone Number)

Anne Shea Gaza
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899-0551
Telephone:  (302) 651-7539

D. Jeffrey Ireland (Ohio Bar No. 0010443)
Brian D. Wright (Ohio Bar No. 0075359)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH  45402
Telephone:  (937) 227-3710

170403 1

2

JS 44 Reverse (Rev 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed The attorney filing a case should complete the form as follows:

I.     (a) Plaintiffs-Defendants Enter names (last, first, middle initial) of plaintiff and defendant If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title

(b) County of Residence For each civil case filed, except U S plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing In U S plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing (NOTE: Inland condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved )

(c) Attorneys Enter the firm name, address, telephone number, and attorney of record If there are several attorneys, list them on an attachment, noting in this section "(see attachment)"

II. Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C P , which requires that jurisdictions be shown in pleadings Place an "X" in one of the boxes If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff (1) Jurisdiction based on 28 U S C 1345 and 1348 Suits by agencies and officers of the United States are included here.

United States defendant (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box

Federal question (3) This refers to suits under 28 U S C 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States In cases where the U S is a party, the U S plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship (4) This refers to suits under 28 U S C. 1332, where parties are citizens of different states When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases )

III. Residence (citizenship) of Principal Parties. This section of the JS 44 is to be completed if diversity of citizenship was indicated above Mark this section for each principal party

IV. Nature of Suit. Place an "X" in the appropriate box If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit If the cause fits more than one nature of suit, select the most definitive

V.     Origin Place an "X" in one of the seven boxes.

Original Proceedings (1) Cases which originate in the United States district courts

Removed from State Court (2) Proceedings initiated instate courts maybe removed to the district courts under Title 2 8 U S C , Section 144 1 When the petition for removal is granted, check this box

Remanded from Appellate Court (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date

Reinstated or Reopened (4) Check this box for cases reinstated or reopened in the district court Use the reopening date as the filing date

Transferred from Another District (5) For cases transferred under Title 28 U S C Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers

Multidistrict Litigation (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U S C Section 1407 When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment (7) Check this box for an appeal from a magistrate judge's decision

VI. Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause Do not cite jurisdictional statutes unless diversity.       Example:       U S. Civil Statute: 47 USC 553
                                                            Brief Description: Unauthorized reception of cable service

VII. Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F R Cv P

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand Check the appropriate box to indicate whether or not a jury is being demanded

VIII. Related Cases. This section of the JS 44 is used to reference related pending cases if any If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases

Date and Attorney Signature. Date and sign the civil cover sheet

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 6 – 4 4 3

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____9_____ COPIES OF AO FORM 85.

_____7/21/06_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Matthew D Mitchell
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action