# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE PROCTER & GAMBLE COMPANY
and THE GILLETTE COMPANY,

        Plaintiffs,

v.

**C.A. No. 06-443 (GMS)**

SUSAN HARRISON; WILLIAM G.
HARRISON III, individually and as a
Trustee for the Harrison Family Trust
and The Emily Waldrup Trust;
CINDY NOSSER; KATHY ALLEN;
PAT ALLEN; TINA HARRISON;
W.G. HARRISON IV; LARRY
LUXENBERG; and JOHN SHELTON

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS

**LANDIS, RATH & COBB, LLP**
Daniel B. Rath (Bar No. 3022)
Rebecca L. Butcher (Bar No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

**CHAIKEN & CHAIKEN, P.C.**
Robert L. Chaiken
(State Bar No. 04057830)
Kenneth B. Chaiken
(State Bar No. 04057800)
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
Telephone: (214) 265-0250
Facsimile: (214) 265-1537

Dated: October 10, 2006

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................................... iv

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ........................... 1

SUMMARY OF THE ARGUMENT.................................................................................... 3

STATEMENT OF FACTS ................................................................................................. 5

ARGUMENT .................................................................................................................. 10

    A.  Rules of contract construction under Delaware law ............................................... 10

    B.  The First Filed Rule requires that this action be dismissed, stayed or
        transferred ........................................................................................................... 11

    C.  The Court should decline to exercise jurisdiction over both Plaintiffs' claims for
declaratory relief because Plaintiffs have improperly attempted use the Declaratory
Judgment Act to adjudicate issues already pending in another court. (¶¶30-35 of
Complaint) .................................................................................................................. 15

    D.  The Court should dismiss P&G's claim for breach of contract (¶¶36-43 of
Complaint) pursuant to Rule 12(b)(1) because P&G does not have standing to assert a claim
for breach of the Agreement since it is neither a party to the Agreement nor an Assignee of
Gillette's rights under the Agreement. ...................................................................................... 18

        1.  The Applicable Standard for a Rule 12(b)(1) motion to dismiss for lack of
            jurisdiction based on facts outside the pleadings................................................. 18

        2.  P&G does not have standing to enforce the Agreement since it is neither a party
            to the Agreement nor an assignee of Gillette's interests thereunder ............... 19

    E.  The Court should dismiss the breach of contract claim asserted by both Plaintiffs
(¶¶36-43 of the Complaint) because Defendants' suit against P&G in Texas cannot
constitute a breach of the forum selection clause found in the Agreement since P&G is
neither a party to the Agreement nor an Assignee of Gillette's rights under the Agreement.
.................................................................................................................. 20

        1.  The Applicable Standard for a Motion to Dismiss pursuant to Rule 12(b)(6). 20

2. Plaintiffs' Breach of Contract Claim is negated by the
   express terms of the Agreement ..............................................................21

CONCLUSION        ..........................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Aetna Casualty & Surety Co. v. Quarles,*
   92 F.2d 321 (4th Cir. 1937) ......................................................................... 17

*Anderson v. Haverford College,*
   851 F.Supp. 179 (E.D.Pa. 1994) ........................................................... 10, 22

*Arizona v. San Carlos Apache Tribe of Arizona,*
   463 U.S. 545 (1983) ............................................................................... 16

*Beanstalk Group, Inc. v. AM General Corp.,*
   283 F.3d 856 (7th Cir. 2002) .............................................................. 10, 20

*Borough of Carlstadt v. United States Army Corps of Engineers,*
   2006 WL 305314 (D.N.J. Feb. 8, 2006) ........................................................ 19

*Conley v. Gibson,*
   355 U.S. 41 (1957) ...............................................................................21

*Crosley Corp. v. Hazeltine Corp.,*
   122 F.2d 925 (3d Cir.1941), cert. denied, 315 U.S. 813 (1942)................................... 11

*Crown, Cork & Seal Co., Inc. v. Borden,*
   779 F.Supp. 33 (E.D.Pa.) 1991 .................................................................. 16

*E.E.O.C. v. University of Pa.,*
   850 F.2d 969 (3d Cir.), cert. granted in part, 488 U.S. 992 (1988), aff'd, 493 U.S. 182
   (1990)........................................................................................ 11, 12

*Envirometrics Software, Inc. v. Georgia-Pacific Corp.,*
   1997 WL 699328 (D. Del. Nov. 4, 1997) .................................................... 16, 17

*Forum Ins. Co. v. National Union Ins. Co.,*
   865 F.2d 584 (3d Cir. 1989) .................................................................... 14

*Graves v. Lowery,*
   117 F.3d 723 (3d Cir.1997) ...................................................................20, 21

*Insituform of North America, Inc. v. Chandler,*
    534 A.2d 257 (Del. Ch. 1987) ...........................................................................19

*Kost v. Kozakiewicz,*
    1 F.3d 183 (3d Cir. 1993) ...............................................................................20

*Lorillard Tobacco Co. v. American Legacy Foundation,*
    903 A.2d 728 (Del. 2006) ...................................................................... 10, 11

*Miteq, Inc. v. Comtech Telecomminications Corp,*
    2003 WL 179991 (D. Del. Jan. 23, 2003) ....................................................... 12

*Moore Corp. Ltd. v. Wallace Computer Services, Inc.,*
    898 F.Supp. 1089 (D. Del. 1995) ............................................................. 11, 12

*Morse v. Lower Merion Sch. Dist.,*
    132 F.3d 902 (3rd Cir. 1997) ..........................................................................20

*Mortensen v. First Federal Savings & Loan Ass'n,*
    549 F.2d 884 (3d Cir. 1977).   .................................................................. 18, 19

*National Cancer Hospital v. Webster,*
    251 F.2d 466 (2d Cir. 1958) ........................................................................... 17

*NYLife Distributors, Inc. v. Adherence Group, Inc.,*
    72 F.3d 371 (3d. Cir.1995) ....................................................................... 15, 16

*Pierce Associates, Inc. v. Nemours Foundation,*
    865 F.2d 530 (3d Cir. 1988) ........................................................................... 19

*Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,*
    616 A.2d 1192 (Del.1992) ....................................................................... 10, 11

*Rottlund Homes of New Jersey, Inc. v. Saul, Ewing, Remick & Saul, LLP,*
    243 F.Supp.2d 145 (D. Del. 2003) ................................................................. 19

*Storino v. Borough of Point Pleasant Beach,*
    322 F.3d 293 (3d Cir. 2003) ........................................................................... 19

*Sun Oil v. Transcontinental Gas Pipeline Corp.,*
    108 F.Supp. 280 (E.D.Pa 1952) ............................................................... 16, 17

*Terra Nova Ins. Co. Ltd. v. 900 Bar, Inc.,*
    887 F.2d 1213 (3d Cir.1989) ................................................................................. 15, 16

*United States Surgical Corp. v. Litvack,*
    1999 WL 33220034 (D. Del. Dec. 30, 1999) ............................................................ 15, 16

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995) ...................................................................................................... 15

**Statutes**

28 U.S.C. §  2201(a) (1994) ..................................................................................................... 15

Defendants Susan Harrison; William G. Harrison III, individually and as a Trustee for the Harrison Family Trust and The Emily Waldrup Trust; Cindy Nosser; Kathy Allen; Pat Allen; Tina Harrison; W.G. Harrison IV; Larry Luxenberg; and John Shelton (collectively "Defendants"), in support of their Motion to Dismiss would respectfully show as follows:

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.

On June 2, 2006, approximately three weeks, prior to the filing of this suit, the Defendants herein filed a suit in state district court in Wichita Falls, Texas against The Procter & Gamble Company ("P&G"), the law firm of Taft, Stettinius & Hollister LLP (the "Taft Firm") and Thomas E. Grossman, Esq. ("Grossman"). (See Original Petition attached as Exhibit "B" to the Complaint [herinafter "Petition"]). That suit was subsequently removed by P&G and is currently pending in the United States District Court for the Northern District of Texas. (See Declaration of Robert L. Chaiken at ¶3 [hereinafter Chaiken Dec.). This first filed suit will hereinafter be referred to as the "Texas Suit." In the Texas Suit, the plaintiffs, i.e., these Defendants, assert a claim against P&G for tortiously interfering with the June 4, 2004 Stock Purchase Agreement between Defendants and Gillette (the "Agreement") and with the business relationship between Gillette and Defendants. (Petition at ¶¶ 6.1-6.4). The Texas Suit also contains a claim for legal malpractice against the Taft Firm and Grossman. (Id. at ¶¶ 6.5-6.7). P&G has filed a Motion to Dismiss, Transfer or Stay the Texas Suit premised in part upon the purported applicability of a forum selection clause contained in the Agreement to which P&G is

*Defendants' Brief in Support of Motion to Dismiss*
*Page 1*

neither a party nor an assignee of Gillette's interests.    (See Chaiken Dec. at ¶9).  P&G's

Motion is set for hearing on November 6, 2006 in the Texas court.  (Id.).

Plaintiffs, "P&G" and The Gillette Company ("Gillette") initiated this second filed

action on June 21, 2006.  All of the Defendants in this suit are plaintiffs in the "Texas Suit."

(See Chaiken Dec. at ¶3).  In this subsequent action, Plaintiffs jointly asserted a claim for

actual and punitive damages for breach of the Agreement (the same "Agreement" at issue

in the Texas Suit) as well as a claim seeking declaratory judgments to the effect that

Plaintiffs have performed under the Agreement, that P&G and Gillette are affiliates as

defined in the Agreement and that, contrary to Defendants' assertions in the Texas Suit,

P&G has not tortiously interfered with Gillette's performance under the Agreement.

(Complaint at ¶¶ 30-43). Plaintiffs' claim for breach of contract is based solely upon

Defendants' filing of the Texas Suit against P&G which Plaintiffs allege violates the Forum

Selection Clause in the Agreement to which P&G is neither a party nor an assignee.

(Complaint at ¶¶36-41).

## II.    <u>SUMMARY OF THE ARGUMENT.</u>

1.    The Court should apply the "first filed" rule and dismiss all of P&G's claims based on the existence of the prior filed suit pending in the Northern District of Texas.

2.    The Court should exercise its discretion and decline to exercise jurisdiction over both Gillette and P&G's[1] claims for declaratory relief (¶¶30-35 of Complaint) because Plaintiffs have improperly attempted to use the Declaratory Judgment Act for the purpose of adjudicating issues already pending in the Texas Suit.

3.    The Court should dismiss P&G's claim for breach of contract (¶¶36-43 of Complaint) pursuant to Rule 12(b)(1) because P&G does not have standing to assert a claim for breach of the Agreement since it is neither a party to the Agreement nor an assignee of Gillette's rights under the Agreement. (asserted in the alternative to the request for dismissal pursuant to the first filed rule).

4.    The Court should dismiss the breach of contract claims asserted by both Gillette and P&G (¶¶36-43 of the Complaint) pursuant to Rule 12(b)(6) because Defendants' suit against P&G in Texas cannot constitute a breach of the forum selection clause found in the Agreement since P&G is neither a party to the Agreement nor an Assignee of Gillette's rights under the Agreement, (asserted

---

1  Both this request for dismissal of P&G's declaratory judgment action and the following requests to dismiss P&G's breach of contract claim are asserted in the alternative to the request that the Court dismiss all of P&G's claims based on the first filed rule.

*Defendants' Brief in Support of Motion to Dismiss*
*Page 3*

as to P&G only in the alternative to the request that P&G's claims be dismissed based on the first filed rule).

## III.    STATEMENT OF FACTS.

Defendants, including Susan Harrison and the Harrison Family Trust were shareholders in a small Wichita Falls, Texas based company called Zooth, Inc. Zooth was in the business of designing and distributing children's manual and battery powered-toothbrushes and toothpaste. (Complaint at ¶¶11-13).

Defendants eventually sold their interests in Zooth to Gillette through the Stock Purchase Agreement, i.e., the Agreement, on June 4, 2004. (Complaint at ¶14). A copy of the Agreement is attached as Exhibit "A" to Plaintiffs' Original Complaint. In addition to the initial purchase price for Defendants' interest in the company, Gillette agreed to pay deferred compensation to Defendants in the form of a percentage of net sales of certain products within a stated minimum and maximum possible payout. (Complaint at ¶15; Agreement at §2.2.1(b)). P&G's interference with Gillette's and Zooth's performance as it relates to the payment of this deferred compensation is the subject of the Defendants' tortious interference claim against P&G in the Texas Suit. (See Original Petition at ¶¶6.1-6.4 attached as Exhibit "B" to the Original Complaint).

The Agreement also contains a provision entitled *"Succession and Assignment; No Third-Party Beneficiary"* which states in relevant part as follows:

> "**Subject to the immediately following sentence**, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a party hereto for all purposes hereof."

"No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties; <u>provided however, that the Buyer [Gillette] may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates</u>, and (b) designate one or more of its Affiliates to perform its obligations hereunder, in each case, so long as Buyer is not relieved of any Liability hereunder."

"<u>Except as expressly provided here</u>, this Agreement is for the sole benefit of the Parties and their permitted successors and assignees and <u>nothing herein expressed or implied</u> will give or be construed to give any Person, other than the parties and such successors and assignees, any legal or equitable rights hereunder."

(See Agreement at ¶12.2) (emphasis added).

The term "Affiliate" is defined so as to include a parent corporation. (See Agreement at page 2).

Lastly, the Agreement contains forum and venue selection clauses for disputes "between the parties." Specifically, those provisions state as follows:

12.12.1 <u>Jurisdiction</u>. Subject to the provisions of Sections 2.5.4 and 10.4.5, **each party to this agreement**, by its execution hereof, (a) **hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of Delaware or the United States District Court located in the State of Delaware for the purpose of any Action <u>between the parties</u>** arising in whole or in part under or in connection with this Agreement, (b) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of forum non conveniens, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court and (c) hereby agrees not to commence any such Action other than before one of the above-named courts. Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely

*Defendants' Brief in Support of Motion to Dismiss*
*Page 6*

for the purpose of enforcing an order or judgment issued by one of the above-named courts.

12.12.2 <u>Venue</u>. **Each party agrees that for any Action <u>between the parties</u>** arising in whole or in part under or in connection with the Agreement, such party bring Actions only in the State of Delaware. Each party further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

Five months after the sale of Defendants' interests in Zooth closed, Gillette announced that it was going to be acquired by P&G. (Petition at ¶5.5). This takeover was consummated on October 1, 2005, when P&G merged with Gillette. Although Gillette continued to exist as a Delaware corporation following the merger, it became a wholly-owned subsidiary of P&G. (Complaint at ¶¶3 and 24).

On June 2, 2006, following the merger and after P&G had engaged in numerous acts designed to interfere with the sale of Zooth products and favor P&G's own competing products, the Defendants sued P&G in Texas for tortious interference alleging that P&G interfered with and prevented Gillette and/or Zooth from fully performing with respect to allowing Defendants the opportunity to earn the deferred compensation based on a percentage of sales as set forth in the Agreement. (Original Petition at ¶¶5.5 and 6.1-6.4).

Defendants then commenced settlement discussions with P&G and in the course of those discussions promised to refrain from serving P&G with the suit so long as negotiations were ongoing. (Chaiken Dec. at ¶7). In midst of these discussions, P&G notified Defendants that P&G considered the filing of the Texas Suit to be a violation of the Forum Selection clause of the Agreement. (Chaiken Dec. at ¶6; Letter of June 13, 2006 –

Exhibit "A"). When Defendants requested confirmation from P&G that it had been assigned Gillette's rights pursuant to the Agreement, including those arising under the Forum Selection clause, P&G refused to provide the confirmation and responded by removing the Texas Suit and filing this suit in what it acknowledged to be a procedural maneuver to "level the playing field." (Chaiken Dec. at ¶7; Letter of June 20, 2006 - Exhibit "B"). Eventually, in the course of resolving issues with respect to the scope of discovery concerning P&G's motion to dismiss filed in Texas, P&G eventually provided Defendants with an affidavit that confirmed that Gillette had in fact **not** assigned its interest in the Agreement to P&G or anyone else. (Affidavit of Susan S. Felder -Exhibit "F").

In this lawsuit, P&G asserts claims for breach of the Agreement to which it is not a party. (Complaint ¶¶36-41). P&G's breach of contract claim is based solely upon Defendant's acts of filing the suit against P&G in Texas and then requesting a jury in that suit. P&G asserts that it is a "permitted assign" under the terms of the contract. (Id.). P&G also asserts a claim for declaratory judgment in which it seeks three declarations from the Court. P&G asks the Court to declare that (1) it has fully performed under the Agreement; (2) that it and Gillette are affiliates; and, (3) that it has not tortiously interfered with Gillette's performance under the Agreement. (Complaint at pages 11 and 12).

Gillette likewise asserts a claim for breach of contract based on the alleged violation of the Forum Selection clause. (Complaint at ¶¶36-41). Gillette also asks the court for

declarations to the effect that it has performed under the Agreement and that it and P&G are affiliates.    (Complaint at pages 11-12).

## IV.    ARGUMENT.

### A.    Rules of contract construction under Delaware law.

Since the Plaintiffs have attached a copy of the Agreement to their Complaint, the terms of that Agreement are incorporated into their Complaint and may be considered in the Court's determination as to whether Plaintiffs' claims should be dismissed. *See Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 857 (7th Cir. 2002) (affirming dismissal of breach of contract claim); *see also Anderson v. Haverford College*, 851 F.Supp. 179 (E.D.Pa. 1994) (dismissing breach of employment agreement claim where existence of agreement negated by employee handbook relied on by plaintiffs).

When interpreting a contract under Delaware law, the role of a court is to effectuate the parties' intent. *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728 (Del. 2006). In doing so, the court is constrained by the words utilized by the parties and the plain meaning of those words where no special meaning is intended. *Id.* The court's goal should be to determine what a reasonable person in the position of the parties would have thought the language of a contract means. *Id.* In order to accomplish this, the court should give clear and unambiguous language its ordinary and usual meaning. *Id.* "'Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it.'" Id. (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992)). Thus, when the language of a contract is clear and unequivocal, the parties will be bound by its plain meaning because creating an ambiguity

where none exists could, in effect, create a new contract with rights and obligations to which the parties had not agreed. *Id.*

Moreover, a contract is not made ambiguous simply because the parties do not agree upon its construction. *Id.* A contract is ambiguous only when the provisions at issue are reasonably susceptible of different interpretations. *Id.* "'Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.'" *Id.* (quoting *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992)). Adherence to these rules of construction should result in a determination of what a reasonable person in the position of the parties would have thought it meant.

**B.      The First Filed Rule requires that this action be dismissed, stayed or transferred.**

Where two actions are pending concurrently in separate forums, there is a potential for conflicting resolutions. In response to this contingency, the Third Circuit Court of Appeals has adopted the "first-filed" rule, whereby in all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it. *See Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941), *cert. denied,* 315 U.S. 813, 62 S.Ct. 798 (1942); *see also E.E.O.C. v. University of Pa.,* 850 F.2d 969, 971 (3d Cir.), *cert. granted in part,* 488 U.S. 992, 109 S.Ct. 554 (1988), *aff'd,* 493 U.S. 182, 110 S.Ct. 577 (1990) (hereinafter *EEOC*).

The "first filed" rule is based on principles of equity and comity, and allows a trial judge to dismiss an action, where an action involving the same issues between the same parties is already pending in another forum. *Moore Corp. Ltd. v. Wallace Computer Services,*

*Defendants' Brief in Support of Motion to Dismiss*
*Page 11*

*Inc.*, 898 F.Supp. 1089, 1098-99 (D. Del. 1995). Although, the application of the "first filed" rule is not "a mandate directing wooden application of the rule," a court only has discretion to depart from the rule in "extraordinary circumstances" or in cases involving "inequitable conduct, bad faith, or forum shopping." *See EEOC*, 850 F.2d at 972; *Miteq, Inc. v. Comtech Telecomminications Corp*, 2003 WL 179991, *1 (D. Del. January 23, 2003) ("Courts must be presented with exceptional circumstances before exercising their discretion to depart from the first filed rule.").

In the present case, it is undisputed that the Texas Suit was filed prior to this case. (Petition at p.1). It is also undisputed that both P&G and all of the Defendants here are also parties to the Texas Suit. (Chaiken Dec. at ¶3). Likewise, the issues raised by P&G, i.e., breach of the Agreement, the interference with the Agreement and whether P&G is effectively a party to the Agreement are all issues that are present in the Texas Suit. (Petition at pp. 4-6).

Given, these undisputed facts, the Court must dismiss, stay or transfer P&G's claims in the absence of some "extraordinary circumstance" or "inequitable conduct" in some form or fashion. See *EEOC*, 850 2d at 972. None of those permitted exceptions to the "first filed" rule weigh in favor of the Court maintaining jurisdiction over P&G's claims in this case. In fact, those factors actually weigh heavily in favor of application of the "first filed" rule because of P&G's own inequitable conduct and forum shopping.

Defendants anticipate that P&G will argue that it is entitled to the benefit of the Forum Selection Clause despite the fact that Gillette has not assigned its interests under the

Agreement to P&G. (See Felder Affidavit - Exhibit "F"). However, this position is clearly contradictory to the express terms of the Agreement. Although the Agreement provides that it "will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns," this provision is expressly made subject to the "immediately following sentence." (Agreement at ¶12.3). That next sentence sets forth the limitations governing to whom the contractual rights may be assigned and under what circumstances. Specifically, the Agreement provides that with respect to non-affiliates of the parties, an assignment or delegation may only be made with the "prior written approval of the other parties." (Id.) However, an assignment may be made without such "prior written approval" if the assignee is an "Affiliate" of the assignor.

Although, P&G admittedly falls within the scope of the definition of "Affiliate," its status as an Affiliate only means that an assignment **may** be made to P&G without the consent of the other parties. P&G's status as an Affiliate does not create an assignment by operation of law without an actual document executed by Gillette to effectuate the assignment. Since P&G admits that it did not exercise its discretion to make such an assignment, P&G cannot claim the benefits of Gillette's contractual rights under the terms of the Agreement including the Forum Selection Clause.

Although P&G will also likely argue that it is entitled to the benefits of the Forum Selection Clause by virtue of some equitable right granted by implication, the Agreement expressly disclaims the possibility that rights thereunder, whether legal or equitable, can be granted to a third party by implication. Specifically, the Agreement states that **"[e]xcept as**

expressly provided herein, this Agreement is for the sole benefit of the Parties and their permitted successors and assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties and such successors and assignees, any legal or equitable rights hereunder." (See Agreement at ¶12.2) (emphasis added). Moreover, even in the absence of this express disclaimer of P&G's right to claim the benefits of the Agreement, it is well settled that one who is neither a party to nor an intended third party beneficiary of a contract cannot use the terms of the contract offensively for his benefit. *See Forum Ins. Co. v. National Union Ins. Co.*, 865 F.2d 584, 586 (3d Cir. 1989).

Thus, as they were permitted to do in the absence of a forum selection clause applicable to P&G, Defendants properly sued P&G in Defendants' chosen forum for torts committed in that forum. There is absolutely nothing about that act that can even remotely be described as inequitable or bad faith.

In contrast, P&G clearly engaged in inequitable conduct and blatant forum shopping. Knowing full well that Gillette had not assigned its rights under the Agreement, including the right to enforce the Forum Selection Clause, P&G misrepresented the terms of the Agreement to Defendants in an attempt to coerce Defendants to drop the Texas Suit. (See Letter of June 13, 2006 Exhibit "A"). Then, when confronted with Defendants' request for evidence of the assignment that would give P&G the benefit of the Forum Selection Clause, P&G, knowing that such an assignment did not exist, filed this suit. Not only does P&G not deny that it filed suit to obtain a procedural advantage, P&G actually admits that

it did so to "level the playing field." See Letters of June 24 and 25, 2006 – Exhibits "C" and "D").

The creation of duplicative and unnecessary litigation for the admitted purpose of obtaining a procedural advantage clearly constitutes the type of bad faith conduct condemned by the Third Circuit in *EEOC*. Consequently, the Court must dismiss, stay or transfer P&G's suit against Defendants.

**C.    The Court should decline to exercise jurisdiction over both Plaintiffs' claims for declaratory relief because Plaintiffs have improperly attempted use the Declaratory Judgment Act to adjudicate issues already pending in another court. (¶¶30-35 of Complaint).**

Even absent the application of the "first filed" rule, the law of this circuit mandates the dismissal of both Plaintiffs' Declaratory Judgment Act claims.    Although the Declaratory Judgment Act provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration," as the statute implies, courts are granted considerable discretion in determining whether or not to entertain a declaratory judgment action.  28 U.S.C. § 2201(a) (1994); *United States Surgical Corp. v. Litvack*, 1999 WL 33220034, *2 (D. Del. December 30, 1999) (Sleet, J.) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)).  Thus, under appropriate circumstances, a district court can simply decline to exercise jurisdiction. *See Litvack, 1999 WL 33220034 at *2; Terra Nova Ins. Co. Ltd. v. 900 Bar, Inc.*, 887 F.2d 1213, 1224-25 (3d Cir.1989).   For example, in order to avoid duplicative litigation, a district court may stay or dismiss a declaratory judgment action when a similar action is pending in another jurisdiction. *Litvack*, 1999 WL 33220034 at *2 (citing *Brillhart v. Excess Insurance Co.*, 316 U.S. 491 (1942); *see also NYLife Distributors,*

*Defendants' Brief in Support of Motion to Dismiss*
*Page 15*

*Inc. v. Adherence Group, Inc.,* 72 F.3d 371, 376-377 (3d. Cir.1995).

As this court has previously recognized, "duplicative litigation creates a 'serious potential for spawning an unseemly and destructive race to see which forum can resolve the same issues first.'" *Litvack,* 1999 WL 33220034 at *2 (quoting *Arizona v. San Carlos Apache Tribe of Arizona,* 463 U.S. 545, 567 (1983)). Consequently, "'[c]ourts look with disapproval upon any attempt to circumvent the laudable purposes of the Act, and seek to prevent the use of the declaratory action as a method of procedural fencing, or as a means to provide another forum in a race for res judicata.'" *Terra Nova Ins. Co.,* 887 F.2d at 1224-25 (quoting 6A J. Moore, J. Lucas & G. Girtheer, Jr., *Moore's Federal Practice* ¶ 57.08[5], at 57-50 (2d ed. 1987)).

Although the *Litvack* and *Terra Nova* cases involved parallel cases pending in state rather than federal court, the principles underlying the decisions in those cases are just as applicable in circumstances such as those present here where the parallel litigation was initially filed in state court and then removed to federal court after the second case was filed in federal court. *See e.g., Crown, Cork & Seal Co., Inc. v. Borden,* 779 F.Supp. 33, 34-35 (E.D.Pa. 1991) (dismissing anticipatory declaratory judgment filed by defendant to second filed warranty claim in Oklahoma federal district court due to "procedural fencing" by plaintiff in declaratory judgment action); *Sun Oil v. Transcontinental Gas Pipeline Corp.,* 108 F.Supp. 280, 282 (E.D.Pa 1952) (dismissing first filed declaratory action filed in anticipation of second filed suit pending in Texas federal district court); *Envirometrics Software, Inc. v. Georgia-Pacific Corp.,* 1997 WL 699328, *3-4 (D. Del. November 4, 1997) (declining to exercise

*Defendants' Brief in Support of Motion to Dismiss*
*Page 16*

jurisdiction over first filed declaratory judgment action where second filed action pending in federal court in Georgia).

The principles applied in *Litvack* and *Terra Nova* are equally applicable here because "[t]he object of the [Declaratory Judgment Act] is to afford a new form of relief where needed, not to furnish a new choice of tribunals . . . ." *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937). Consequently, courts should refuse to exercise the discretion to grant declaratory relief "for the purpose of trying issues involved in cases already pending . . . or for the purpose of anticipating the trial of an issue in a court of co-ordinate jurisdiction." *Id.; accord National Cancer Hospital v. Webster*, 251 F.2d 466, 468 (2d Cir. 1958); *see also, Sun Oil*, 108 F.Supp. at 282 ("[a] declaratory judgment action should not be entertained when it is initiated by a prospective or actual defendant in a tort action."); *Envirometrics Software*, 1997 WL 699328 at *3-4 (declining to exercise jurisdiction over declaratory judgment action filed in anticipation of litigation by defendant).

In the present case, the declaratory judgment actions filed by Plaintiffs are clearly duplicative of the Texas Suit. Whether Plaintiffs performed under the Agreement and whether P&G interfered with Gillette's performance under the Agreement are issues that are clearly subsumed within Defendants' offensive claim for tortious interference in the Texas Suit. Likewise, the issue of whether Gillette and P&G are affiliates – while of no consequence to the forum selection clause unless Gillette assigned its interests under the Agreement to P&G – may be intertwined with P&G's defense as to whether it could legally interfere with the performance of its subsidiary Gillette. Thus, the two suits present the

same issues. Moreover, the United States District Court for the Northern District of Texas is certainly an adequate forum for adjudicating the rights of the parties involved.

Accordingly, considering these factors along with the impropriety of P&G's use the Declaratory Judgment act to engage in "procedural fencing" by admittedly filing suit in an attempt to "level the playing field," the Court should dismiss both Gillette and P&G's claims for Declaratory Judgment and allow the parties to litigate their claims in the forum originally chosen by Defendants.

**D.** **The Court should dismiss P&G's claim for breach of contract (¶¶36-43 of Complaint) pursuant to Rule 12(b)(1) because P&G does not have standing to assert a claim for breach of the Agreement since it is neither a party to the Agreement nor an Assignee of Gillette's rights under the Agreement.[2]**

1. *The Applicable Standard for a Rule 12(b)(1) motion to dismiss for lack of jurisdiction based on facts outside the pleadings.*

Unlike the typical Rule 12(b)(6) motion to dismiss, a motion to dismiss for lack of subject matter jurisdiction may be based on facts outside of the four corners of the complaint. *Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Such a motion is termed a factual 12(b)(1) motion. *Id.* Under such a motion, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Id.* Moreover, when determining a factual Rule 12(b)(1) motion, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* Under such a challenge, "the plaintiff will have the burden of proof that

---

2 Asserted in the alternative to the request to dismiss all of P&G's claims based on the application of the

jurisdiction does in fact exist." *Id.* A challenge to the plaintiff's standing to assert a claim is among the jurisdictional challenges that may be asserted via a factual Rule 12(b)(1) motion. *See e.g., Borough of Carlstadt v. United States Army Corps of Engineers,* 2006 WL 305314 (D.N.J. February 8, 2006).

### 2. *P&G does not have standing to enforce the Agreement since it is neither a party to the Agreement nor an assignee of Gillette's interests thereunder.*

Standing is a threshold jurisdictional issue. *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 296 (3d Cir. 2003). "As a general matter, only a party to a contract has standing to enforce a contract and sue for breach of that contract." *Rottlund Homes of New Jersey, Inc. v. Saul, Ewing, Remick & Saul, LLP,* 243 F.Supp.2d 145, 153 (D. Del. 2003). Although Delaware law allows a third-party to recover on a contract made for his benefit, the contracting parties must intend to confer the benefit. *Pierce Associates, Inc. v. Nemours Foundation,* 865 F.2d 530, 535 (3d Cir. 1988) (applying Delaware law). Thus, "strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party." *Insituform of North America, Inc. v. Chandler,* 534 A.2d 257, 270 (Del. Ch. 1987) (holding that nonsignatories to a contract have no rights under the contract, and thus no standing to assert claims under the contract).

In the present case, as set forth in section (B) above, the parties to the Agreement expressly disclaimed any intent for non-parties to benefit from the contract except as allowed by the express terms of the Agreement. (Agreement at ¶¶12.2). Accordingly, since

"first filed" rule.

P&G is not a party to the Agreement and, as evidenced by the affidavit provided by Plaintiffs, Gillette did not execute an assignment of its interests under the Agreement to P&G as required to give P&G the benefits of the Agreement, P&G lacks standing to assert a claim for breach of the Agreement and its breach of contract claim must be dismissed.

**E.    The Court should dismiss the breach of contract claim asserted by both Plaintiffs (¶¶36-43 of the Complaint) because Defendants' suit against P&G in Texas cannot constitute a breach of the forum selection clause found in the Agreement since P&G is neither a party to the Agreement nor an Assignee of Gillette's rights under the Agreement.**

*1.    The Applicable Standard for a Motion to Dismiss pursuant to Rule 12(b)(6).*

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir. 1993). Thus, in determining whether a Rule 12(b)(6) motion should be granted, the Court should accept as true all material allegations of the complaint as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir. 1997). Where contracts are attached to the complaint, the court should consider the terms of the contract for purposes of a Rule 12(b)(6) motion without converting the motion to one for summary judgment. *See Beanstalk Group, Inc. v. AM General Corp.,* 283 F.3d 856, 857 (7th Cir. 2002) (affirming dismissal breach of contract claim). A court should dismiss a complaint if it is clear that no relief could be granted

under a set of facts consistent with the allegations of the complaint. *See Graves,* 117 F.3d at

726; (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

> ### 2.    *Plaintiffs' Breach of Contract Claim is negated by the express terms of the Agreement.*

Plaintiffs' claim that Defendants breached the Forum Selection Clause of the

Agreement by bringing suit against P&G in Texas.  Plaintiffs have attached both the

Defendant's Texas lawsuit and the Agreement to their Complaint.  Plaintiffs' Complaint

avers that "Procter & Gamble is an Affiliate and a permitted assign under the terms of the

Stock Purchase Agreement." (Complaint at ¶¶2 and 25).  The Complaint also quotes the

Agreement, in part, stating that "[Gillette] **may** (a) assign any or all of its rights and

interests hereunder to one or more of its Affiliates . . . ." (Complaint at ¶25) (emphasis

added).

However, Plaintiffs' Complaint does not assert any facts that would demonstrate

that P&G was entitled to the protection of the Forum Selection Clause.  The clause itself is

specifically limited to "Action[s] between the parties." (Agreement at ¶¶ 12.12).  Plaintiffs

have not alleged that P&G was a party to the Agreement and the Agreement itself negates

that possibility.  (Agreement at ¶¶ 12.2). Nor have Plaintiffs asserted facts that would

demonstrate that Gillette exercised the discretion given to it under the Agreement and

executed an assignment of its rights and interests to P&G as required by the express terms

of the Agreement.  (Id.) Absent such factual averments, Plaintiffs fail to state a claim for

breach of the Forum Selection Clause and thus both P&G and Gillette's breach of contract

action must be dismissed. *See Beanstalk Group,* 283 F.3d at 862-63 (affirming dismissal of

*Defendants' Brief in Support of Motion to Dismiss*
*Page 21*

breach of contract claim based on express terms of contract attached to pleading); *see also Anderson v. Haverford College*, 851 F.Supp. 179 (E.D.Pa. 1994) (dismissing breach of employment agreement claim where existence of agreement negated by employee handbook relied on by plaintiffs).

## V.   CONCLUSION.

The issue that underlies all of Plaintiffs' claims and thus likewise informs the Court's determination of Defendants' Motion to Dismiss is the inapplicability of the Forum Selection Clause to P&G due to the fact that Gillette has not undertaken to assign its rights and interests under the Agreement to P&G.   Absent the applicability of that provision (or of the Agreement as a whole for that matter) to P&G, Defendants' filing of suit in Texas was appropriate and cannot form the basis of a breach of contract claim by either Plaintiff. Likewise, since Defendants' suit was proper and was first filed, this subsequent suit by Plaintiffs should be dismissed.   Plaintiffs should not be allowed, as they have admitted was their intention, to gain a procedural advantage by utilizing the Declaratory Judgment Act in a race to the courthouse.   Such "procedural fencing" cannot be allowed to stand. Consequently, for the reasons set forth in this Brief, Defendants respectfully request that the Court dismiss Plaintiffs' suit in its entirety.

LANDIS, RATH & COBB LLP


Daniel B. Rath (Bar No. 3022)
Rebecca L. Butcher (Bar No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

and

Robert L. Chaiken (Bar No. 04057830)
Kenneth B. Chaiken (Bar No. 04057800)

**CHAIKEN & CHAIKEN, P.C.**
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
Telephone: (214) 265-0250
Facsimile: (214) 265-1537

**ATTORNEYS FOR DEFENDANTS**

*Defendants' Brief in Support of Motion to Dismiss*
*Page 24*

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, Esquire, hereby certify that a true and correct copy of the foregoing Defendants' Opening Brief in Support of Motion to Dismiss was served this 10th day of October, 2006, upon the following in the manner indicated:

**VIA E-FILING**
**BY HAND-DELIVERY**

Allen M. Terrell, Jr., Esquire
Anne Shea Gaza
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE 19899-0551

**VIA FIRST CLASS MAIL**

D. Jeffrey Ireland, Esquire
Brian D. Wright, Esquire
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, SW
10 North Ludlow Street
Dayton, OH 45402

Rebecca L. Butcher (I.D. No. 3816)

581.001-14145.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE PROCTER & GAMBLE COMPANY     '
and THE GILLETTE COMPANY,     '
    '
        Plaintiffs,     '
    '
VS.     '    **C.A. NO. 1:06-CV-00443-UNA**
    '
SUSAN HARRISON; WILLIAM G.     '
HARRISON III, individually and as a     '
Trustee for the Harrison Family Trust     '
and The Emily Waldrup Trust;     '
CINDY NOSSER; KATHY ALLEN;     '
PAT ALLEN; TINA HARRISON;     '
W.G. HARRISON IV; LARRY     '
LUXENBERG; and JOHN SHELTON     '

## COMPENDIUM OF UNREPORTED OPINIONS TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS

**LANDIS, RATH & COBB, LLP**
Daniel B. Rath (Bar No. 3022)
Rebecca L. Butcher (Bar No. 3816)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

**CHAIKEN & CHAIKEN, P.C.**
Robert L. Chaiken (Bar No. 04057830)
Kenneth B. Chaiken (Bar No. 04057800)
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
Telephone: (214) 265-0250
Facsimile: (214) 265-1537

Dated: October 10, 2006

## TABLE OF CONTENTS

TAB

*Borough of Carlstadt v. United States Army Corps of Engineers,*
  2006 WL 305314 (D.N.J. Feb. 8, 2006) ..................................................................... 1

*Envirometrics Software, Inc. v. Georgia-Pacific Corp.,*
  1997 WL 699328 (D. Del. Nov. 4, 1997) ................................................................. 2

*Miteq, Inc. v. Comtech Telecomminications Corp,*
  2003 WL 179991 (D. Del. Jan. 23, 2003) .............................................................. 3

*United States Surgical Corp. v. Litvack,*
  1999 WL 33220034 (D. Del. Dec. 30, 1999) ................................................... 4

# TAB 1

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**


**C**
Briefs and Other Related Documents
Borough of Carlstadt v. U.S. Army Corps of EngineersD.N.J.,2006.
United States District Court,D. New Jersey.
BOROUGH OF CARLSTADT, Plaintiff,
v.
UNITED STATES ARMY CORPS OF ENGINEERS; Colonel Richard J. Polo, Jr .; Meadowland
Mills/Mack-Cali Limited Partnership; and New Jersey Meadowlands Conservation Trust
Defendants.
**No. Civ.A. 05-2771(JAP).**

Feb. 8, 2006.


Stuart J. Lieberman, Mara Epstein, Lieberman & Blecher, PC, Princeton, NJ, for
Plaintiff Borough of Carlstadt.
Sue Ellen Wooldridge, Acting Assistant Attorney General, Environment and Natural
Resources Division, Eileen T. McDonough, Environmental Defense Section, United
States Department of Justice, Washington, D.C., Christopher J. Christie, United
States Attorney, Susan Handler-Menahem, Assistant United States Attorney, Newark,
NJ, for Defendants United States Army Corps of Engineers and Colonel Richard J.
Polo, Jr.
Benjamin Clarke, De Cotiis, Fitzpatrick, Cole & Wisler, LLP, Glenpointe Centre
West, Teaneck, NJ, for Defendant Meadowlands Mills/Mack-Cali Limited Partnership.
Penny S. Cirrotti, State of New Jersey, Trenton, NJ, for Defendant New Jersey
Meadowlands Conservation Trust.

OPINION

PISANO, District Judge.

I. INTRODUCTION

*1 Plaintiff Borough of Carlstadt ("Plaintiff" or "Carlstadt") brought this action
against the United States Army Corps of Engineers and Colonel Richard J. Polo, Jr.
(collectively, the "Army Corps") as well as the Meadowlands Mills/Mack-Cali Limited
Partnership ("Mills/Mack-Cali") and the New Jersey Meadowlands Conservation Trust
(the "Conservation Trust"). Plaintiff purports to challenge both the issuance and
the execution of a permit (the "Permit") issued by the Army Corps to Mills/Mack-
Cali. The Permit allows Mills/Mack-Cali to fill 7.69 acres of wetlands and open
waters of the United States in East Rutherford, New Jersey in connection with the
construction of a shopping, entertainment, sports, lodging, and office development
project called "Xanadu." (*See, e.g.,* Compl. ¶ ¶ 10-16). Further, according to
Plaintiff, the Permit contains a specific condition requiring permanent
preservation of property within the Borough of Carlstadt known as the "Empire
Tract." (Compl.¶ 102).

Plaintiff alleges, *inter alia,* that the Army Corps violated the National
Environmental Policy Act ("NEPA"), Section 404 of the Clean Water Act ("CWA"),
Section 10 of the Rivers and Harbors Act ("RHA"), as well as applicable regulations

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

promulgated under each of the foregoing statutes, and the Administrative Procedure
Act (the "APA") in connection with the issuance of the Permit. (Compl. First-Eighth
Causes of Action). Plaintiff also alleges that conduct of Mills/Mack Cali and the
Conservation Trust violated the specific condition of the Permit requiring
permanent preservation of the Empire Tract and was unlawful under laws of the State
of New Jersey. (Compl. Ninth Cause of Action). Plaintiff requests declaratory and
injunctive relief as well as costs, expenses, and attorneys' fees.[FN1] (Compl. at 35-
36).

> FN1. Plaintiff seeks: (1) declarations that the Army Corps's actions in
> issuing the Permit were arbitrary and capricious, that the Army Corps
> violated the federal environmental statutes under which Plaintiff purports to
> sue, that the Permit is null and void, that Mills/Mack Cali failed to meet
> the conditions of the Permit requiring permanent preservation of the Empire
> Tract, and that the actions of the Conservation Trust are *ultra vires* and
> must be voided because it accepted title to the Empire Tract that allows for
> future development; (2) orders requiring the Army Corps to complete a NEPA
> environmental impact statement and staying the Permit until its is completed,
> remanding the Permit to the Army Corps to provide opportunity for public
> comment, requiring the Army Corps to complete a "full and proper"
> alternatives analysis avoiding or minimizing wetlands fill, and requiring the
> Army Corps to complete an "adequate and proper" public interest review under
> the RHA; and (3) injunctions suspending and ultimately prohibiting activities
> authorized by the Permit and requiring Mills/Mack Cali to restore any
> wetlands or open waters filled pursuant to the Permit. (Compl. at 35-36).

The Army Corps moved to dismiss the Complaint, arguing that Plaintiff lacks
standing to bring the federal statutory claims asserted. Mills/Mack-Cali and the
Conservation Trust each answered the Complaint. This Court has jurisdiction under
28 U.S.C. § 1331. The Court resolves the motion on the papers without oral
argument pursuant to Fed.R.Civ.P. 78.

For the reasons expressed below, the Court finds that Plaintiff has failed to
establish that it has prudential standing to maintain its causes of action alleging
violations of federal statutes and, consequently, the First through Eighth Causes
of Action must be dismissed. Further, the Ninth Cause of Action must be dismissed
because Plaintiff cannot proceed under 33 U.S.C. § 1365 and because the Court
declines to exercise supplemental jurisdiction over this claim to the extent it
alleges violation of state law. Accordingly, Plaintiff's Complaint is dismissed
with prejudice and this case is closed.

## II. BACKGROUND

The Xanadu project is a mixed-use redevelopment of the Continental Airlines Arena
site in the New Jersey Meadowlands at the Meadowlands Sports Complex in the Borough
of East Rutherford, New Jersey. (Compl.¶ 10-11, 16). The New Jersey Meadowlands is
an environmentally sensitive area for which New Jersey has enacted legislation
seeking to preserve the delicate environmental balance. (Compl.¶ ¶ 18-22). The New
Jersey Meadowlands encompass approximately 32 square miles and extend into 14
municipalities in New Jersey, including the Borough of East Rutherford and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 3
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff Borough of Carlstadt.  (Compl.¶  17).

*2 Carlstadt is located immediately adjacent to the Xanadu development site.
(Compl.¶  3). In addition, Carlstadt contains the "Empire Tract," which is "an
ecologically sensitive parcel of property" comprising approximately 557 acres.
(Compl. ¶  102; Pltf's Br. at 2). According to the Army Corps, the Empire Tract is
almost entirely wetlands. (Army Corps Br. at 6 (citing 36 N.J.R. 1033 (Feb. 17,
2004))). In its Opposition to the Army Corps's Motion to Dismiss, Plaintiff alleges
that the Empire Tract had been the subject of a redevelopment agreement with
Mills/Mack-Cali for a "megamall," which project was abandoned by Mills/Mack-Cali in
favor of the Xanadu project at the Continental Airlines Arena site. (Pltf.'s Opp.
Br. at 2-3).

The New Jersey Sports and Exposition Authority ("NJSEA") owns and operates the
Meadowlands Sports Complex, including the Continental Airlines Arena site on which
Xanadu's construction is planned. (Compl.¶  22, 49). In February 2003, NJSEA
selected Mills/Mack-Cali from among competing developers to redevelop the
Continental Airlines Arena site pursuant to the Xanadu proposal. (Compl.¶  48). On
December 3, 2003, NJSEA and Mills/Mack-Cali entered into a redevelopment agreement
setting forth terms under which Mills/Mack-Cali would develop the Xanadu project
(the "Redevelopment Agreement"). (Compl.¶  49). As proposed, the Xanadu project is
a $1.3 billion, 4.96 million square foot shopping, sports, entertainment, hotel,
and office complex. (Compl.¶  50). As part of the Redevelopment Agreement, as
amended, Mills/Mack-Cali agreed to preserve the Empire Tract property located in
Carlstadt. (Compl.¶  102).

Construction of Xanadu as proposed will require filling of 7.69 acres of federal
wetlands and open waters. (Compl.¶  60). Since the wetlands and open waters at
issue appear to be subject to the jurisdiction of the Army Corps, Mills/Mack-Cali
was required to apply for a fill permit pursuant to §  404 of the CWA and §  10 of
the RHA. (Compl.¶  60).

Mills/Mack-Cali applied to the United States Army Corps of Engineers for a permit
to fill the 7.69 acres of wetlands on the proposed Xanadu development site in June
2003, and amended its application in May 2004. (Compl.¶  ¶  12, 61-62). The Army
Corps accepted public comments from July 27, 2004 through September 22, 2004,[FN2] and
held a public hearing on August 26, 2004.  (Compl.¶  63).

    FN2. The public comment period was scheduled to end on September 7, 2004, but
    was extended to September 22, 2004. (Compl.¶  63).

On March 18, 2005, the Army Corps issued the Permit to Mills/Mack-Cali authorizing
the fill of the 7.69 acres of wetlands, concluding that the proposed filling would
not "significantly [affect] the quality of the human environment" and that an
environmental impact statement pursuant to NEPA [FN3] would not be required. (Compl. ¶
¶  12, 68, 69 (citing MR at 118) (alteration in Compl.)). A specific condition of
the Permit requires permanent preservation of the Empire Tract. (Compl. ¶  102,
104; Pltf's Br. at 2). Mills/Mack Cali transferred ownership of the Empire Tract to
the Conservation Trust by deed dated March 16, 2005. (Compl.¶  105).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 4
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

> FN3. NEPA requires federal agencies to prepare analyses in assessing the
> effects of agency action. If, after preparing an "Environmental Assessment",
> an agency determines that a proposed action is a "major federal action[ ]
> significantly affecting the quality of the human environment," the agency
> must prepare an "Environmental Impact Statement". *See* 40 C.F.R. § § 1501.3,
> 1501.4(c), 1501.4(e); 42 U.S.C. § 4332(2)(C); *see also* *Dunn v. U.S.,* 842
> F.2d 1420, 1427 (3d Cir.1988). If, however, that agency determines that the
> proposed action will not have a significant impact, the agency must set forth
> its reasons in a Finding of No Significant Impact. *See* 40 C.F.R. § § 1501.3,
> 1501.4(c), 1501.4(e), 1508.13; *see also* *Dunn,* 842 F.2d at 1427.

### III. DISCUSSION

**\*3** Plaintiff's first eight causes of action allege that actions of the Army Corps
in issuing the Permit violated federal statutes and corresponding regulations.
Specifically, Plaintiff alleges in relevant part that the Army Corps violated
Sections 404(a) and 404(b)(1) of the CWA, 33 U.S.C. § 1344(a), (b)(1) (First
through Fourth Causes of Action), NEPA, 42 U.S.C. § 4332(2)(C), (Fifth and Sixth
Causes of Action), and Section 10 of the RHA, 33 U.S.C. § 403 (Seventh Cause of
Action), and the Adminsitrative Procedure Act, 5 U .S.C. § 706(2) (Eighth Cause of
Action). Further, Plaintiff alleges that each alleged violation of the CWA, NEPA,
and RHA should be held unlawful and set aside under the Adminsitrative Procedure
Act, 5 U.S .C. § 706(2). (Compl.¶ ¶ 114, 122, 126, 131, 137, 141, 148, 151). The
Army Corps's motion to dismiss argues that Plaintiff lacks standing to maintain the
First through Eighth Causes of Action alleging violations of federal statutes by
the Army Corps. For the reasons discussed below, the Court finds that Plaintiff
lacks standing to maintain the First through Eighth Causes of Action and,
accordingly, grants the Army Corps's motion to dismiss.

Plaintiff's Ninth Cause of Action does not appear to assert a claim against the
Army Corps. Rather, the Ninth Cause of Action alleges that conduct of Mills/Mack
Cali and the Conservation Trust violated a specific condition of the Permit
requiring permanent preservation of the Empire Tract and was unlawful under the
laws of the State of New Jersey. As addressed below, although Defendants
Mills/Mack-Cali and the Conservation Trust have not filed motions to dismiss, the
Court must likewise dismiss the Ninth Cause of Action because Plaintiff cannot
proceed under 33 U.S.C. § 1365 and because the Court declines to exercise
supplemental jurisdiction over the aspects of this claim premised upon state law.

### A. *Plaintiff's First Through Eighth Causes of Action Must Be Dismissed*

#### 1. Standard of Review

The Army Corps's objection to Plaintiff's standing is a challenge to the Court's
subject matter jurisdiction and is brought as a motion to dismiss under
Fed.R.Civ.P. 12(b)(1). *See, e.g., Storino v. Borough of Point Pleasant,* 322 F.3d
293, 296 (3d Cir.2003); *New Hope Books, Inc. v. Farmer,* 82 F.Supp.2d 321, 324
(D.N.J.2000).

For purposes of ruling on a motion to dismiss challenging standing, a court "must

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 5
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

accept as true all material allegations of the complaint, and must construe the
complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501
(1975); *see also Storino,* 322 F.3d at 296; *Turicentro, S.A. v. American Airlines,
Inc.,* 303 F.3d 293, 300 n. 4 (3d Cir.2002). At the pleading stage, "general factual
allegations of injury resulting from the defendant's conduct may suffice, for on a
motion to dismiss we presum[e] that general allegations embrace those specific
facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife,* 504
U.S. 555, 561 (1992) (internal quotations and citations omitted) (alterations
omitted). However, "the Court can consider affidavits attached to the moving papers
or even require such affidavits to be submitted." *New Hope Books,* 82 F.Supp.2d at
324 (citations omitted). "If, after this opportunity, the plaintiff's standing does
not adequately appear from all materials of record, the complaint must be
dismissed." *Warth,* 422 U.S. at 501-02.

**\*4** Plaintiff " 'bears the burden of establishing' the elements of standing, and
'each element must be supported in the same way as any other matter on which the
plaintiff bears the burden of proof, *i.e* ., with the manner and degree of evidence
required at the successive stages of the litigation." ' *FOCUS v. Allegheny County
Court of Common Pleas,* 75 F.3d 834, 838 (3d Cir.1996) (quoting *Lujan,* 504 U.S. at
561).

## 2. Legal Framework

Standing "subsumes a blend of constitutional requirements and prudential
considerations." [FN4] *Valley Forge Christian Coll. v. Americans United for Separation
of Church & State, Inc.,* 454 U.S. 464, 471 (1982).

> FN4. The "irreducible constitutional minimum of standing" requires: (1) an
> injury in fact, (2) that the injury is fairly traceable to the challenged
> action, and (3) that the injury is likely to be redressed by a favorable
> decision. *See Lujan,* 504 U .S. at 560-61. The prudential requirements are:
> (1) the plaintiff must assert its own legal rights and interests; (2) the
> plaintiff must not be asserting a generalized grievance; and (3) the
> plaintiff's injuries must fall within the zone of interests of the statutes
> at issue. *Society Hill Towers Owners' Assoc. v. Rendell,* 210 F.3d 168, 177-78
> (3d Cir.2000); *see also Elk Grove United Sch. Dist. v. Newdow,* 542 U.S. 1,
> 124 S.Ct. 2301, 2308 (2004). The prudential rules of standing aid the court
> in determining whether a particular plaintiff is the proper party to invoke
> judicial resolution of the specific dispute. *Mariana v. Fisher,* 338 F.3d
> 289, 204 (3d Cir.2003).

In the context of a challenge to agency action, such as that made in the First
through Eighth Causes of Action in Plaintiff's Complaint,[FN5] to determine whether a
plaintiff has prudential standing, a reviewing court must consider "whether the
interest sought to be protected by the complainant is arguably within the zone of
interests to be protected or regulated by the statute or constitutional guarantee
in question." *Bennett v. Spear,* 520 U.S. 154, 175 (1997); *see also Oxford Assocs.
v. Waste System Authority of Eastern Montgomery County,* 271 F.3d 140, 146 (3d
Cir.2001); *Township of Belleville v. Federal Transit Administration,* 30 F.Supp.2d
782, 790 (D.N.J.1998). This requirement stems from § 702 of the APA, entitled

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

"Right of Review", which provides that "[a] person suffering legal wrong because of
agency action, or adversely affected or aggrieved by agency action within the
meaning of a relevant statute, is entitled to judicial review thereof." 5 U .S.C. §
702 (2005); *see, e.g., Township of Belleville,* 30 F.Supp.2d at 790. "The 'relevant
statute' refers to the statute 'whose violation is the gravamen of the complaint."
' *Township of Belleville,* 30 F.Supp.2d at 791 (*quoting Lujan v. National Wildlife
Fed'n,* 497 U.S. 871, 886 (1990)). Further, a reviewing court should consider the
"particular provision of law upon which the plaintiff relies" rather than "the
overall purpose of the Act in question." *Bennett,* 520 U.S. at 175. Finally, where,
as here, "the plaintiff is not the subject of the contested regulatory action, the
test denies a right of review if the plaintiff's interests are so marginally
related to or inconsistent with the purposes implicit in the statute that it cannot
reasonably be assumed that Congress intended to permit the suit." *Ashley Creek
Phosphate Co. v. Norton,* 420 F.3d 934, 940 (9th Cir.2005) (internal quotations and
citation omitted).

> FN5. Plaintiff asserts each of the first eight causes of action under §
> 706(2) of the APA, entitled "Scope of Review." Section 706 provides:
> To the extent necessary to decision and when presented, the reviewing court
> shall decide all relevant questions of law, interpret constitutional and
> statutory provisions, and determine the meaning or applicability of the terms
> of an agency action. The reviewing court shall-
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions
> found to be-
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short
> of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to section 556 and
> 557 of this title or otherwise reviewed on the record of an agency hearing
> provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to
> trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole
> record or those parts of it cited by a party, and due account shall be taken
> of the rule of prejudicial error.
> 5 U.S.C. § 706 (2005).

### 3. The Alleged Interests that Plaintiff Seeks to Protect

In the Complaint, Plaintiff alleges the following as its injuries: "[t]he
recreational, aesthetic, and conservation interests of Plaintiffs' members will be
directly and adversely affected by the Xanadu Project" and "Plaintiffs' members
will also be adversely affected by the increased traffic and air pollution expected
to result from this project." (Compl.4). In its Motion to Dismiss, the Army Corps
argued that Plaintiff's allegations in the Complaint are insufficient to establish
standing because Plaintiff did not allege any injury to its own interests, but
instead alleged injury to its "members", and a municipality cannot assert standing

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

based on *parens patriae* or the doctrine of associational standing. In its
Opposition to the Army Corps's Motion to Dismiss, Plaintiff does not dispute the
Army Corps's arguments. Rather, Plaintiff expressly abandons its reliance on these
purported injuries to its "members" and instead enumerates alternative theories of
alleged injuries to its own interests. (See Pltf's Opp. Br. at 7-8, 9).

**\*5** In Plaintiff's Opposition, Plaintiff asserts that its "actual," "concrete and
particularized" injuries to its own interests are that in excess of $1.7 million
has been taken from Carlstadt's tax roll without any compensation or benefit to
Carlstadt, creating 'a hole that must be filled through taxing, borrowing, or
cutting, or a combination; that Xanadu will "increase the need for emergency
services, with [Carlstadt] having to shoulder the additional costs for these
services"; and that approximately $14 million to $21 million in anticipated future
tax revenues will not come to fruition because Mills/Mack-Cali has abandoned any
interest in developing a megamall on the Empire Tract in favor of the Xanadu
project. (Pltf's Opp. Br. at 2-4, 8). All of Plaintiff's injuries are, therefore,
fundamentally economic in nature.

According to Plaintiff, prior to the transfer of the Empire Tract to the
Conservation Trust for permanent preservation pursuant to a specific condition of
the Permit, the Empire Tract had a total assessed value of $70,216,100. (Pltf's
Br. at 3). At that assessed value, the Empire Tract was expected to generate more
than $1.7 million per year in tax revenue. (Pltf's Br. at 1). Because the Empire
Tract has been transferred to the Conservation Trust for permanent preservation, it
has been removed from Carlstadt's tax rolls and reclassified as tax exempt. (Pltf's
Br. at 3; Ranone Cert. ¶ ¶ 8-9). Plaintiff alleges that the Army Corps's permit
directly resulted in the loss of approximately $1.7 million per year in tax revenue
that "will become the burden of the taxpayers" of Carlstadt and "that can equate to
cuts in services, loss of jobs, and increased taxes." (Pltf's Opp. Br. at 1, 3, 8).

In addition, Plaintiff alleges that the Empire Tract was previously the subject of
a development agreement between Carlstadt and Mills/Mack-Cali calling for the
development of a "megamall" on that site, which project has since been abandoned by
Mills/Mack-Cali. (Pltf's Opp. Br. at 2). That project was expected to generate
approximately $14 million in tax revenue in year one, and $21 million per year in
tax revenue at full build-out. (Pltf's Opp. Br. at 2-4). Plaintiff asserts that
"[o]n the anticipation of the project being built within Carlstadt, along with the
tax revenue that the project would produce, [Carlstadt] approved and construction
has begun on a new school costing approximately $24 million." (Pltf's Opp. Br. at
4). Further, Plaintiff alleges that resident taxpayers must now "subsume the costs
of the school alone subsequently causing further substantial tax increases" because
the Mills/Mack-Cali megamall project will now not be built in Carlstadt. (Pltf's
Opp. Br. at 4).

Finally, Plaintiff alleges that Carlstadt's volunteer fire department and ambulance
corps will be strained, potentially both endangering proper coverage of Carlstadt's
existing community and costing Carlstadt in excess of $500,000 annually to increase
patrols, because the major ingress and egress routes for Xanadu are within
Carlstadt and Xanadu is estimated to receive 20 million visitors per year. (Pltf's
Opp. Br. at 4-5).

**\*6** Because Plaintiff abandons any reliance on the injuries to its "members"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
(Cite as: Not Reported in F.Supp.2d)

asserted in the Complaint and fails to rebut the Army Corps' arguments that such allegations are insufficient to confer standing, the Court will consider only the alleged injuries to Plaintiff's own interests made by Plaintiff in its opposition brief. While Plaintiff failed to make these allegations in the Complaint, amendment of the Complaint to include such allegations would be futile because these allegations do not demonstrate standing. *See Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 297 (3d Cir.2003); *Jablonski v. Pan American World Airways, Inc.,* 863 F .2d 289, 292 (3d Cir.1988).

### 4. Plaintiff Failed to Establish that Its Alleged Injuries Fall Within the Zones of Interests of the Federal Statutes at Issue

Plaintiff has failed to show that the interests it seeks to protect are within the zones of interests protected by NEPA, Section 404 of the CWA, or Section 10 of the RHA.

#### a. The National Environmental Policy Act

NEPA states:
The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

42 U.S.C. § 4321(a) (2005); *see also Township of Belleville,* 30 F.Supp.2d at 791. Toward that end, NEPA requires, in relevant part, "that federal agencies assess the effects of proposed major federal actions on the human environment." *Id.* By imposing "a substantive obligation upon all federal agencies to balance the environmental considerations and goals of the Congress along with the traditional factors of public interest particular to each agency's mandate", *Township of Belleville,* 30 F.Supp.2d at 791 (quotations and citations omitted), NEPA focuses "national policymaking on the interdependence between human beings and the environment", *Dunn v. U.S.,* 842 F.2d 1420, 1426 (3d Cir.1988). NEPA is essentially a procedural statute and does not require an agency to reach a particular result. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350-51 (1989). Regulations promulgated by the Council on Environmental Quality, 40 C.F.R. 1500-08, govern the application of NEPA. *See id., 490 U.S. at 355-56.*

"The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions." *Nevada Land Action Ass'n v. United States Forest Service,* 8 F.3d 713, 716 (9th Cir.1993); *see also Ashley Creek Phosphate,* 420 F.3d at 939 (stating that NEPA "is directed at environmental concerns, not at business interests"). Accordingly, "to assert a claim under NEPA, a plaintiff must allege injury to the environment; economic injury will not suffice." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agriculture,* 415 F.3d 1078, 1102-03 (9th Cir.2005); *see also Ashley Creek Phosphate,* 420 F.3d at 940 (indicating that the zone of interests that NEPA protects have long been described as environmental and that "purely economic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 9
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

interests do not fall within NEPA's zone of interests"). Because Plaintiff "has
failed to allege any connection to injury to the physical environment, its injury
falls outside of NEPA's zone of interests." *Ranchers Cattlemen Action Legal Fund,*
415 F.3d at 1104. Plaintiff does not claim "to be protecting an interest that is
even remotely intertwined with the environment." *Ashley Creek Phosphate,* 420 F.3d
at 940. Rather, as enumerated above, the interests that Plaintiff seeks to protect
are fundamentally economic in nature: each of Plaintiff's alleged injuries is
premised upon anticipated losses of tax revenues or increases in expenditures.
Plaintiff does not allege "an environmental injury such as to an aesthetic or
recreational interest in a particular place, animal, or plant species." *See Save
Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1120 (9th Cir.2005). Because Plaintiff
asserts purely economic injuries, Plaintiff does not have standing to challenge the
Army Corps's action under NEPA. *See Town of Stratford v. FAA,* 285 F.3d 84, 88
(D.C.Cir.2002).

**\*7** Plaintiff attempts to cure this deficiency by alleging in the section of its
Opposition Brief addressing the zone of interests requirement that Xanadu will
generate traffic that will render Carlstadt's roadways "congested" and "unsafe",
will result in "inefficient travel", and will jeopardize the "safety and welfare of
Carlstadt property owners." (Pltf.'s Br. at 10-11). Plaintiff argues that "traffic
impacts are one of the environmental considerations that an agency must examine
when reviewing a proposed project under NEPA" and that the Army Corps did not
comply with NEPA because it inadequately considered traffic impacts that will
result from Xanadu. (*Id.*). Plaintiff's attempt to rely on traffic impacts in
connection with its "zone of interests" argument is inapt. In identifying its
alleged injuries in fact to its own interests, Plaintiff made clear that
Plaintiff's real interest in traffic is that traffic may cause Carlstadt to incur
additional expenses because of a potential increase in need for emergency services
in Carlstadt. (*See* discussion *supra*; Pltf's Opp. Br. at 2-4, 8). Thus, while
Plaintiff emphasizes traffic impacts in its argument, the interest it seeks to
protect remains fundamentally economic.

NEPA "cannot be used as a handy stick by a party with no interest in protecting
against an environmental injury to attack a defendant." *Town of Stratford,
Connecticut v. FAA,* 285 F.3d 84, 88 (D.C.Cir.2002). Plaintiff's Opposition Brief
indicates that Plaintiff's real complaints are that, instead of developing a
megamall on Carlstadt's "ecologically sensitive" Empire Tract, which is comprised
almost entirely of wetlands, Mills/Mack-Cali is developing the Xanadu project in
East Rutherford and has caused the Empire Tract to be transferred to the
Conservation Trust for preservation, all of which is alleged to negatively impact
Carlstadt's finances. Plaintiff has revealed no interest in protecting any
purported environmental injury and thus cannot use NEPA to attack the Defendants.
*Id.*

Accordingly, Plaintiff's claims asserted pursuant to NEPA must be dismissed.

### b. Section 404 of the Clean Water Act

The CWA establishes a comprehensive framework designed to "restore and maintain the
chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §
1251(a) (2005). To achieve this objective, the CWA prohibits the discharge of

pollutants into navigable waters, which is defined to include certain wetlands, unless authorized by a CWA § 404 permit. 33 U.S.C. § § 1311(a), 1362(7) (2005); 33 C.F.R. § 328.3(a),(b); *see also* Bayou des Familles Dev. Corp. v. U.S. Corps of Engineers, 541 F.Supp. 1025, 1035 (E.D.La.1982) ("Under the [CWA], the [Army] Corps has the right to control the disposal of dredged material upon freshwater as well as tidal wetlands."). Consistent with the purpose of the CWA, "[t]he permit program established under Section 404 ... was intended to control the degradation of aquatic resources that results from any replacement of water with fill material, as well as the degradation that results from the discharge of dredged or fill material which contains toxic substances." Bayou des Familles Dev. Corp. v. U.S. Corps of Engineers, 541 F.Supp. 1025, 1036 (E.D.La.1982) (citing S.Rep. No. 95-370, 95th Cong., 1st Sess. (1977), at 74-75, reprinted in (1977) U.S.Code Cong. & Ad. News 4326, 4399-4400). The Army Corps is the agency authorized to regulate discharges of dredged and fill materials into wetlands through the issuance of § 404 permits.[FN6] 33 U.S.C. § 1344.

FN6. CWA regulations establish a case-by-case review process for the issuance of individual permits that involves site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination. *See* 33 C.F.R. Pts. 323, 325. In addition, individual permit applications are subject to a public interest review by the Army Corps, in which environmental an other considerations are examined, and which includes an opportunity for public comment. *See* 33 C.F.R. § § 320.4(a), 325.3.

**\*8** Plaintiff's alleged injuries do not fall within the zone of interests of § 404 of the CWA. As discussed, Plaintiff's interests are purely economic. Plaintiff's claims do not address the quality of aquatic resources or the protection of wetlands. Indeed, Plaintiff's asserted injuries have nothing to do with water at all, but rather concern only Plaintiff's interest in protecting its finances. Reference to Plaintiff's essential grievances clarifies that prevention of degradation of water resources is not an interest that Plaintiff seeks to advance in this litigation: that Mills/Mack-Cali is developing Xanadu on the Continental Airlines Arena site in East Rutherford instead of developing a megamall in Carlstadt on the Empire Tract, an "ecologically sensitive parcel of property" consisting almost entirely of wetlands, and that, because the Empire Tract has been transferred to the Conservation Trust for permanent preservation, it is no longer eligible for development and the tax revenues that may generate. That the Continental Airlines Arena site on which Xanadu is being developed contains 7.69 acres of wetlands is irrelevant to Plaintiff's interests; Plaintiff's Opposition Brief makes clear that Plaintiff simply does not want Xanadu constructed in East Rutherford because that project allegedly threatens Carlstadt's financial interests.

Plaintiff's only argument that its interests are within the zone of interests of § 404 of the CWA is that the CWA and its regulations indicate that economic values, safety, the needs and welfare of the people, and tax revenues are among the factors that the Army Corps may consider. (Pltf.'s Br. at 11). However, the fact that the analysis that the Army Corps undertakes during its decision-making process may be far-reaching in scope, and may even include economic concerns among the factors considered, does not change the basic principle that Congress enacted this law to protect the public interest in the waters of the United States. *See Town of*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                     Page 11
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

*Stratford, Connecticut,* 285 F.3d at 88-89.

Accordingly, Plaintiff's claims asserted pursuant to § 404 of the CWA must be
dismissed.

### c. Section 10 of the Rivers and Harbors Act

Section 10 of the RHA requires that a permit issued by the Army Corps be obtained
prior to the construction of any obstructions to navigation in the navigable waters
of the United States.[FN7] 33 U.S.C. § 403 (2005); 33 C.F.R. § § 329.4, 320.2(b).
The purpose of § 10 of the RHA is to "prohibit[ ] any activity affecting the
course, condition, location or capacity of any navigable water unless authorized by
a permit issued by the [Army] Corps." *Bayou des Familles,* 541 F.Supp. at 1032; *see
also United States v. Ohio Barge Lines, Inc.,* 432 F.Supp. 1023, 1027 (W.D.Pa.1977)
(indicating that purpose of § 10 of the RHA is to prohibit unauthorized
obstructions to navigable waters so as to remove obstructions to interstate and
foreign commerce); *Potomac River Ass'n, Inc. v. Lundeberg Maryland Seamanship
School, Inc.,* 402 F.Supp. 344 (D.Md.1975) (indicating that the purpose of § 10 of
the RHA is to prohibit obstructions in navigable waters and protect navigation).

> FN7. As with CWA Section 404 permits, Army Corps regulations detail the
> permit application review process. *See* 33 C.F.R. Pt. 325.

*\*9 Plaintiff's alleged injuries do not fall within the zone of interests of § 10
of the RHA. Plaintiff does not allege that the fill of the 7.69 acres of wetlands
authorized by the Permit will adversely impact navigable waters or that Plaintiff
will be injured as a result of any such impact. In fact, Plaintiff's claims do not
address concerns relating to the navigability of any water resource. Further, as
discussed above, Plaintiff's asserted injuries have nothing to do with water at
all. Plaintiff's argument that its interests fall within the zone of interests of §
10 of the RHA is the same as that made in connection with the § 404 CWA, discussed
*supra,* and must be rejected for the same reason: although the Army Corps's analysis
may be far-reaching in scope, Congress enacted this law to protect the public
interest in navigability of the waters of the United States. *See Town of Stratford,
Connecticut,* 285 F.3d at 88-89.

Accordingly, Plaintiff's claims asserted pursuant to § 10 of the RHA must be
dismissed.

### 5. Conclusion

Because Plaintiff has failed to show that the interests it seeks to protect are
within the zones of interests protected by NEPA, Section 404 of the CWA, or Section
10 of the RHA, Plaintiff lacks prudential standing to maintain the First through
Eighth Causes of Action. Consequently, Plaintiff's First through Eighth Causes of
Action must be dismissed.

### B. *Plaintiff's Ninth Cause of Action Must Be Dismissed*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unlike the First through Eighth Causes of Action, Plaintiff's Ninth Cause of Action does not allege that conduct of the Army Corps violated various federal statutes. Rather, Plaintiff's final Cause of Action alleges that conduct of Mills/Mack Cali and the Conservation Trust violated a specific condition of the Permit requiring permanent preservation of the Empire Tract and was unlawful under the laws of the State of New Jersey. First, Plaintiff alleges that a specific condition of the Permit requires that the Empire Tract be subjected to a perpetual deed restriction guaranteeing its preservation. Plaintiff argues that because the deed transferring ownership of the Empire Tract from Mills/Mack-Cali to the Conservation Trust contains a provision allegedly allowing for development depending on "unforeseen or changed circumstances", Mills/Mack-Cali has failed to fulfill the obligations of the Permit. (Compl. ¶ ¶  152-53, 161). Further, Plaintiff also argues that the provision in the deed for "unforeseen or changed circumstances" is contrary to the purpose and understanding of the transfer as stated in correspondence between Mills/Mack-Cali and the Conservation Trust, and, therefore, that "there is no 'meeting of the minds" ' between Mills/Mack-Cali and the Conservation Trust. (Compl.¶ ¶  153-60). Finally, Plaintiff alleges that the deed is contrary to the statutory laws and the public policy of the State of New Jersey and that, consequently, the Conservation Trust's acceptance of the deed is *ultra vires*. (Compl.¶ ¶  158-59). In connection with the Ninth Cause of Action, Plaintiff appears to seek, *inter alia,* a declaration that Mills/Mack-Cali failed to meet the conditions of the permit requiring permanent preservation of the Empire Tract and a declaration that the actions of the Conservation Trust are *ultra vires* and must be voided because it accepted title to the Empire Tract that allows for future development.

**\*10** To the extent that Plaintiff's Ninth Cause of Action alleges that Mills/Mack-Cali has failed to fulfill the obligations of the Permit, Plaintiff's Ninth Cause of Action must be dismissed. (Compl.¶ ¶  152-53, 161). As noted above, the Permit was issued pursuant to §  404 of the CWA, 33 U.S.C. §  1344. Under circumstances such as that presented here, it appears that the CWA may not permit a private right of action against a private defendant for alleged violations of the terms or conditions of a permit issued under §  404 of the CWA, 33 U.S.C. §  1344. *See Northwest Environmental Defense Center v. U.S. Army Corps of Engineers,* 118 F.Supp.2d 1115 (D.Or.2000) (citing 33 U.S.C. §  1365(a)); *see also Jones v. Rose,* No. 00-1795, 2005 WL 2218134, at \*23 n. 9 (D.Or. Sept. 9, 2005) (discussing conflicting authority and noting that "[a]lthough the Court concludes Plaintiff does not have the right to bring a citizens suit based on an alleged violation of the conditions of a §  404 permit, Plaintiff does have the right to bring an action under the APA challenging the validity of a §  404 permit"). However, the Court need not decide that issue, because even if a private right of action against a private defendant for alleged violations of the terms or conditions of a §  404 permit were among the types of citizens suits permitted by 33 U.S.C. §  1365(a), there is no indication that Plaintiff complied with the sixty-day notice provision in 33 U.S.C. §  1365(b). Accordingly, Plaintiff's Ninth Cause of Action must be dismissed to the extent Plaintiff alleges that Mills/Mack-Cali has failed to satisfy a condition of the Permit.

Further, to the extent that Plaintiff's Ninth Cause of Action alleges that the transfer of the Empire Tract is inconsistent with the stated statutory laws or public policy of the State of New Jersey or that "there is no 'meeting of the minds" ' between Mills/Mack-Cali and the Conservation Trust, Plaintiff advances

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 13
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**

claims premised upon laws of the State of New Jersey. (*See* Compl. ¶ ¶  152-62).
Because the Court has already dismissed all claims supporting the Court's original,
federal question jurisdiction, the Court declines to exercise supplemental
jurisdiction over Plaintiff's claims to the extent brought pursuant to state law.

Section 1367 enables a federal court to consider claims premised upon state law
over which no independent basis of federal jurisdiction exists. District courts
have supplemental jurisdiction "over all other claims that are so related to claims
in the action within such original jurisdiction that they form part of the same
case or controversy...." 28 U.S.C. §  1367(a).  Section 1367(c) permits a district
court to decline to exercise supplemental jurisdiction over a claim when "the
district court has dismissed all claims over which it has original jurisdiction."
28 U.S.C. §  1367(c)(3). As discussed above, all of Plaintiff's federal claims have
been dismissed. This Court's original jurisdiction was based on federal question
pursuant to 28 U.S.C. §  1331. No other basis for jurisdiction appears to exist.[FN8]
To the extent Plaintiff's Ninth Cause of Action is premised upon state law, it is
dismissed. See 28 U.S.C. 1367(c)(3); *Kohn v. AT & T Corp.*, 58 F.Supp.2d 393, 421-
22; *Eckhaus v. Consolidated Rail Corp.*, No. 00-5748(WGB), 2003 WL 23205042, at *16
(D.N.J. Dec. 24, 2003).

> FN8. Because Plaintiff and some of Defendants are citizens of New Jersey,
> diversity jurisdiction is lacking. *See* 28 U.S.C. §  1332; Com pl. ¶ ¶  3-7,
> 8.

## IV. CONCLUSION

**\*11** For the reasons expressed above, with respect to Plaintiff's First through
Eighth Causes of Action, Plaintiff has failed to establish that the interests it
seeks to protect are arguably within the zones of interests to be protected or
regulated by the federal statutes in question. Plaintiff therefore lacks prudential
standing to assert the alleged violations of those statutes and Plaintiff's First
through Eighth Causes of Action consequently must be dismissed. Further, for the
reasons discussed above, Plaintiff's Ninth Cause of Action must be dismissed
because, to the extent that it seeks to enforce the terms of the Permit, Plaintiff
cannot proceed under 33 U .S.C. §  1365, and, to the extent it challenges the
transfer of the Empire Tract to the Conservation Trust, it is premised upon state
law and the Court exercises its discretion to decline to exercise supplemental
jurisdiction to consider it. Accordingly, Plaintiff's Complaint is dismissed with
prejudice and this case is closed. An appropriate order will follow.

D.N.J.,2006.
Borough of Carlstadt v. U.S. Army Corps of Engineers
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118

Briefs and Other Related Documents (Back to top)

• 2005 WL 3172064 (Trial Motion, Memorandum and Affidavit) Federal Defendants'
Memorandum in Support of Motion to Dismiss for Lack of Subject-Matter Jurisdiction
(Oct. 31, 2005)
• 2005 WL 3172407 (Trial Pleading) Answer (Oct. 21, 2005)
• 2:05cv02771 (Docket) (May 31, 2005)

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 14
Not Reported in F.Supp.2d, 2006 WL 305314 (D.N.J.), 62 ERC 1118
**(Cite as: Not Reported in F.Supp.2d)**


• 2005 WL 3523162 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum
in Opposition to Defendants United States Army Corps of Engineers and Colonel
Richard J. Polo, Jr.'s Motion to Dismiss for Lack of Subject-Matter Jurisdiction
(2005)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.                                          Page 1
Not Reported in F.Supp., 1997 WL 699328 (D.Del.)
(Cite as: 1997 WL 699328 (D.Del.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ENVIROMETRICS SOFTWARE, INC., Plaintiff,
v.
GEORGIA-PACIFIC CORPORATION, Defendant.
**No. CIV. A. 97-243-SLR.**

Nov. 4, 1997.
M. Duncan Grant, Esquire, Daniel V. Folt, Esquire, and Tara L. Lattomus, Esquire,
of Pepper, Hamilton & Scheetz LLP, Wilmington, Delaware, for plaintiff.

Thomas C. Grimm, Esquire, and Karen L. Pascale, Esquire, of Morris, Nichols, Arsht
& Tunnell, Wilmington, Delaware, for defendant.

MEMORANDUM OPINION

ROBINSON, District J.

INTRODUCTION

*1 Pending before the court is a motion filed by plaintiff EnviroMetrics Software,
Inc. ("ESI") to enjoin a related case pending in the United States District Court
for the Northern District of Georgia.  Also pending is a motion to dismiss the
instant litigation filed by defendant Georgia-Pacific Corporation ("G-P").  The
underlying facts to the parties' dispute are relatively straightforward.

ESI is a Delaware corporation with its principal place of business in New Castle,
Delaware.  (D.I. 10, Ex. B at ¶ 3) ESI is in the business of writing computer
software that may be used by companies with industrial operations to monitor and to
provide reporting on air, water, and solid waste emissions that are being generated
by their industrial processes.  (D.I. 10, Ex. B at ¶ 2) G-P is a Georgia
corporation which manufactures paper and paper products in numerous plants located
throughout the United States.

As of May 30, 1995, ESI and G-P entered into a contract, entitled Computer
Software License and Services Agreement (the "License Agreement"), whereby ESI
licensed use of its "PlantWare" software to G-P. The License Agreement expressly
set forth numerous warranties respecting PlantWare (including performance and
documentation warranties), as well as functional enhancements.  (D.I.7, ¶ 3).  G-
P paid $1,000,000 to ESI for PlantWare and over $400,000 for "consulting" services
in connection with PlantWare.  (D.I.7, ¶ 4)

ESI and G-P also entered into a separate agreement entitled Program and

® 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 2
Not Reported in F.Supp., 1997 WL 699328 (D.Del.)
(Cite as: 1997 WL 699328 (D.Del.))


Documentation Maintenance Agreement (the "Maintenance Agreement") as of May 30,
1995, in which ESI agreed to provide G-P with certain specified maintenance
services for the PlantWare software. (D.I. 10, Ex. B at ¶ 7) Pursuant to the
terms of the Maintenance Agreement, G-P owed ESI $20,000 as of July 15, 1996, and
an additional $20,000 as of December 15, 1996, for services provided between June
15, 1996 and June 15, 1997. (D.I. 10, Ex. B at ¶ 8)

  G-P asserts that during the two years following execution of the License
Agreement, it reported to ESI "more than 100 deficiencies, defects and bugs with
PlantWare..., many of which were fundamental, and irremedial, flaws in the
software, and many others of which were not corrected within the time period
specified by the License Agreement." (D.I.7, ¶ 5) ESI relatedly asserts that when
G-P completed payment of the $1,000,000 under the License Agreement on August 14,
1996, G-P expressly "confirm[ed to ESI] that it accepted the PlantWare software as
satisfactory at the conclusion of the acceptance period provided for in the
Licensing Agreement." (D.I. 10, Ex. B at ¶ 10)

  The parties are in agreement that, at a meeting held on April 22, 1997, G-P
demanded reimbursement of the entire $1,000,000 it had already paid under the
Licensing Agreement, contending that the PlantWare software failed to meet warranty
specifications. (D.I. 7, ¶ 7; D.I. 10, Ex. B at ¶ ¶ 11-13) This meeting was
followed by a letter to Mr. James E. Bostic, Jr., a Senior Vice President at G-P,
dated April 28, 1997 from David N. Hommrich, President of ESI, whereby ESI offered
a " 'no-risk' set of services" by which ESI was to help G-P successfully implement
PlantWare at two appropriate facilities. Mr. Hommrich concluded his letter with
the following: "I look forward to hearing from you, and am hopeful that we can
work with you in the near future." (D.I.15, Ex. A)

  *2 Mr. Bostic received Mr. Hommrich's letter on May 2, 1997. Mr. Bostic and Mr.
Hommrich had a follow-up conversation on May 12, 1997, as confirmed by a letter
dated May 14, 1997 from Mr. Hommrich. Mr. Hommrich ended this letter as follows:
"I'll be calling you today to discuss this matter. There are people here, Jim,
who are prepared for this challenge and want to work very hard for you. I hope
you'll take us up on this offer." (D.I.15, ¶ ¶ 7-10, Ex. B) During the course of
these discussions and without advance warning to G-P, on May 7, 1997, ESI filed a
complaint in this court against G-P. [FN1] Count I of the complaint seeks a
declaration under 28 U.S.C. § 2201 et seq. that ESI has not breached the License
Agreement.    Count II of the complaint is a $40,000 breach of contract claim under
the Maintenance Agreement. [FN2] Count III is a claim for attorneys' fees. [FN3]
(D.I.1) Not until May 16, 1997, when the complaint was served on G-P's registered
agent in Georgia, did G-P understand that the parties' negotiations had been
terminated. (D.I. 7, ¶ ¶ 9-10; D.I. 15, Exs. C, D)

    FN1. Mr. Hommrich averred in this litigation that, "[a]t the time [ [ESI]
    filed suit, there were no ongoing settlement negotiations." (D.I. 10, Ex. B
    at ¶ 15) The record indicates otherwise.

    FN2. G-P has refused to pay the $40,000 due and owing under the Maintenance
    Agreement.

    FN3. Both the License Agreement and the Maintenance Agreement provide that if
    either G-P or ESI commences litigation to enforce its rights under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 3
Not Reported in F.Supp., 1997 WL 699328 (D.Del.)
(Cite as: 1997 WL 699328 (D.Del.))

     agreements, "the successful party in any such suit or action shall be
     entitled to recover from the other such sum as the court may adjudge
     reasonable as an attorney's fee in such suit or action and in any appeals
     therefrom." (D.I. 7, Ex. A at ¶ 13.10)

On June 25, 1997, G-P filed an action in Georgia state court against both ESI and
ESI's President, David M. Hommrich, alleging breach of the License Agreement as
well as fraud and negligent misrepresentations in connection with G-P's purchase of
PlantWare. (D.I.10, Ex. A) Defendants ESI and Hommrich have removed the state
court action to the United States District Court for the Northern District of
Georgia.

 This court has jurisdiction pursuant to 28 U.S.C. § 1332.   The question at issue
is whether the court should exercise such jurisdiction under the Declaratory
Judgment Act, 28 U.S.C. § 2201(a).

 DISCUSSION

 Plaintiff ESI contends that the court must exercise its jurisdiction under the
"first-filed" rule.   As explained by the Third Circuit in E.E.O.C. v. University
of Pennsylvania, 850 F.2d 969, 976-77 (3d Cir.1988),
     [a]lthough exceptions to the [first-filed] rule are rare, courts have consistently
     recognized that the first-filed rule "is not a rigid or inflexible rule to be
     mechanically applied...." ... Bad faith ... and forum shopping have always been
     regarded as proper bases for departing from the rule.... Similarly, courts have
     rejected the rule when the second-filed action had developed further than the
     initial suit... and when the first-filing party instituted suit in one forum in
     anticipation of the opposing party's imminent suit in another, less favorable,
     forum....
     The letter and spirit of the first-filed rule, therefore, are grounded on
     equitable principles.   See Columbia Plaza Corp. v. Security Nat. Bank, 525 F.2d
     620, 621 (D.C.Cir.1975); cf. Kerotest Mfg. Co. v. C-O-Two Co., 342 U.S. 180,
     183-84, 72 S.Ct. 219, 221-22, 96 L.Ed. 200 (1952) (under Federal Declaratory
     Judgment Act, factors relevant to wise judicial administration between coordinate
     federal courts "are equitable in nature").   To be sure, the rule's primary
     purpose is to avoid burdening the federal judiciary and to prevent the judicial
     embarrassment of conflicting judgments.... Yet, fundamental fairness dictates the
     need for "fashioning a flexible response to the issue of concurrent jurisdiction."
     ...
 *3 (citations omitted) (emphasis added).

 Defendant G-P maintains that plaintiff at bar instituted suit first in Delaware
"in anticipation of the opposing party's [i.e., G-P's] imminent suit in another,
less favorable, forum," id. at 976, in this case Georgia state court.   Not only do
these circumstances constitute a recognized exception to the first-filed rule, but
constitute as well a framework for analyzing the exercise of the court's discretion
under the Declaratory Judgment Act, 28 U.S .C. § 2201(a), which provides:
     In a case of actual controversy within its jurisdiction ... any court of the
     United States, upon the filing of an appropriate pleading, may declare the rights
     and other legal relations of any interested party seeking such declaration,
     whether or not further relief is or could be sought ...
     Declaratory relief is appropriately awarded when it will " 'serve a useful

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1997 WL 699328 (D.Del.)
(Cite as: 1997 WL 699328 (D.Del.))

purpose in clarifying the legal relations in issue or terminate and afford relief
from the uncertainty, insecurity, and controversy giving rise to the proceeding." '
*Gribin v. Hammer Galleries*, 793 F.Supp. 233, 234 (C.D.Cal.1992) (quoting *Tierney v.
Schweiker*, 718 F.2d 449, 457 (D.C.Cir.1983)). It is generally recognized,
however, that

   "[t]he Declaratory Judgment Act was not intended to enable a party to obtain a
   change of tribunal from a state to federal court, and it is not the function of
   the federal declaratory action merely to anticipate a defense that otherwise could
   be presented in a state action." Wright & Miller, § 2758, at 631- 632.
   *Gribin*, 793 F.Supp. at 235. Indeed, the Third Circuit has instructed courts to
look critically at

   "any attempt to circumvent the laudable purposes of the Act, and [to] seek to
   prevent the use of the declaratory action as a method of procedural fencing, or as
   a means to provide another forum in a race for res judicata." 6A J. Moore, J.
   Lucas & G. Girtheer, Jr., *Moore's Federal Practice* ¶ 57.08[5], at 57-50 (2d
   ed.1987) (footnote omitted).

   *Terra Nova Ins. Co., Ltd. v. 900 Bar, Inc.*, 887 F.2d 1213, 1225 (3d Cir.1989);
see also *Nat'l Union Fire Ins. Co. of Pittsburgh v. Freeport-McMoRan Inc.*, 767
F.Supp. 568, 573 (D.Del.1991). Venerable Third Circuit precedent specifically has
directed that "it is not one of the purposes of the declaratory judgment acts to
enable a prospective ... defendant to obtain a declaration of non-liability...."
*Sun Oil Co. v. Transcontinental Gas Pipe Line Corp.*, 108 F.Supp. 280, 282
(E.D.Pa.1953). The "race to the courthouse" is particularly inappropriate under
circumstances where " 'the party entitled to bring a coercive action [has not]
fail[ed] or delay[ed] in bringing it." ' *Gribin*, 793 F.Supp. at 236 (quoting *State
Farm Fire & Cas. Co. v. Taylor*, 118 F.R.D. 426, 429 (M.D.N.C.1988) (emphasis in
original)), and where (aside from potential litigation costs) there is no "accruing
damage," *Crown Cork & Seal Co., Inc. v. Borden, Inc.*, 779 F.Supp. 33, 36
(E.D.Pa.1991); see also, *ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 823
(3d Cir.1981) (because "declaratory judgment relief was intended to avoid ... the
'accrual of avoidable damages to one not certain of his rights," ' it is proper to
exercise jurisdiction where judgment would "affect present behavior, have present
consequences and resolve a present dispute.").

   *4 The record at bar demonstrates that defendant G-P was dissatisfied with the
performance of plaintiff ESI's PlantWare software and initiated discussions with
ESI to resolve outstanding problems and complaints. It is apparent under the
circumstances presented that defendant G-P is "the party entitled to bring a
coercive action." The parties had been discussing G-P's complaints for only a
matter of days (and were still discussing possible resolutions) when plaintiff ESI
filed this lawsuit. Such a time frame from notice of breach to lawsuit surely is
insufficient to generate the magnitude of uncertainty and insecurity typically
associated with declaratory judgment actions, especially where (as here) the
conduct at issue was already complete and the damages record thus established.
Plaintiff ESI's declaratory judgment action clearly was filed in anticipation of a
coercive action by G-P and, as such, constitutes an inappropriate use of the
declaratory judgment remedy and an exception to the first-filed rule. The court
declines to exercise its discretionary jurisdiction over Count I under these
circumstances. [FN4]

        FN4. These circumstances include as well the fact that the Georgia action is
        directed at the President of ESI, David M. Hommrich, an individual who is not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 5
Not Reported in F.Supp., 1997 WL 699328 (D.Del.)
(Cite as: 1997 WL 699328 (D.Del.))

     a party to the instant lawsuit.

 With respect to Counts II and III, plaintiff has carried its burden of persuading
the court that the remaining amounts in controversy are sufficient to satisfy the
$75,000 jurisdictional prerequisites of 28 U.S.C. § 1332. The question rests on
Count III, which seeks attorneys' fees under the License and Maintenance
Agreements.  Although the court is speculating to some extent in finding
jurisdiction, it cannot say to a "legal certainty that the plaintiff cannot recover
more than [$75,000]" under the circumstances presented. *Suber v. Chrysler Corp.,*
*104 F.3d 578, 583 (3d Cir.1997)* (citing *St. Paul Mercury Indemnity Co. v. Red Cab*
*Co., 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938)*).

 Having so concluded, the court recognizes that it is inefficient to have both this
court and the Georgia court handling different pieces of the same dispute.
Therefore, the court will order the parties to submit their respective positions on
transferring this action to the Northern District of Georgia pursuant to 28 U.S.C.
§ 1404.

   CONCLUSION

 For the reasons stated, plaintiff's motion to enjoin is denied and defendant's
motion to dismiss is granted in part and denied in part.

 An order shall issue.

 Not Reported in F.Supp., 1997 WL 699328 (D.Del.)

         **Motions, Pleadings and Filings (Back to top)**

• 1:97cv00243 (Docket) (May. 07, 1997)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)


C
Briefs and Other Related Documents
Miteq, Inc. v. Comtech Telecommunications Corp.D.Del.,2003.Only the Westlaw
citation is currently available.
                    United States District Court,D. Delaware.
                          MITEQ, INC., Plaintiff,
                                     v.
              COMTECH TELECOMMUNICATIONS CORP., Defendant.
                         No. Civ.A. 02-1336-SLR.

                             Jan. 23, 2003.


                            MEMORANDUM ORDER

ROBINSON, J.

                           I. INTRODUCTION

*1 On July 29, 2002, plaintiff Miteq, Inc. filed this action against defendant
Comtech Telecommunications, Corp. seeking a declaratory judgment that it does not
infringe U.S. Patent No. 5,666,646 ("the '646 patent") owned by a subsidiary of
defendant, or that the '646 patent is invalid. (D.I.1) Presently before the court
is defendant's motion to dismiss, stay, or transfer this action. (D.I.6) This court
has jurisdiction pursuant to 28 U.S.C. § § 1331 and 1338. For the reasons that
follow, the motion shall be granted.


                           II. BACKGROUND

Plaintiff is a Delaware corporation with its principal place of business in
Hauppauge, New York. (D.I. 14 at 5) Plaintiff designs and manufactures satellite
communications equipment, including the accused infringing products. (Id. at 7)
Defendant is a Delaware corporation with its principal place of business in
Melville, New York. (D.I.8) Comtech EF Data ("EF Data") is a wholly owned
subsidiary of defendant with its principal place of business in Tempe, Arizona.
(Id.) EF Data is the assignee of the '646 patent entitled "Radio Frequency (RF)
Converter System with Distributed Protection Switching and Method Transfer." (Id.)
Defendant and EF Data design and manufacture satellite communications equipment
utilizing the technology of the '646 patent.

On April 10, 2002, defendant filed a complaint against plaintiff in the United
States District Court for the District of Arizona alleging infringement of the '646
patent. (D.I. 7 at 3) However, defendant asserts that it did not serve plaintiff in
the Arizona case until August 1, 2002, in order to "permit a dialogue between the
parties." (Id.) Prior to being served in the Arizona case, plaintiff filed this
action and served defendant on July 29, 2002, seeking declaratory judgment of non-
infringement and invalidity of the '646 patent. (D.I.1) Defendant now seeks to
either dismiss this action, stay this case until resolution of the Arizona
litigation, or transfer this case to the District of Arizona. (D.I.7)

           © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)


                            III. DISCUSSION

More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-
filed rule" where "in all cases of federal concurrent jurisdiction the court which
first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine
Corp.*, 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver*, 22 U.S. (9 Wheat.)
532, 6 L.Ed. 152 (1824)). Consequently, the second filed action should be stayed or
transferred to the court where the first filed action is pending. *Peregrine Corp.
v. Peregrine Indus., Inc.*, 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon
Enterprises, Inc. v. Lowe's Companies, Inc.*, 2001 U.S. Dist. LEXIS 18547, Civil
Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound
judicial administration and promotes comity among federal courts of equal rank."
*E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir.1988). The
decision to transfer or stay the second action is within the discretion of the
trial court. *Id. at 972, 977.* However, invocation of the rule will usually be the
norm, not the exception. Courts must be presented with exceptional circumstances
before exercising their discretion to depart from the first-filed rule. *Id. at 979.*

*2 In this case, it is undisputed that the first-filed case in Arizona and the
present case involve the same patent and the same issues. Therefore, the burden is
on plaintiff to present some exceptional circumstances why the court should depart
from the first-filed rule. In support of its argument opposing transfer, plaintiff
states that all of its relevant witnesses reside in New York, all the documents and
records related to the accused product are in New York, and the "center of gravity"
of the case is New York. (D.I. 14 at 6-7) None of these arguments show that there
are any exceptional circumstances requiring the court to depart from the first-
filed rule.

Furthermore, defendant makes the same arguments in favor of transferring the case
to Arizona. It argues that all of its relevant witness, documents, and products are
either in or near Arizona. Therefore, by not allowing a transfer, the court would
simply be transferring the inconvenience of traveling from plaintiff to defendant.
Mere inconvenience to one party does not rise to the level of exceptional
circumstances that would require the court to depart from the well-established
principles of the first-filed rule. Since the patent litigation action in Arizona
was filed first, transfer of the subsequently filed Delaware action will promote
judicial administration and consistency of results.


                            IV. CONCLUSION

For the reasons stated, at Wilmington, this 23rd day of January, 2003, IT IS
ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. Defendant's motions to dismiss and stay (D.I.6) are denied as moot.

3. The above-captioned action shall be transferred to the United States District
Court for the District of Arizona.

          © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
Not Reported in F.Supp.2d                    .                        Page 3
Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)
```

```
D.Del.,2003.
Miteq, Inc. v. Comtech Telecommunications Corp.
Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)
```

Briefs and Other Related Documents (Back to top)

• 1:02CV01336 (Docket) (Jul. 29, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB 4**

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

C

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.


                    United States District Court, D. Delaware.
                  UNITED STATES SURGICAL CORPORATION, Plaintiff,
                                        v.
                           Frank LITVACK, Defendant.
                             No. Civ.A. 99-88-GMS.

                               Dec. 30, 1999.
    Edward P. Welch, and Paul J. Lockwood, of Skadden, ARPS, Slate, Meagher & Flom
LLP, Wilmington, Delaware, George A. Zimmerman, and W .H. Ramsey Lewis, of Skadden,
ARPS, Slate, Meagher & Flom LLP, New York, New York, for Plaintiff, of counsel.

    Peter J. Walsh, Jr., and Kevin R. Shannon, of Potter, Anderson & Corroon LLP,
Wilmington, Delaware, Christopher L. Rudd, and Donald R. Brown, of Manatt, Phelps &
Phillips, Los Angeles, California, for Defendant, of counsel.

                                    OPINION

    SLEET, J.

    I. INTRODUCTION.

    *1 On February 2, 1999, the United States Surgical Corporation ("U.S.Surgical")
filed a complaint against Dr. Frank Litvack with this court, asking for a
declaratory ruling on the parties' rights and obligations under a merger agreement
between U.S. Surgical and Progressive Angioplasty Systems, Inc. ("PAS"). Dr.
Litvack is a former director and principal shareholder of PAS. The court may
properly exercise subject matter jurisdiction over this matter since the parties
are citizens of different states and the amount in controversy exceeds $75,000. See
28 U.S.C. § 1332 (1994).

    On April 1, 1999, Dr. Litvack filed a motion to dismiss the action for lack of
personal jurisdiction and for improper venue. In the alternative, Dr. Litvack
requested a transfer of the matter to the Northern District of California or a stay
of proceedings pending the resolution of a substantially similar action filed in
the California Superior Court in and for San Mateo County ("the California
action"). The California action, which was filed by several former shareholders of
PAS, includes claims against U.S. Surgical for breach of contract and the implied
covenant of good faith and fair dealing as well as claims against U.S. Surgical's
parent company, Tyco International, Ltd. ("Tyco"), for, inter alia, fraud and
intentional interference with contractual relations.

    Given the existence of the more comprehensive California action, the court has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 2
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

decided *sua sponte* that it will not exercise its discretionary jurisdiction over
this declaratory judgment action and will, therefore, will dismiss U.S. Surgical's
complaint. [FN1] As a result, Dr. Litvack's motions are moot. The following
sections explain the basis for the court's reasoning in greater detail.

> FN1. Because the court raised this issue with the parties on its own motion,
> they were allowed to provide supplemental briefing on the matter.

II. BACKGROUND.

On February 4, 1997, U.S. Surgical entered into a merger agreement with PAS,
formerly a Delaware corporation with its principal place of business in California.
After the merger, PAS became a division of U.S. Surgical and continued its historic
business under the name Vascular Therapies. Pursuant to the terms of the merger
agreement, U.S. Surgical issued $75 million in its stock to the shareholders of PAS
in exchange for their PAS stock. In addition U.S. Surgical agreed to issue up to
$75 million in its stock to the former PAS shareholders upon the achievement of
certain financial milestones.

In May of 1998, U.S. Surgical was acquired by Tyco, a Bermuda corporation.
Pursuant to the terms of this merger agreement, the former shareholders of PAS
agreed to exchange their U.S. Surgical stock for Tyco stock, while Tyco agreed to
assume U.S. Surgical's contractual obligations to the former shareholders of PAS.
However, in January of 1999, the Vascular Therapies division was completely shut
down. On January 28, 1999, Dr. Litvack wrote a letter to Mr. R. Gilleland, the
President and CEO of Tyco Healthcare, on behalf of the controlling shareholders of
the former PAS. In the letter, Dr. Litvack claimed that U.S. Surgical had
materially breached the terms of its merger agreement with PAS by shutting down the
Vascular Therapies division. Dr. Litvack also requested approximately $68 million
in "former earn out consideration" payable in Tyco stock.

*2 Less than one month later, U.S. Surgical filed a complaint against Dr. Litvack
in this court. The complaint itself asks for declaratory relief-specifically, a
ruling that U.S. Surgical's decision to shut down Vascular Therapies did not
violate the terms and conditions of the merger agreement between U.S. Surgical and
PAS and that, as a result, U.S. Surgical does not owe any further consideration to
Dr. Litvack or the shareholders who he may represent.

On March 23, 1999, approximately seven weeks after this action was filed, some of
the former controlling shareholders of PAS filed a lawsuit against U.S. Surgical
and Tyco in the California Superior Court. This lawsuit, the California action,
alleges breach of contract as well as breach of the covenant of good faith and fair
dealing arising out of the merger agreement between U.S. Surgical and PAS. The
California action also includes additional claims of tortious interference with
contractual relations and common law fraud against Tyco. On December 9, 1999, Dr.
Litvack was allowed to join this lawsuit as a plaintiff by joint stipulation of the
parties.

III. DISCUSSION.

The Declaratory Judgment Act provides that a district court "may declare the
rights and other legal relations of any interested party seeking such declaration."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 3
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

28 U.S.C. § 2201(a) (1994). As this language implies, a district court has
discretion in deciding whether or not to entertain a declaratory judgment action.
See, e.g., Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (citing Public Serv.
Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 (1952)). For example, a district
court may justifiably stay or dismiss a declaratory judgment action in favor of a
similar action pending in state court to avoid duplicative litigation and the
accompanying waste of scarce judicial resources. See Brillhart v. Excess Insurance
Co., 316 U.S. 491 (1942); see also NYLife Distributors, Inc. v. Adherence Group,
Inc., 72 F.3d 371, 376-377 (3d. Cir.1995) (citing Brillhart ).

 The court has this inherent power because, apart from being a wasteful exercise,
duplicative litigation creates a "serious potential for spawning an unseemly and
destructive race to see which forum can resolve the same issues first." See Arizona
v. San Carlos Apache Tribe of Arizona, 463 U.S. 545, 567 (1983). For this very
reason, the federal courts tend to disapprove of litigants who use the Declaratory
Judgment Act as a means for winning the "race for res judicata," especially when
there is a virtually identical action pending in state court. See, e.g., Terra Nova
Ins. Co. Ltd. v. 900 Bar, Inc., 887 F.2d 1213, 1224-25 (3d Cir.1989) (citing 6A
Moore's Federal Practice ¶ 57.08[5], at 57-50 (2d ed.1987)).

 Here, because it appears that U.S. Surgical has used the Declaratory Judgment Act
in an attempt to win just such a race, the court will use its discretion to dismiss
the complaint.

 A. The Terra Nova Analysis.

 *3 In Terra Nova, the Third Circuit articulated several factors which a district
court must consider when determining whether to stay or dismiss an action for
declaratory relief in deference to a similar state lawsuit. 887 F.2d at 1224; see
also National Union Fire Ins. Co. of Pittsburgh v. Freeport-McMoran, Inc., 767
F.Supp. 568, 571 (D.Del.1991) (citing Terra Nova ). All of these factors weigh in
favor of dismissing U.S. Surgical's complaint.

 1. The breadth of the state court proceedings.

 First, the court should examine the adequacy of the state court proceedings in
order to determine "whether the state suit presents the same issues, not governed
by federal law, between the same parties." See Terra Nova, 887 F.2d at 1224. In
this case, the California action covers more issues and involves more parties than
this lawsuit. Cf. National Union, 767 F.Supp. at 571 (noting that "the state court
action is broader than the declaratory judgment action in this court"). In
particular, in addition to alleging breach of contract and breach of the covenant
of good faith and fair dealing, the complaint in the California action also
includes claims for, inter alia, intentional interference with contractual
relations and common law fraud against Tyco, who is not a party to this action.
Furthermore, Dr. Litvack is now a party to both lawsuits. As a result, he will be
bound by the outcome of the California action. Cf. Agora Syndicate Inc. v. Robinson
Janitorial Specialists, Inc., 149 F.3d 371, 373 (5th Cir.1998) (explaining that
"parallel state proceedings" require an identity of parties in the federal and
state suits).

 2. The adequacy of the state court proceedings.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

  Second, the court must be convinced that the state court proceeding will serve as an adequate forum for determining and protecting the rights of the parties. *See United States v. Commonwealth of Pennsylvania Dept. of Envtl. Resources, 923 F.2d 1071, 1076-77 (3d Cir.1991)* (cited *National Union, 767 F.Supp. at 573).* Here, there is no indication that the California Superior Court will be unable to satisfactorily resolve the claims of all the interested parties or that any of the parties in this case will be unable to raise their claims or defenses in the California action. *See National Union, 767 F.Supp. at 573.* Furthermore, it does not seem that the legal issues in this case are so complex or involve such unique aspects of Delaware law that the California court will be unable to properly address them. There is also no indication that the California Superior Court will not reach the merits of the dispute between the parties. *See Pennsylvania Dept. of Envtl. Resources, 923 F.2d at 1076.* In fact, in order to address the breach of contract claim, the California court will have no other choice but to address the merits of the dispute between Dr. Litvack and U.S. Surgical. Therefore, this court has no doubt that the California Superior Court will serve as an adequate forum for the resolution of the issues raised in this lawsuit. [FN2]

    FN2. Thus, while U.S. Surgical argues that the California Superior Court is not an adequate forum for the resolution of this dispute because only this court has jurisdiction over all parties and potential third-party beneficiaries, the court is not persuaded. In particular, the court notes that U.S. Surgical bases its argument solely on the *permissive* forum selection clause contained within its merger agreement with PAS. This clause states that "any Action arising out of this Agreement *may* be brought ... in any competent court of the State of Delaware or in any competent court of the United States located within the State of Delaware." (emphasis added). As the explicit language of this clause implies, while a legal action arising out of the merger agreement between U.S. Surgical may be brought in Delaware, it can also be brought elsewhere. The very presence of the California action confirms this understanding. Thus, contrary to U.S. Surgical's assertions, this court is not the only one with jurisdiction over the parties and potential third-parties beneficiaries to the contract.

  3. The governing law.

  *4 Third, the court must consider "whether state or federal law governs this dispute." *See National Union, 767 F.Supp. at 571-72.* Here, Delaware state law governs the merger agreement between PAS and U.S. Surgical. Thus, even though this court might be more familiar with the underlying principles of Delaware law which govern this dispute, *see Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509 (1947),* it is important to note that the governing law in this case is not federal law. As a result, this court can find "no *federal* interest in resolving this dispute in a federal court rather than in a state court." *See National Union, 767 F.Supp. at 572* (emphasis added). For this reason, the court will not allow U.S. Surgical to use the Declaratory Judgment Act as a means of "furnish[ing] a new choice of tribunals or ... draw[ing] into the federal courts the adjudication of causes properly cognizable by courts of the states." *See Travelers Ins. Co. v. Davis, 490 F.2d 536, 543 (3d Cir.1974)* (citing *Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 324 (4th Cir.1937)).* In other words, if U.S. Surgical was truly intent on seeking a conclusive interpretation of Delaware law, then it seems that it would have filed

Not Reported in F.Supp.2d                                    Page 5
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

its declaratory action in either the Delaware Court of Chancery or the Delaware
Superior Court instead of in federal court.

4. Additional factors.

In addition to these three factors, the court must also consider: (a) whether a
declaratory ruling by a federal court will resolve the uncertainty of obligation
which gave rise to the present controversy; (b) the public interest in settlement
of the uncertainty of this obligation; © the convenience of the parties in
proceeding in this forum; and (d) the availability and convenience of other
remedies. See *Department of Envtl. Resources, 923 F.2d. at 1075* (citing, *inter
alia, Terra Nova, 887 F.2d. at 1224).*

a. The effect of a declaratory ruling by this court.

Because the complaint filed in the California action contains additional claims
and parties that are not present in this lawsuit, it seems that a declaratory
ruling by this court would not definitively resolve all of the disputes between the
parties. For example, even if this court concluded that U.S. Surgical did not
breach the terms of its merger agreement with PAS, there is still the question of
whether the implied covenant of good faith and fair dealing was breached in
addition to the questions of whether Tyco committed fraud or intentionally
interfered with the contractual relations of the former PAS shareholders.
Furthermore, even if a ruling by this court would resolve these issues, it is not
clear which of the two actions would be the first to go to trial. As a result,
allowing this lawsuit to proceed while the California action was also moving
forward would seem to encourage the very race for res judicata which the Supreme
Court and the Third Circuit have tried to discourage. See *San Carlos Apache Tribe,
463 U.S. at 567; Terra Nova, 887 F.2d at 1224-25.*

b. The public interest.

*5 Furthermore, while the public has no identifiable interest in whether this
controversy is adjudicated in state or federal court, the public does have an
interest in avoiding duplicative litigation which places an unnecessary drain on
the public fisc. See *National Union, 767 F.Supp. at 572.* Thus, as was the case in
*National Union,* the public's interest is not ultimately served by allowing this
declaratory judgment action to go forward. *Id.*

c. The convenience of the parties.

In addition, as his motion to transfer makes clear, Delaware is an extremely
inconvenient forum for Dr. Litvack. With the exception of being a former
shareholder of PAS, which was once a Delaware corporation before it merged with
U.S. Surgical, Dr. Litvack has no ties to the State of Delaware. He is a private
citizen who resides in California. Therefore, even though Delaware is a more
convenient forum for U.S. Surgical since it is based in Connecticut, the court
cannot help but note that U.S. Surgical is a multi-billion dollar company which is
already a party to the California action. Consequently, requiring U.S. Surgical to
litigate its dispute with Dr. Litvack in that forum would not seem to put the
company to any greater inconvenience. This approach, however, would greatly reduce
the inconvenience suffered by Dr. Litvack since he would only have to litigate in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                            Page 6
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

one forum; that one being his home state.

  d. The availability and convenience of other remedies.

  Finally, the Third Circuit has instructed the district courts to "**look with
disapproval upon any attempt to circumvent the laudable purposes of the
[Declaratory Judgment] Act**" in order to "**prevent the use of the declaratory action
as a method of procedural fencing or as a means to provide another forum in a race
for res judicata.**" See _Terra Nova_, 887 F.2d at 1224-25 (quoting 6A Moore's Federal
Practice ¶  57.05[5], at 57-50). In light of this directive, the court finds that
the dismissal of U.S. Surgical's complaint is the only appropriate remedy in this
case.

  Although U.S. Surgical points out that it filed this lawsuit before the California
action was initiated, this fact alone cannot save its case from dismissal.

  First, as Judge Schwartz has explained, "the discretion of a federal court [to
entertain a declaratory judgment action] should not turn on so mechanical a rule."
See _National Union_, 767 F.Supp. at 573. Instead, "[t]he real question ... is not
which action was commenced first but which will most fully serve the needs and
convenience of the parties and provide a comprehensive solution for the general
conflict." See 10A Wright & Miller, § 2758 at 638 (quoted in _National Union_ 767
F.Supp. at 573). As previously discussed, that action is the one pending in the
State of California, not the one here in Delaware.

  Second, like the defendant in _National Union_, U.S. Surgical filed this action in
anticipation of Dr. Litvack bringing suit. As previously discussed, on January 28,
1999, Dr. Litvack wrote a letter to the president and CEO of Tyco's healthcare
division, alleging that U.S. Surgical had materially breached the terms of its
merger agreement with PAS by shutting down the Vascular Therapies division. The
letter also requested roughly $68 million in Tyco stock in compensation for lost
earn out consideration. Although this letter did not expressly threaten suit, it
did state that Dr. Litvack's "attorney ha[d] sent several letters [to] and had a
number of phone conversations [with individuals at U.S. Surgical] to no tangible
effect." The letter concluded by expressing Dr. Litvack's "hope[ ] that the
shareholders of PAS will be treated fairly and that this matter can be resolved
expeditiously."

  *6 In direct response to this letter, U.S. Surgical filed this action less than
one month later. As the opening sentence of U.S. Surgical's February 19, 1999
letter to Dr. Litvack makes clear,
  In response to your January 28, 1999 letter threatening suit against United States
  Surgical Corporation ..., U.S. Surgical has commenced a lawsuit against you
  seeking a declaratory judgment on the claims that you asserted in your letter.

  Thus, U.S. Surgical clearly filed this lawsuit as a preemptive strike against the
one contemplated by Dr. Litvack. The words of the company's February 19, 1999
letter could not make this fact any more plain. In this light, U.S. Surgical's
decision to file this lawsuit as a preemptive strike against Dr. Litvack serves as
a perfect illustration of the type of use of the Declaratory Judgment Act which the
Third Circuit has criticized. See _Terra Nova_, 887 F.2d at 1224-25. For "[w]hen a
federal declaratory judgment action has been filed in apparent anticipation of the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 7
Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)
(Cite as: 1999 WL 33220034 (D.Del.))

other pending [state] proceeding, equitable considerations militate toward
'allowing the later filed action to proceed to judgment in the plaintiff's chosen
forum.' ' *See National Union*, 767 F.Supp. at 573 (quoting *Hartford Accident &
Indem. Co v. Hop-On Intn'l Corp.*, 568 F.Supp. 1569, 579 (S.D.N.Y.1983)). Thus, as
was the case in both *National Union* and *Hartford Accident*, this court will not
reward U.S. Surgical for "winning the race to the courthouse which it completed
before its adversary heard the starting gun." *Id.* (quoting same). For these
reasons, the court will dismiss U.S. Surgical's complaint seeking declaratory
relief.

  III. CONCLUSION.

  Because considerations of fairness and efficiency warrant a dismissal of this
lawsuit in favor of the later-filed California action, this court has declined to
exercise its discretionary authority to entertain U.S. Surgical's claims for relief
under the Declaratory Judgment Act. For these reasons, the court need not address
the Dr. Litvack's motion to dismiss for lack of personal jurisdiction and for
improper venue or, in the alternative, to transfer or stay these proceedings. The
court will issue an order to this effect in conjunction with this opinion.

                                 *ORDER*
  For the reasons stated in the court's opinion of this date, IT IS HEREBY ORDERED
that:

  1. All claims within Plaintiff's complaint against Defendant are DISMISSED WITHOUT
PREJUDICE; and

  2. As a result, Defendant's Motion to Dismiss or, in the alternative, to Transfer
or Stay Proceedings (D.I.3) is DENIED AS MOOT.

  Not Reported in F.Supp.2d, 1999 WL 33220034 (D.Del.)


                 **Motions, Pleadings and Filings (Back to top)**

• 1:99CV00088 (Docket) (Feb. 19, 1999)

END OF DOCUMENT

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, Esquire, hereby certify that a true and correct copy of the foregoing Compendium of Unreported Opinions to Defendants' Opening Brief in Support of Motion to Dismiss was served this 10th day of October, 2006, upon the following in the manner indicated:

**VIA E-FILING**
**BY HAND-DELIVERY**

Allen M. Terrell, Jr., Esquire
Anne Shea Gaza
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE  19899-0551

**VIA FIRST CLASS MAIL**

D. Jeffrey Ireland, Esquire
Brian D. Wright, Esquire
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, SW
10 North Ludlow Street
Dayton, OH  45402

Rebecca L. Butcher (I.D. No. 3816)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE PROCTER & GAMBLE COMPANY
and THE GILLETTE COMPANY,

                    Plaintiffs,

VS.

SUSAN HARRISON; WILLIAM G.
HARRISON III, individually and as a
Trustee for the Harrison Family Trust
and The Emily Waldrup Trust;
CINDY NOSSER; KATHY ALLEN;
PAT ALLEN; TINA HARRISON;
W.G. HARRISON IV; LARRY
LUXENBERG; and JOHN SHELTON

C.A. NO. 1:06-CV-00443-UNA

**APPENDIX TO DEFENDANTS' MOTION TO DISMISS**

| | |
|---|---|
| **LANDIS, RATH & COBB, LLP** | **CHAIKEN & CHAIKEN, P.C.** |
| Daniel B. Rath (Bar No. 3022) | Robert L. Chaiken |
| Rebecca L. Butcher (Bar No. 3816) | (State Bar No. 04057830) |
| 919 Market Street, Suite 600 | Kenneth B. Chaiken |
| Wilmington, DE 19801 | (State Bar No. 04057800) |
| Telephone: (302) 467-4400 | One Galleria Tower |
| Facsimile: (302) 467-4450 | 13355 Noel Road, Suite 600 |
| | Dallas, Texas 75240 |
| | Telephone: (214)265-0250 |
| | Facsimile: (214)265-1537 |

Dated: October 10, 2006

## TABLE OF CONTENTS

Declaration of Robert L. Chaiken in Support of Motion to Dismiss.............................Tab 1

    Exhibit A:   Letter dated July 13, 2006 from D. Jeffrey Ireland to Robert L. Chaiken

    Exhibit B:   Letter dated July 20, 2006 from Kenneth B. Chaiken to D. Jeffrey Ireland

    Exhibit C:   Letter dated July 24, 2006 from D. Jeffrey Ireland to Kenneth B. Chaiken

    Exhibit D:   Letter dated July 25, 2006 from D. Jeffrey Ireland to Kenneth B. Chaiken

    Exhibit E:  Order Vacating Scheduling Order and Setting Hearing on the Procter & Gamble Company's Motion to Dismiss Plaintiffs' Complaint

    Exhibit F:   Letter dated October 2, 2006 from D. Jeffrey Ireland to Robert L. Chaiken with attached Affidavit of Susan S. Felder of Procter & Gamble

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE PROCTER & GAMBLE COMPANY<br>and THE GILLETTE COMPANY, | §<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| VS. | §<br>§ | C.A. NO. 1:06-CV-00443-UNA |
| SUSAN HARRISON; WILLIAM G.<br>HARRISON III, individually and as a Trustee<br>for the Harrison Family Trust and The Emily<br>Waldrup Trust; CINDY NOSSER; KATHY<br>ALLEN; PAT ALLEN; TINA HARRISON;<br>W.G. HARRISON IV; LARRY<br>LUXENBERG; and JOHN SHELTON | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## DECLARATION OF ROBERT L. CHAIKEN
## IN SUPPORT OF MOTION TO DISMISS

1. "My name is Robert L. Chaiken. I am of sound mind and I am fully competent and capable of making this declaration. I am over the age of twenty-one (21) years. I have personal knowledge of all of the facts stated in this declaration and they are all true and correct.

2. I am a citizen and resident of the State of Texas. I declare under penalty of perjury that the foregoing is true and correct.

3. I am one of the attorneys representing the individuals named as Defendants herein and who are also the Plaintiffs (hereinafter referred to as "Former Zooth Shareholders") in a suit styled and numbered as follows: Case No. 7-06CV-121-R; *Susan Harrison, et al. v. The Proctor & Gamble Company, et al.*; In the United States District Court, Northern District of Texas (removal of Cause No. 164,474-C; *Susan Harrison et al. v. The Proctor & Gamble Company, et al.*, In the 87th Judicial District Court, Wichita County, Texas) (hereinafter referred to as the "Texas lawsuit").

4. By virtue of my representation and involvement in the case, I am personally familiar with the events leading up to the filing of the instant lawsuit and the Texas lawsuit that is now pending

Declaration of Robert L. Chaiken                                                    Page 1

A-1

in the United States District Court for the Northern District of Texas.

5. On or about June 2, 2006, the Former Zooth Shareholders filed suit against The Proctor & Gamble Company, Taft, Stettinius & Hollister LLP and Thomas E. Grossman in the 89th District Court of Wichita Falls, Texas.

6. On or about July 13, 2006, I received a letter from D. Jeffrey Ireland on behalf of the Proctor & Gamble Company and The Gillette Company. A true and correct copy of the letter is attached as **Exhibit "A"** to the Appendix in Support of Defendants' Motion to Dismiss ("Appendix"). Among other things, Mr. Ireland alleged that the Former Zooth Shareholders were in breach of the Stock Purchase Agreement on account of their filing suit in Wichita Falls, Texas against Proctor & Gamble. The letter also demanded that the Former Zooth Shareholders dismiss their lawsuit or the two entities would "act accordingly to protect their rights under the Stock Purchase Agreement . . . ." (the "Agreement").

7. Subsequent to this letter, the parties began discussing the potential for settlement and the Former Zooth Shareholders agreed not to serve their lawsuit while these discussions were ongoing and while they were evaluating Mr. Ireland's assertion that the filing of suit in Texas constituted a breach of the Agreement. Counsel for the Former Zooth Shareholders believed that the parties were at a standstill while these discussions were ongoing. See the letter dated July 20, 2006, a true and correct copy of same which is attached hereto as **Exhibit "B"** to the Appendix. As a part of these discussions, we sought to ascertain from Mr. Ireland whether there had an actual assignment of the Stock Purchase Agreement by Gillette to Proctor & Gamble. See the July 20, 2006 Letter at **Exhibit "B."**

8. On or about July 21, 2006, counsel for the Former Zooth Shareholders learned from a news reporter, that Proctor & Gamble and Gillette had filed suit in Delaware against the Former

Zooth Shareholders. When we confronted counsel for Gillette and P&G about this development, he advised that he had never agreed to any kind of standstill and twice asserted that the suit was filed in Delaware in order "to level the playing field." See letters dated July 24 and 25, 2006, a true and correct copy of same which are attached hereto as **Exhibits "C"** and **"D"** to Appendix.

9. On or about July 25, 2006, Proctor & Gamble removed the Wichita Falls lawsuit to the Northern District of Texas where it was assigned cause number 7:06-CV-121-R. On August 16, 2006, Procter & Gamble filed a Motion to Dismiss Plaintiffs' Complaint, Transfer, or Stay premised, in part, on the Forum Selection Clause of the Agreement. The district court in Texas has set the motion for hearing on November 6, 2006. See the court's order, a true and correct copy of same which is attached hereto as **Exhibit "E"** to the Appendix

10. Attached as **Exhibit "F"** is a true and correct copy of the Affidavit of Susan Felder stating that there has been no assignment by Gillette to Procter & Gamble concerning the Stock Purchase Agreement.

Executed on October 10, 2006 in Dallas, Texas, United States of America.

Robert L. Chaiken

**EXHIBIT "A"**

A-4

# FARUKI IRELAND & COX P.L.L.
### ATTORNEYS AT LAW

CHARLES J. FARUKI
D. JEFFREY IRELAND
JEFFREY T. COX
RONALD I. RAETHER, JR
PAUL L. HORSTMAN
THOMAS R. KRAEMER
LAURA A. SANOM
JEFFREY S SHARKEY
MARTIN A FOOS

ROBERT P BARTLETT, JR

500 COURTHOUSE PLAZA, S.W
10 NORTH LUDLOW STREET
DAYTON, OHIO 45402

D Jeffrey Ireland
(937) 227-3710
djireland@ficlaw.com

BRADLEY D. ANDERSON
ERIN A. BAIR
JACQUELINE V BROWN
CHAD E. BURTON
DONALD E. BURTON
MELINDA K. BURTON
JOHN A. FISCHER
ROBERT W. GURRY
R. HOLTZMAN HEDRICK
ROBERT W. KIEFABER
KATHERINE A. MILTNER
MICHELE A. MURPHY
REBECCA M. OWEN
TIMOTHY G. PEPPER
K. LYNN POSEY
ANDREW J. REITZ
ERIN E. RHINEHART
ADAM V SADLOWSKI
ANGELA M. SINKOVITS
NICHOLAS M SMITH
ERIC P VOIGT
KATRINA L. WAHL
BRIAN D. WRIGHT
JULIE E ZINK

July 13, 2006

*VIA FACSIMILE;*
*CONFIRMATION COPY BY REGULAR MAIL*

Robert L. Chaiken, Esq.
Chaiken & Chaiken, P.C.
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, TX 75240

Re: Susan Harrison, et al. v. The Procter & Gamble Company, et al.,
Case No. 164,474-C; District Court, Wichita County, Texas

Dear Mr. Chaiken:

This letter is to provide you notice that your clients, Susan Harrison, William G. Harrison III, Cindy Nosser, Kathy Allen, Pat Allen, Tina Harrison, W.G. Harrison IV, Larry Luxenburg, John Shelton, the Harrison Family Trust, and the Emily Waldrip Trust have breached the June 4, 2004 Stock Purchase Agreement Between The Gillette Company, Zooth, Inc., and the Seller and Option Holders ("Agreement").

Section 12.12 of the Agreement provides exclusive jurisdiction to the state courts of Delaware or the United States District Court for the District of Delaware. This Section of the Agreement was breached by your clients by filing a lawsuit in the 89th District Court of Wichita County, Texas.

The Procter & Gamble Company and The Gillette Company demand that your clients dismiss immediately the above-referenced action. If a dismissal entry is not returned to us by July 17, 2006, The Procter & Gamble Company and The Gillette Company will act

**FARUKI IRELAND & COX** P.L.L.

Robert L. Chaiken, Esq.
July 13, 2006
Page Two

accordingly to protect their rights under the Agreement, including the recovery of all losses, costs, and fees associated with your clients' breach.

Very truly yours,

D. Jeffrey Ireland

DJI/vj

cc:    Taft, Stettinius & Hollister LLP (c/o George D. Molinsky, Esq. via Facsimile and Confirmation via U.S. Mail)

A-6

**EXHIBIT "B"**

A-7



CHAIKEN & CHAIKEN, P.C.
ONE GALLERIA TOWER
13355 NOEL ROAD. STE. 600
DALLAS. TEXAS 75240
P 214·265·0250
F 214·265·1537
WWW.CHAIKENLAW.COM

July 20, 2006

D. Jeffrey Ireland                            *Via Facsimile: 937/227-3717 and Regular Mail*
Faruki, Ireland & Cox, P.L.L.
500 Courthouse Plaza, S.W.
109 North Ludlow Street
Dayton, OH 45402

Re:    *Susan Harrison et al. v. The Proctor & Gamble Company, et al.*,
       Cause No. 164,474-C; In the 87th Judicial District Court, Wichita County, Texas

Dear Jeffrey:

I write in response to your letter to me dated July 18th, and preliminarily, to your letters to Robert Chaiken dated July 13th.

We are, indeed, continuing our efforts to formulate a response to your clients' settlement proposal which, as you know, was accompanied by their assertion that our clients have breached the applicable stock purchase agreement by suing one of your two clients– The Proctor and Gamble Company, in a Texas state court and not in Delaware. As I have represented to you, we will not take any further action in the Texas lawsuit, including causing your client to be served with process, until we have exhausted our settlement discussions or I otherwise have told you that we are proceeding with service or other activity in that suit.

Obviously, your clients' settlement position is tied to their and your perception of the strength and merit of your argument that the above-referenced Texas suit was improperly filed, so you will not be surprised to learn that our response to your clients' proposal will (as you undoubtedly contemplated and intended it would) give full consideration to that argument and its actual strength and merit.

In order for us to fully evaluate your position with regard to whether P&G was properly or improperly sued in Texas (we maintain, given what we know, that suing P&G in Texas was entirely appropriate), we require some documentation from you to support your contention that P&G is "a permitted assign" under the stock purchase agreement. Please deliver to us a true and correct copy of the applicable assignment and delegation instrument (s) along with true and correct copies of any related documents confirming, memorializing or relating to P&G's asserted status as a "permitted assign." Please be advised that without the requested documents, we will have no choice but to assume that our analysis of this issue to date is completely accurate and correct, and our response

A-8

D. Jeffrey Ireland
July 20, 2006
Page 2

to your settlement proposal will reflect that point of view. In contrast, if the additional information we have requested supports your contention, we may be forced to formulate a different settlement response.

I am assuming that you have the above-requested documents on hand or immediately available to you given their obvious importance in your formulation of your position statements to date. Accordingly, I will appreciate your forwarding those documents to me **immediately** so that we can deliver our response to your clients' settlement proposal and, as need be, to your other correspondence, by the targeted time of early next week (tomorrow will not be feasible).

In closing, I note that in at least one of your letters to us, you show the Taft Stettinius firm as a copied recipient of the letter. As you know, having received and reviewed a copy of our original petition in the above-referenced lawsuit, my clients are adverse to the Taft Stettinius firm. As I suspect you sent Taft Stettinius a copy of your correspondence to satisfy a notice requirement in the stock purchase agreement, please consider this as my clients' request that you and your client(s) deliver all such notices, in the future, to our firm in the place and stead of the Taft Stettinius firm. If you require any further information to effectuate this change to the notice provision of the agreement, kindly let me know. In any event, this will confirm that the Taft Stettinius firm and its lawyers are not authorized to act for or in the interests of any of our clients who, as you know, are the Plaintiffs in the pending lawsuit.

If you have any questions about or desire to discuss any of the foregoing, please do not hesitate to contact me.

Very truly yours,

Kenneth B. Chaiken

KBC:sl

cc:    Robert L. Chaiken (of the firm)
       Clients

**EXHIBIT "C"**

A-10

# FARUKI IRELAND & COX P.L.L.
## ATTORNEYS AT LAW

CHARLES J. FARUKI
D. JEFFREY IRELAND
JEFFREY T. COX
RONALD I. RAETHER, JR.
PAUL L. HORSTMAN
THOMAS R. KRAEMER
LAURA A. SANOM
JEFFREY S. SHARKEY
MARTIN A. FOOS

ROBERT P. BARTLETT, JR.

500 COURTHOUSE PLAZA, S.W
10 NORTH LUDLOW STREET
DAYTON, OHIO 45402

D. Jeffrey Ireland
(937) 227-3710
djireland@ficlaw.com

BRADLEY D. ANDERSON
ERIN A. BAIR
JACQUELINE V. BROWN
CHAD E. BURTON
DONALD E. BURTON
MELINDA K. BURTON
JOHN A. FISCHER
ROBERT W. GURRY
R. HOLTZMAN HEDRICK
ROBERT W. KIEFABER
KATHERINE A. MILTNER
MICHELE A. MURPHY
REBECCA M. OWEN
TIMOTHY G. PEPPER
K. LYNN POSEY
ANDREW J. REITZ
ERIN E. RHINEHART
ADAM V. SADLOWSKI
ANGELA M. SINKOVITS
NICHOLAS M. SMITH
ERIC P. VOIGT
KATRINA L. WAHL
BRIAN D. WRIGHT

July 24, 2006

*VIA FACSIMILE;*
*CONFIRMATION REGULAR MAIL*

Kenneth B. Chaiken, Esq.
CHAIKEN & CHAIKEN, P.C.
One Galleria Tower
13355 Noel Rd., Ste. 600
Dallas, TX 75240

> Re:    Susan Harrison, et al. v. The Procter & Gamble Company, et al.
>        Case No. 164,474-C; District Court, Wichita County, Texas

Dear Mr. Chaiken:

This letter responds to your July 24, 3006 letter; as you requested, it corrects the misstatements.

First, The Procter & Gamble Company and The Gillette Company filed a lawsuit against your clients in Delaware, the proper forum, on July 21, 2006. I also returned your telephone call on July 21, 2006. If you would have returned my telephone call, you would have learned of the lawsuit directly from me, rather than from a reporter. Further, I do not consider the filing of a lawsuit in the proper forum to be inconsistent with any representation. It simply leveled the playing field. It is also neither slimy nor dishonorable, especially where your clients initiated this tactic by filing a lawsuit against Procter & Gamble in Texas state court (the wrong forum), without notifying Procter & Gamble.

Second, as I explained, my letter dated July 13, 2006 discusses our legal position. It has not changed.

Third, The Procter & Gamble Company is an affiliate of Gillette (and Gillette is an affiliate of The Procter & Gamble Company, as defined by the Stock Purchase Agreement). There are other bases for P&G's right to benefit from the jurisdictional provision, which have been outlined in my previous correspondence, and will be addressed with the court, if necessary.

**FARUKI IRELAND & COX** P.L.L.

Kenneth B. Chaiken, Esq.
July 24, 2006
Page 2

        If you have any questions, please let me know.

                Very truly yours,

                D. Jeffrey Ireland

DJI/slr

EXHIBIT "D"

A-13

# FARUKI IRELAND & COX P.L.L.
### ATTORNEYS AT LAW

CHARLES J. FARUKI
D. JEFFREY IRELAND
JEFFREY T COX
RONALD I. RAETHER, JR
PAUL L. HORSTMAN
THOMAS R. KRAEMER
LAURA A. SANOM
JEFFREY S SHARKEY
MARTIN A FOOS

———————

ROBERT P BARTLETT, JR

500 COURTHOUSE PLAZA, S.W
10 NORTH LUDLOW STREET
DAYTON, OHIO 45402


D. Jeffrey Ireland
(937) 227-3710
djireland@ficlaw.com

BRADLEY D. ANDERSON
ERIN A. BAIR
JACQUELINE V BROWN
CHAD E BURTON
DONALD E BURTON
MELINDA K. BURTON
JOHN A. FISCHER
ROBERT W. GURRY
R. HOLTZMAN HEDRICK
ROBERT W. KIEFABER
KATHERINE A. MILTNER
MICHELE A. MURPHY
REBECCA M. OWEN
TIMOTHY G. PEPPER
K. LYNN POSEY
ANDREW J. REITZ
ERIN E. RHINEHART
ADAM V SADLOWSKI
ANGELA M. SINKOVITS
NICHOLAS M. SMITH
ERIC P VOIGT
KATRINA L. WAHL
BRIAN D. WRIGHT

July 25, 2006

***VIA FACSIMILE;***
***CONFIRMATION REGULAR MAIL***

Kenneth B. Chaiken, Esq.
CHAIKEN & CHAIKEN, P.C.
One Galleria Tower
13355 Noel Rd., Ste. 600
Dallas, TX 75240

> Re:    Susan Harrison, et al. v. The Procter & Gamble Company, et al.
>        Case No. 164,474-C; District Court, Wichita County, Texas
>        and The Procter & Gamble Company, et al. v. Susan Harrison, et al.
>        C.A. No. 06-443; District Court of Delaware

Dear Mr. Chaiken:

    This letter responds briefly to the two letters that you sent me yesterday afternoon.

    First, I am unaware of any "admission" on the part of The Procter & Gamble Company ("P&G") that it has interfered with Gillette's performance under the Stock Purchase Agreement. Mr. Franz of P&G, as well as myself, have made it clear that P&G did not interfere with the Stock Purchase Agreement, and it cannot interfere with the Agreement. As a matter of law, the lawsuit that you filed in Texas fails.

    The rejection of your demand, however, is not a rejection of settlement discussions. If your clients are interested in making a more reasonable settlement demand, then P&G and Gillette will certainly consider it.

    We did not agree to a "stand still." You agreed not to take any action to serve the Texas lawsuit, but I made no similar agreement on behalf of P&G and Gillette. The "clandestinely" filed lawsuit was simply an effort to level the playing field. I repeat, again, that if you had returned my telephone call on Friday, July 21, 2006 then I would have made you aware of the filing.

FARUKI IRELAND & COX P.L.L.

Kenneth B. Chaiken, Esq.
July 25, 2006
Page 2

       As to your suggestion that the parties should mutually agree upon service of process, we initiated redundant service yesterday afternoon (before receipt of your letters), including service on Mr. Molinsky because you do not represent all of the parties to the Stock Purchase Agreement. You should be receiving your copy of the Complaint soon. We also served the Secretary of State in Delaware. Nevertheless, we are willing to accept service of process as you suggest in exchange for your agreement to waive any defect in service on the Delaware suit.

       If you have any questions, please let me know.

               Very truly yours,

               D. Jeffrey Ireland

DJI/slr

A-15

EXHIBIT "E"

A-16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| SUSAN HARRISON, et al., | § | **FILED**<br>September 29, 2006 |
| | § | |
| Plaintiffs, | § | CLERK, U.S. DISTRICT COURT |
| | § | |
| vs. | § | Civil Action No: 7:06-cv-121-R |
| | § | |
| THE PROCTER & GAMBLE CO., et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER VACATING SCHEDULING ORDER AND SETTING HEARING ON THE PROCTER & GAMBLE COMPANY'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

On August 16, 2006, the Court became aware of Defendant The Procter & Gamble Company's intent to file a Motion to Dismiss Plaintiffs' Complaint. The Court, therefore, vacates its September 7, 2006, Scheduling Order (Dkt. No. 14) and sets Defendant's Motion to Dismiss for hearing.

The Court will hear arguments at **9:00 a.m. on November 6, 2006**, to be held at the United States Courthouse, 1000 Lamar Street, Wichita Falls, Texas.

Defendant The Procter & Gamble Company will have 15 minutes for argument and 5 minutes for rebuttal. Plaintiffs will have, collectively, 15 minutes to present argument.

ENTERED: September 29, 2006

It is so ORDERED.

*Jerry Buchmeyer*

_____
**JERRY BUCHMEYER**
**SENIOR DISTRICT JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

A-17

EXHIBIT "F"

A-18

# FARUKI IRELAND & COX P.L.L.
### ATTORNEYS AT LAW

CHARLES J. FARUKI
D. JEFFREY IRELAND
JEFFREY T COX
RONALD I. RAETHER, JR
PAUL L HORSTMAN
THOMAS R. KRAEMER
LAURA A. SANOM
JEFFREY S SHARKEY
MARTIN A FOOS
———
ROBERT P BARTLETT, JR

500 COURTHOUSE PLAZA, S.W
10 NORTH LUDLOW STREET
DAYTON, OHIO 45402

D  Jeffrey Ireland
(937) 227-3710
djireland@ficlaw com

BRADLEY D. ANDERSON
ERIN A. BAIR
JACQUELINE V BROWN
CHAD E BURTON
DONALD E BURTON
MELINDA K. BURTON
JOHN A. FISCHER
ROBERT W. GURRY
R. HOLTZMAN HEDRICK
ROBERT W. KIEFABER
KATHERINE A. MILTNER
REBECCA M. OWEN
TIMOTHY G. PEPPER
K. LYNN POSEY
ANDREW J. REITZ
ERIN E RHINEHART
ADAM V SADLOWSKI
ANGELA M. SINKOVITS
NICHOLAS M SMITH
ERIC P VOIGT
KATRINA L. WAHL
BRIAN D WRIGHT

October 2, 2006

*VIA FEDERAL EXPRESS*

Robert L. Chaiken, Esquire
CHAIKEN & CHAIKEN, P.C.
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas  75240

Re:    Susan Harrison, et al. v. The Procter & Gamble Company, et al.
       Case No. 7:06-CV-121-R; Northern District of Texas

Dear Robert:

Enclosed please find the Affidavit of Susan Felder per our discussion concerning the motion to dismiss.  If you have any questions, please let me know.

Very truly yours,

D. Jeffrey Ireland

DJI/lrc

c:    Brian D. Wright, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

SUSAN HARRISON, et al.,              :     CASE NO. 7:06-CV-121-R
                                        :
        Plaintiffs,            :     (Senior District Judge
                                        :     Jerry Buchmeyer)
v.                             :
                                        :
THE PROCTER & GAMBLE COMPANY,   :     **AFFIDAVIT**
et al.,                                  :
                                        :
        Defendants.         :

STATE OF OHIO        )
                       ) SS:
COUNTY OF HAMILTON  )

        Susan S. Felder, being first duly sworn deposes and says:

        1.     I am employed by The Procter & Gamble Company ("Procter & Gamble") as an Assistant Secretary. I am making this Affidavit based upon personal knowledge, and I am competent to testify in the matter stated below.

        2.     Attached as Exhibit 1 to this Affidavit is a true and accurate copy of the Form S-4 that Procter & Gamble filed with the Securities and Exchange Commission as part of its merger with The Gillette Company ("Gillette").

        3.     Attached as Exhibit 2 to this Affidavit is a true and accurate copy of the Certificate of Merger filed with the Delaware Secretary of State following the merger of Procter & Gamble and Gillette.

4.    Attached as Exhibit 3 to this Affidavit is a true and accurate copy of the

8-K that was filed with the Securities and Exchange Commission following the completion of

Procter & Gamble's merger with Gillette.

5.    There has been no assignment of the interest of Gillette in the Stock

Purchase Agreement.

6.    Neither Procter & Gamble nor its wholly-owned subsidiary, Gillette, has

witnesses or documents located in the state of Delaware that are relevant to this lawsuit.

Further affiant saith not.

_Susan S. Felder_
Susan S. Felder
Assistant Secretary

Sworn to before me and subscribed in my presence by the said _Susan S. Felder_

this _27_ day of September, 2006.

_Donna D. Quinn_
Notary Public

172501.1



DONNA D. QUINN
Notary Public, State of Ohio
My Commission Expires 11-16-07

2

A-21

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, Esquire, hereby certify that a true and correct copy of the foregoing Appendix to Defendants' Motion to Dismiss was served this 10th day of October, 2006, upon the following in the manner indicated:

**VIA E-FILING**
**BY HAND-DELIVERY**

Allen M. Terrell, Jr., Esquire
Anne Shea Gaza
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
P.O. Box 551
Wilmington, DE  19899-0551

**VIA FIRST CLASS MAIL**

D. Jeffrey Ireland, Esquire
Brian D. Wright, Esquire
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, SW
10 North Ludlow Street
Dayton, OH  45402

Rebecca L. Butcher (I.D. No. 3816)